Katherine K. O'Brien
Earthjustice
313 East Main Street
Bozeman, MT 59715
Phone:  (406) 586-9699
Fax:  (406) 586-9695
kobrien@earthjustice.org

Elizabeth Forsyth *(Pro Hac Vice Pending)*
Earthjustice
800 Wilshire Blvd., Suite 1000
Los Angeles, CA 90017
Phone:  (415) 217-2000
Fax:  (415) 217-2040
eforsyth@earthjustice.org

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

|  |  |
|---|---|
| KSANKA KUPAQA XAʾŁ₵IN, ROCK CREEK ALLIANCE, EARTHWORKS, MONTANA ENVIRONMENTAL INFORMATION CENTER, DEFENDERS OF WILDLIFE, SIERRA CLUB, and CENTER FOR BIOLOGICAL DIVERSITY;<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES FISH AND WILDLIFE SERVICE; CHAD W. BENSON, Kootenai National Forest Supervisor; and UNITED STATES FOREST SERVICE;<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      This case challenges the failure of the U.S. Fish and Wildlife Service ("FWS") and U.S. Forest Service to comply with the Endangered Species Act ("ESA") in approving commencement of the Rock Creek Mine project, a major industrial copper and silver mine proposed in the unspoiled Cabinet Mountains of northwest Montana.

2.      The Rock Creek Mine would tunnel beneath the Cabinet Mountains Wilderness—one of the original wilderness areas designated by Congress under the federal Wilderness Act and one of the region's last undeveloped habitats for grizzly bears and bull trout.  Both grizzly bears and bull trout are listed as threatened species under the ESA and both hold profound cultural and spiritual importance for the Ktunaxa (Kootenai) people, in whose aboriginal territory the mine would be built.

3.      The Rock Creek Mine would bring hundreds of people into the remote project area and involve mining and processing up to 10,000 tons of ore per day, seven days per week, for as long as 30 years, generating enough waste to fill a roughly 300-acre impoundment on the doorstep of the wilderness.  The decades-long project and its permanent industrial footprint would alter the wilderness environment forever and irreparably disturb land, waters, wildlife, and sources of traditional foods and medicines that are sacred to the Ktunaxa people.

1

4.      The ESA charges FWS and the Forest Service with ensuring that the Rock Creek Mine would not jeopardize the continued existence of grizzly bears or bull trout.  Plaintiffs—a coalition of traditional cultural leaders from the Ksanka Band of the Ktunaxa Nation and local, regional, and national conservation organizations—challenge the agencies' failure to satisfy that fundamental statutory duty.

5.      This is not the first time this Court has been called upon to remedy the defendant agencies' failures to comply with the ESA with regard to this project.  In 2005, this Court ruled that FWS's prior biological opinion concluding that the Rock Creek Mine would not jeopardize grizzly bears or bull trout violated the ESA.  Rock Creek All. v. U.S. Fish & Wildlife Serv., 390 F. Supp. 2d 993 (D. Mont. 2005) ("Rock Creek I").  FWS issued a new no-jeopardy biological opinion in 2006.  This Court upheld FWS's 2006 biological opinion but invalidated the Forest Service's authorization for the Rock Creek Mine based on its failure to adequately address project impacts on bull trout.  Rock Creek All. v. U.S. Forest Serv., 703 F. Supp. 2d 1152 (D. Mont. 2010) ("Rock Creek II"), aff'd 663 F.3d 439 (9th Cir. 2011).

6.      In 2017, FWS and the Forest Service determined that they must reinitiate formal consultation under the ESA concerning the mine's impacts on bull trout, based in part on the fact that the biological opinion upheld by this Court in

2010 had failed to consider a major impact that mining would have on bull trout—namely, permanent dewatering of their stream habitat.

7.      However, despite repeated requests from Plaintiffs, FWS refused to reinitiate formal consultation regarding the mine's impacts on grizzly bears to consider significant new grizzly bear mortality data indicating that the mine's mitigation plan cannot rationally be relied upon to neutralize the substantial mortality risks the mine poses to grizzlies.  Instead, in November 2017 FWS issued a supplement to its 2006 biological opinion in which it concluded—without acknowledging or considering the mortality data cited by Plaintiffs—that reinitiation of ESA consultation concerning grizzly bear impacts is not warranted and the agency's 2006 no-jeopardy determination remains valid.

8.      In this case, Plaintiffs challenge that FWS determination and the agencies' resulting failure to reinitiate ESA consultation regarding the mine's impacts on grizzly bears.  Plaintiffs also challenge the legality of FWS's 2017 bull trout biological opinion and the Forest Service's authorization for the first phase of the project in reliance on the challenged FWS decisions.

9.      This Court also has had to step in to ensure the defendant agencies' compliance with their ESA obligations regarding the nearby Montanore Mine, a second proposed copper and silver mine that threatens substantially the same adverse effects on grizzly bears and bull trout as the Rock Creek Mine.  In 2017,

3

this Court vacated the federal approvals for the Montanore Mine after determining that, among other legal violations, FWS had arbitrarily concluded that the Montanore project would not jeopardize grizzly bears or bull trout and the Forest Service had unlawfully relied on those FWS determinations to authorize the project.  Save Our Cabinets v. U.S. Fish & Wildlife Serv., 255 F. Supp. 3d 1035 (D. Mont. 2017).

10.     Despite the recent guidance provided by this Court, in their most recent approvals for the Rock Creek Mine, FWS and the Forest Service have again failed to satisfy their ESA obligations.  Specifically, the Defendants have violated the ESA by (1) ignoring evidence that the mine poses greater mortality threats to grizzly bears than the agencies assumed—evidence this Court held must be considered before the Defendants could approve the nearby Montanore Mine; (2) irrationally dismissing the Rock Creek mine's permanent adverse impacts on important bull trout populations; and (3) relying on a metric for authorized "take" of bull trout that this Court found illegal in its 2017 Save Our Cabinets ruling addressing the Montanore project.  The agency decisions challenged in this case reflect the Defendants' refusal to grapple with significant new evidence concerning the Rock Creek Mine's threats to protected wildlife and defy this Court's rulings in Save Our Cabinets.

4

## JURISDICTION AND VENUE

11.　　Plaintiffs bring this action pursuant to the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701-706, and the citizen suit provision of the ESA, 16 U.S.C. § 1540(g), which waive the Defendants' sovereign immunity.  As required by the ESA citizen suit provision, Plaintiffs sent FWS and the Forest Service a 60-day notice of their intent to sue on August 28, 2018.  See id. § 1540(g)(2)(A)(i).  The Forest Service, in consultation with FWS, responded by letter on October 23, 2018, but the Defendants have not remedied the legal violations alleged in this complaint.

12.　　This Court has jurisdiction over Plaintiffs' claims under 16 U.S.C. § 1540(g) and 28 U.S.C. § 1331 (federal question) and may issue a declaratory judgment and injunctive relief under 28 U.S.C. §§ 2201-2202.

13.　　Venue lies in the District of Montana, Missoula Division, because plaintiff Ksanka Kupaqa Xaʾɬȼin is based in Lake County, Montana; the lands at issue in this suit are located primarily in Sanders County, Montana; and a substantial part of the events giving rise to Plaintiffs' legal claims occurred in the District of Montana.  See 28 U.S.C. § 1391(e)(1); D. Mont. L.R. 1.2(c)(5).

## PARTIES

14.　　Plaintiff Ksanka Kupaqa Xaʾɬȼin (the Ksanka Crazy Dog Society) is an unincorporated organization based on the Flathead Indian Reservation in

Montana.  Ksanka Kupaqa Xaʾⱡ¢in is a traditional warrior society within the

Ksanka Band of the Ktunaxa (Kootenai) Nation.  The society's contemporary

membership consists of United States military veterans who play a leadership role

within the Ksanka community and serve as special stewards of their Nation's

spiritual and cultural traditions.  Society members use the Cabinet Mountains

Wilderness and adjacent national forest lands, including areas threatened by the

Rock Creek Mine, for traditional cultural, spiritual, and subsistence activities;

recreation; and family and community gatherings.  The lands and waters threatened

by the Rock Creek Mine lie within the aboriginal territory of the Ktunaxa people

and include areas of sacred importance to the Ksanka Kupaqa Xaʾⱡ¢in and their

broader community.  The Ksanka Kupaqa Xaʾⱡ¢in bear a unique responsibility

within their community to safeguard those lands and waters, and the wildlife they

support, for future generations.

15.    Plaintiff Rock Creek Alliance (the "Alliance") is a non-profit

organization with offices in Trout Creek, Montana, and Sandpoint, Idaho, that is

dedicated to protecting the Clark Fork-Pend Oreille watershed and the Cabinet

Mountains Wilderness from the adverse impacts of the proposed Rock Creek

Mine.  Alliance members, board members, and staff live, own property, and

recreate in and around the Cabinet Mountains, including the wilderness and

national forest lands and associated waters threatened by the Rock Creek Mine.

16.    Plaintiff Earthworks is a non-profit organization dedicated to protecting communities and the environment from the adverse effects of mineral and energy development.  Earthworks is headquartered in Washington, D.C., and has field offices across the country, including Missoula, Montana.  Earthworks members live and regularly recreate in northwest Montana, including the areas of the Cabinet Mountains threatened by development of the Rock Creek Mine.

17.    Plaintiff Montana Environmental Information Center ("MEIC") is a member-supported non-profit organization dedicated to protecting and restoring Montana's natural environment and protecting Montanans' constitutional right to a clean and healthful environment.  MEIC members recreate in and otherwise derive benefit from the public lands and waters in the Cabinet Mountains that are threatened by the Rock Creek Mine.

18.    Plaintiff Defenders of Wildlife ("Defenders") is a national nonprofit conservation organization headquartered in Washington, D.C., with offices throughout the country, including Missoula, Montana.  Defenders has more than 340,000 members, including roughly 1,500 in Montana.  Defenders is a science-based advocacy organization focused on conserving and restoring native species and the habitat on which they depend, and has been involved in such efforts since the organization's establishment in 1947.  Defenders' members and staff work and recreate on public lands in the Cabinet Mountains that are threatened by the Rock

Creek Mine.  In addition, Defenders has invested more than $600,000 to

implement more than 300 projects to reduce conflicts between humans and grizzly

bears, including several in the Cabinet-Yaak grizzly bear recovery area where the

Rock Creek Mine is proposed.

19.    Plaintiff Sierra Club is a national nonprofit organization with 67

chapters and roughly 3.5 million members and supporters, including approximately

3,000 members in Montana, dedicated to exploring, enjoying, and protecting the

wild places of the earth; to practicing and promoting the responsible use of the

earth's ecosystems and resources; to educating and enlisting humanity to protect

and restore the quality of the natural and human environment; and to using all

lawful means to carry out these objectives.  Sierra Club members recreate in and

value the Cabinet Mountains ecosystem and its public lands and waters for the

irreplaceable wildlife and outstanding recreational opportunities they provide.

20.    Plaintiff Center for Biological Diversity (the "Center") is a nonprofit

organization dedicated to the preservation, protection, and restoration of

biodiversity, native species, and ecosystems.  The Center was founded in 1989 and

is based in Tucson, Arizona, with offices throughout the country.  The Center

works through science, law, and policy to secure a future for all species, great or

small, hovering on the brink of extinction.  The Center is actively involved in

species and habitat protection issues and has more than 68,000 members

throughout the United States and the world, including 375 members in Montana.
Center members recreate in and around the Cabinet Mountains on public lands
threatened by the proposed Rock Creek Mine.

21.    Plaintiffs have longstanding interests in the preservation and recovery
of bull trout and grizzly bears in the Northern Rocky Mountains region, including
the Cabinet Mountains and broader Cabinet-Yaak ecosystem in northwest
Montana.  Over a period of decades, Plaintiffs have invested in the protection and
recovery of bull trout and grizzly bears in the region through a variety of actions
including public outreach and education, investment in conflict reduction
measures, scientific analysis, advocacy, and when necessary, litigation.  Plaintiffs
have participated actively in available public comment processes concerning the
proposed Rock Creek Mine and its effects on bull trout and grizzly bears, including
by filing extensive comments on the proposed and final environmental impact
statements and draft record of decision for the Rock Creek Mine issued by the U.S.
Forest Service, and by submitting multiple requests to the agencies for ESA-
compliant consultation regarding the mine's impacts on grizzly bears and bull
trout.

22.    Plaintiffs' members, staff, and volunteers use and enjoy the Cabinet
Mountains Wilderness and surrounding national forest lands for a wide range of
activities, including traditional cultural, subsistence, and spiritual practices;

recreational pursuits such as hiking, camping, backpacking, bird watching, and wildlife watching (including observation of bull trout and grizzly bears); as well as spiritual renewal and aesthetic enjoyment.  Plaintiffs' members, staff, and/or volunteers have viewed bull trout and grizzly bears or signs of grizzly bear presence in and around the Cabinet Mountains Wilderness and have engaged in extensive scientific, educational, and advocacy efforts aimed at maintaining a healthy and intact ecosystem in the Cabinet Mountains that supports native fish and wildlife.

23.    By issuing biological opinions and a record of decision that allow the Rock Creek Mine project to proceed in a manner that will harm threatened grizzly bears and bull trout in the Cabinet Mountains and without rationally ensuring that the project will not jeopardize those species, the Defendants will harm Plaintiffs' interests in viewing bull trout and grizzly bears and maintaining a healthy and intact ecosystem in the Cabinet Mountains that supports the full complement of native wildlife.  Accordingly, the legal violations alleged in this complaint cause direct injury to the cultural, spiritual, aesthetic, conservation, recreational, scientific, educational, and wildlife preservation interests of the Plaintiffs and their members, staff, and volunteers.

24.    Unless Plaintiffs' requested relief is granted, the cultural, spiritual, aesthetic, conservation, recreational, scientific, educational, and wildlife

10

preservation interests of Plaintiffs and their members, staff, board members, and volunteers will be adversely and irreparably injured by the Defendants' failure to comply with federal law.  These are actual, concrete injuries that are traceable to Defendants' conduct and would be redressed by the requested relief.  Plaintiffs have no adequate remedy at law.

25.     Defendant U.S. Fish and Wildlife Service is an agency of the United States Department of Interior and is responsible for administering the ESA with regard to freshwater aquatic and terrestrial species, including bull trout and grizzly bears.

26.      Defendant Chad W. Benson is the acting United States Forest Service Supervisor for the Kootenai National Forest, in which a majority of the activities and environmental impacts associated with the Rock Creek Mine will occur.  The Kootenai National Forest Supervisor is identified as the responsible federal official for authorization and oversight of the mine project and signed the challenged Record of Decision approving phase one of the project.

27.     Defendant U.S. Forest Service is an agency of the United States Department of Agriculture and is responsible for the management and protection of the Cabinet Mountains Wilderness and Kootenai National Forest.  In that capacity, the Forest Service has jurisdiction and responsibility to authorize the Rock Creek

11

Mine project and ensure the project's compliance with the ESA and other

applicable laws.

## LEGAL BACKGROUND

28.     "The ESA is 'the most comprehensive legislation for the preservation

of endangered species ever enacted by any nation.'  It represents a commitment 'to

halt and reverse the trend toward species extinction, whatever the cost.'" Ctr. for

Biological Diversity v. Zinke, 900 F.3d 1053, 1059 (9th Cir. 2018) (quoting Tenn.

Valley Auth. v. Hill, 437 U.S. 153, 180, 184 (1978)) (internal citation omitted).

29.     To that end, section 7(a)(2) of the ESA imposes on federal agencies

such as the Forest Service a substantive duty to ensure that actions they authorize

or carry out are not likely to jeopardize listed species or destroy or adversely

modify critical habitat designated for such species.  16 U.S.C. § 1536(a)(2).  An

agency action "jeopardizes" a protected species if it "reasonably would be

expected, directly or indirectly," to reduce appreciably the species' likelihood of

survival or recovery "by reducing the reproduction, numbers, or distribution of that

species."  50 C.F.R. § 402.02; see Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries

Serv., 524 F.3d 917, 932 (9th Cir. 2008) (holding that significant impairment of

species' recovery prospects alone may constitute jeopardy).

30.     Before undertaking or authorizing an action that may affect ESA-

listed species or their critical habitat, the Forest Service must consult with the

appropriate expert fish and wildlife agency, which is FWS in the case of grizzly bears and bull trout.  See 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.01(b).  The formal consultation process culminates in FWS's issuance of a biological opinion, or "BiOp," reflecting FWS's determination—based on "the best scientific and commercial data available"—of whether the proposed action will jeopardize a listed species or destroy or adversely modify designated critical habitat.  16 U.S.C. § 1536(a)(2); see 50 C.F.R. § 402.14.

31.    If FWS concludes that a proposed action is likely to jeopardize a listed species, the action may not proceed.  See 16 U.S.C. § 1536(a)(2).  FWS must determine whether a "reasonable and prudent alternative" exists that would avoid jeopardy.  Id. § 1536(b)(3)(A).

32.    If FWS concludes that implementing a proposed action (or a reasonable and prudent alternative) will not jeopardize a protected species but will nevertheless result in "take" of such species, the agency must issue an incidental take statement with its BiOp.  50 C.F.R. § 402.14(i)(1).  Under the ESA, "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" a protected species "or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  Sections 9 and 10 of the ESA prohibit the taking of listed species unless specifically authorized in an incidental take statement.  Id. §§ 1538(a)(1)(B), 1539.  The amount of take authorized in an incidental take statement must provide an

effective "'trigger' that, when reached, results in an unacceptable level of incidental take ...." Ariz. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv., 273 F.3d 1229, 1249 (9th Cir. 2001). In that circumstance, the protection from take liability provided by the incidental take statement lapses and the federal agencies must re-initiate consultation to ensure that the actual extent of take resulting from the action will not jeopardize the affected species. Id.; see 50 C.F.R. § 402.16(a).

33.     The Forest Service violates the ESA if it approves or implements an action in reliance on a legally flawed biological opinion or fails in its approval or implementation decision "to discuss information that would undercut the [biological] opinion's conclusion." Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt., 698 F.3d 1101, 1127-28 (9th Cir. 2012); accord Save Our Cabinets, 255 F. Supp. 3d at 1063.

34.     The agencies' ESA obligations do not end with FWS's issuance of a biological opinion for a particular action, or with the Forest Service's issuance of an authorization for the action. Instead, the agencies must reinitiate formal consultation where, among other circumstances, the amount of take authorized in the incidental take statement is exceeded or where "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16. "The duty to reinitiate consultation lies with both the action agency and the consulting agency." Salmon

14

Spawning & Recovery All. v. Gutierrez, 545 F.3d 1220, 1229 (9th Cir. 2008)

(citing 50 C.F.R. § 402.16).  "Reinitiation of consultation requires … the FWS …

to issue a new Biological Opinion before the agency action may continue."  Envtl.

Prot. Info. Ctr. v. Simpson Timber Co., 255 F.3d 1073, 1076 (9th Cir. 2001) (citing

Mt. Graham Red Squirrel v. Madigan, 954 F.2d 1441, 1451 (9th Cir. 1992)).

## FACTUAL BACKGROUND

### I.   THE ROCK CREEK MINE

35.   The Rock Creek Mine is a copper/silver mine project proposed

beneath and adjacent to the Cabinet Mountains Wilderness in northwest Montana.

Today, the landscape comprising the Cabinet Mountains Wilderness and

surrounding national forest lands is characterized by unspoiled expanses of

glaciated peaks, forested valleys, and rivers and streams that are among the purest

waters in the continental United States.  The area is part of the aboriginal territory

of the Ktunaxa Nation, and the specific areas threatened by the Rock Creek Mine

include sites that are sacred to the Ktunaxa people and are used for traditional

spiritual, cultural, and subsistence purposes.

36.   The wilderness and national forest lands threatened by the mine are

home to countless plant species and abundant native wildlife, including mountain

goats, bighorn sheep, pikas, wolverines, elk, moose, deer, mountain lions, and

wolves.  In addition, those lands provide a last refuge for the imperiled Cabinet-

Yaak grizzly bear population, and the streams that traverse those lands provide one of the last remaining undeveloped habitats for the region's imperiled population of bull trout.

37.    In the midst of this wild landscape, the Rock Creek Mine project proposes mining beneath the wilderness and constructing ore-processing, wastewater treatment, mine-waste storage, and other industrial facilities on adjacent lands.  These facilities would process up to 10,000 tons of ore per day for as long as 30 years.  Mining waste would be warehoused permanently on site in a tailings storage facility covering more than 300 acres.

38.    Among other adverse environmental impacts, mine development is predicted to permanently dewater streams in the project area—including streams that are occupied by, and are designated as critical habitat for, bull trout—and wilderness streams designated as "Outstanding Resource Waters" under Montana law.  In addition, mine development would bring hundreds of people into the remote project area, increasing the risk of human-caused mortality of grizzly bears.

39.    FWS completed its first biological opinion for the Rock Creek Mine in December 2000.  At that time, FWS concluded that the project would jeopardize the survival and recovery of grizzly bears, but not bull trout.  In light of its jeopardy determination for grizzly bears, FWS developed a reasonable and prudent alternative consisting of additional mitigation requirements intended to address the

16

combined threats to grizzlies from simultaneously developing both the Rock Creek Mine and the Montanore Mine.

40.   In 2001, the Forest Service issued a record of decision approving the Rock Creek project in reliance on FWS's analysis.  In March 2002, however, FWS withdrew its biological opinion in response to litigation and the Forest Service subsequently withdrew its record of decision.

41.   FWS issued a second biological opinion for the Rock Creek Mine in May 2003.  In that decision, FWS concluded that the Rock Creek Mine would not jeopardize grizzly bears or bull trout and would not adversely modify bull trout critical habitat proposed for designation in the area.

42.   The Forest Service issued another record of decision approving the project in June 2003.  But in March 2005, this Court ruled that the 2003 BiOp violated the ESA and vacated the agencies' approvals for the mine.  Rock Creek I, 390 F. Supp. 2d at 1011.

43.   FWS issued a third biological opinion for the Rock Creek Mine in October 2006, in which it again concluded that the mine project would not jeopardize grizzly bears or bull trout nor destroy or adversely modify bull trout critical habitat.  FWS supplemented that biological opinion for the first time in September 2007 to address new information concerning conditions for grizzly bears in the project area and to correct and clarify aspects of its bull trout analysis.

17

The 2006 biological opinion was upheld in litigation, but this Court vacated and remanded the Forest Service's approval of the project based on violations of the Forest Service Organic Act and the National Environmental Policy Act ("NEPA"). See Rock Creek All. v. U.S. Forest Serv., Nos. CV 05-107-M-DWM and CV 08-028-M-DWM, 2010 WL 1287604 (March 29, 2010).

44.    In March 2015, while the Forest Service's remand process remained pending, Rock Creek Alliance, Earthworks, and the Idaho Council of Trout Unlimited requested that FWS and the Forest Service reinitiate section 7 consultation to consider new evidence concerning the mine's impacts on grizzly bears and bull trout that had emerged in the roughly nine years since FWS issued its 2006 BiOp.  Specifically, the groups contended that reinitiation of consultation was required for FWS to consider new information showing that (1) mine development would reduce flows in Rock Creek and East Fork Bull River, which was not anticipated or analyzed in the 2006 BiOp and would result in take of bull trout and permanent harm to their critical habitat; (2) restoration of fish passage over major dams in the Lower Clark Fork River watershed where the mine site is located, which FWS determined is essential for bull trout recovery in the region, had not occurred as FWS anticipated in the 2006 BiOp; and (3) the number of human-caused grizzly bear mortalities in the Cabinet-Yaak ecosystem had

18

increased between 2007-2015, despite implementation of the key mitigation measures called for in the 2006 BiOp to reduce such mortalities.

45.     FWS responded in May 2015, claiming that it cannot require the Forest Service to reinitiate ESA consultation and that FWS and the Forest Service would determine through the Forest Service's pending review under NEPA whether reinitiation of consultation would be required.

46.     In March 2017, the Forest Service determined that reinitiation of consultation on the Rock Creek Mine was required in light of the new evidence that mine development would permanently reduce stream flows in the Rock Creek and Bull River drainages as well as the designation of additional bull trout critical habitat in the project area in 2010.

47.     However, neither the Forest Service's reinitiation request to FWS nor FWS's response indicated that the agencies would evaluate new information concerning the efficacy of mine mitigation measures for preventing grizzly bear mortalities.  Accordingly, in August 2017, Rock Creek Alliance, Earthworks, Montana Environmental Information Center, Defenders of Wildlife, the Idaho Council of Trout Unlimited, Clark Fork Coalition, Sierra Club, and the Center for Biological Diversity sent FWS a letter requesting that the agencies expand the apparent scope of their consultation to address this information.  In that letter, the conservation groups invoked this Court's 2017 <u>Save Our Cabinets</u> ruling

invalidating the ESA analysis and authorizations for the Montanore Mine based on the agencies' failure to consider the very same data showing that a roll-out of the key conflict reduction measures in that mine's mitigation plan, which are substantially identical to those required for the Rock Creek project, had not yielded a reduction in grizzly killings in the Cabinet-Yaak ecosystem. FWS never responded to the letter.

48. Instead, in November 2017, FWS issued a revised biological opinion analyzing the effects of the Rock Creek Mine on bull trout only. U.S. Fish & Wildlife Serv., Revised Biological Opinion on the Effects of the Rock Creek Mine Project on Bull Trout and Designated Bull Trout Critical Habitat (Nov. 2017) ("2017 Bull Trout BiOp"). In its 2017 Bull Trout BiOp, FWS again concluded that—regardless of the new evidence that mining would permanently deplete stream baseflows in bull trout critical habitat in the project area, including in the uniquely important Bull River drainage—the project would not jeopardize bull trout nor destroy or adversely modify their critical habitat.

49. FWS simultaneously issued a second supplement to its 2006 grizzly bear BiOp that updated basic species information and articulated FWS's conclusion that no new information had emerged since 2006 that would warrant reinitiating formal consultation under the ESA. U.S. Fish & Wildlife Serv., Supp. No. 2 to the 2006 Biological Opinion on the Effects to Grizzly Bears from the

Rock Creek Mine Project (Nov. 2017) ("2017 Grizzly Bear Suppl.").  The 2017

Grizzly Bear Supplement does not acknowledge or address the data concerning

grizzly bear mortality risks and mitigation effectiveness that were the focus of the

conservation groups' 2015 and 2017 requests that FWS reinitiate and complete

ESA-compliant consultation on the mine.

## II.    FACTS RELATING TO GRIZZLY BEAR CLAIMS

50.    Grizzly bears once ranged throughout western North America, from

central Mexico to Alaska.  In the lower 48 states alone, there were an estimated

50,000 grizzly bears.  But as European settlers moved west around the turn of the

19th Century, their persecution of grizzly bears caused dramatic population

declines and substantial habitat loss.  By the 1930s, grizzlies had been extirpated

from 98% of their former range.  In 1975, two years after the ESA's enactment,

FWS listed grizzly bears across the lower-48 United States as a threatened species

under the ESA.  Amendment Listing the Grizzly Bear of the 48 Conterminous

States as a Threatened Species, 40 Fed. Reg. 31,734 (July 28, 1975).  FWS has

long recognized that in order to conserve and recover grizzly bears, it must reduce

human-caused mortality and curb habitat loss.

51.    FWS has determined that conserving each of the grizzly bear

populations that remain in the lower-48 is essential to the conservation of the

species.  One of these remnant populations persists in the Cabinet-Yaak ecosystem,

a roughly 2,600-square-mile area of primarily federal public lands in northwest Montana and northeastern Idaho, which includes the site of the proposed Rock Creek Mine. FWS affirmed in its 2017 Grizzly Bear Supplement that conserving the Cabinet-Yaak grizzly population is "essential to long-term survival and recovery of grizzly bears throughout a significant portion of [their] range in the U.S." as a whole. 2017 Grizzly Bear Suppl. 11.

52. FWS has established a population size of 100 individuals as a minimum recovery goal for the Cabinet-Yaak grizzly population.

53. Today, the population falls far short of that goal, even without large mines on the landscape. FWS's 2017 Grizzly Bear Supplement cites a minimum population estimate of just 41 grizzlies in the Cabinet-Yaak recovery zone—less than half the agency's recovery goal—based on captures of individual bears, genetic information, known mortality, and sightings of unique individuals between 2013-2015. The 2017 Supplement also cites a more optimistic population estimate of 55 bears, which is based on FWS's extrapolation from a 2012 population estimate generated by the United States Geological Survey. According to FWS, a population with fewer than 50-100 adults faces a high risk of extinction. Indeed, FWS scientists have stated that the grizzly bear population in the Cabinet-Yaak ecosystem persists at all only because the State of Montana has been "augmenting" it with grizzlies relocated from other areas.

22

54.     Today, human killing of grizzly bears in the Cabinet-Yaak ecosystem poses a leading threat to the grizzly population's survival and a major obstacle to significant population growth.  The risk of human-caused grizzly bear mortality increases proportionally with increased human presence in grizzly habitat.  Most of these killings involve poaching, hunters misidentifying grizzlies as black bears, or people shooting grizzly bears because of a real or perceived need for self-defense.

55.     From 1982-2017, more than 70% of known grizzly deaths in the Cabinet-Yaak ecosystem were caused by humans.  In its 2006 BiOp for the Rock Creek Mine, FWS observed that "[h]uman-caused mortality in the [Cabinet-Yaak ecosystem] is limiting population increase and contributing to extinction risk," and concluded that "[t]he existing human-caused mortality rate, given the small grizzly bear population, is not sustainable with or without the Rock Creek Mine."  U.S. Fish & Wildlife Serv., Biological Opinion on the Effects to Grizzly Bears, Bull Trout, and Bull Trout Critical Habitat from the Implementation of Proposed Actions Associated with Plan of Operation for the Revett RC Res., Inc. Rock Creek Copper/Silver Mine at A-95 ("2006 BiOp").  These conclusions were not disturbed in FWS's 2017 Grizzly Bear Supplement, in which FWS affirmed that "[i]mproving [grizzly bear] survival by reducing human-caused mortality is crucial for recovery of [the Cabinet-Yaak ecosystem] population."  2017 Grizzly Bear Suppl. 12 (quotation omitted). FWS's grizzly bear recovery plan establishes a goal

23

of zero human-caused mortality to facilitate recovery of the Cabinet-Yaak

population.

56.    In its 2006 BiOp—which, as supplemented in 2007 and 2017, remains

the operative BiOp assessing the mine's effects on grizzly bears—FWS recognized

that "[t]he most prominent direct and indirect effects on grizzly bears from the

implementation of the proposed Rock Creek Mine project would stem from the

influx of mine employees into th[e] relatively remote [project] area" and the

associated increase in human-caused mortality risk.  2006 BiOp at A-68, A-70.

FWS's determination that the Rock Creek Mine will not jeopardize grizzly bears

depends on the agency's conclusion that measures in the mine's mitigation plan

designed to reduce human-grizzly conflicts would more than offset the increased

risks of human-caused mortality associated with the mine.  Specifically, FWS

concluded that those mitigation measures would be sufficient to (1) ensure zero

grizzly bear killings attributable to the mine during the project's evaluation phase;

(2) ensure that no more than one grizzly bear will be killed as a result of the mine

project over its 35-year life; and (3) prevent the killing of more than one female

grizzly bear that would have occurred in the ecosystem in the mine's absence,

thereby ensuring that project implementation yields a net reduction in human-

caused grizzly bear mortality ecosystem-wide as compared to the pre-mine

baseline.

24

57.    In reaching these conclusions, FWS placed particular weight on the anticipated effectiveness of public education and outreach efforts, management measures for bear attractants, and conflict resolution work that would be implemented by two grizzly bear management specialists assigned to the Cabinet-Yaak ecosystem as part of the mine's mitigation plan.  Indeed, FWS's 2006 BiOp asserts that the work of bear management specialists plus increased law enforcement would <u>alone</u> yield "a net reduction in the overall existing mortality risks to grizzly bears on both national forest and private lands within the action area and across the [Cabinet-Yaak ecosystem]."  2006 BiOp at A-80.

58.    It is difficult to overstate the ambitiousness of FWS's assessment that such conflict-reduction measures can be counted on to more than neutralize all mortality risks to grizzly bears from the Rock Creek Mine.  From 2011-2016—without the Rock Creek Mine or proposed Montanore Mine on the landscape—there were ten known or probable human-caused grizzly bear mortalities in the United States portion of the Cabinet-Yaak ecosystem, a mortality rate of nearly two bears per year.  The agencies predict that the Rock Creek Mine would bring a major influx of people into the ecosystem, starting with more than 100 people during the mine's evaluation phase and increasing to nearly 800 people during the construction phase.

25

59.     Moreover, since 2007, the Rock Creek Mine proponent has been implementing a key component of the mine's mitigation plan for reducing human-caused grizzly bear mortality by funding the work of a Montana Fish, Wildlife and Parks grizzly bear management specialist dedicated specifically to reducing human-caused grizzly mortality in the Cabinet-Yaak ecosystem.  That specialist has implemented many of the conflict-reduction measures FWS identified as essential in reaching a no-jeopardy determination for the Rock Creek Mine, including conducting extensive public education and outreach activities, providing bear-resistant garbage containers and electric fencing kits to community members to reduce the accessibility of bear attractants, and responding to conflict situations in the communities near the proposed mine.

60.     However, despite the importance of such conflict-reduction efforts to begin addressing the already unsustainable levels of human-caused grizzly bear mortality in the ecosystem, their rollout over the past decade has not coincided with a reduction in the number of human-caused grizzly bear mortalities in the Cabinet-Yaak ecosystem—even without the Rock Creek Mine and its associated population influx underway.  Instead, FWS's own data show that the number of human-caused mortalities in the U.S. portion of the Cabinet-Yaak ecosystem increased during the ten years after the grizzly bear management specialist began work in 2007: 16 known human-caused mortalities occurred in that ten-year time

period compared with 13 during the preceding ten years.  Though these data come

from FWS's own reports and were highlighted in the two requests for reinitiation

of consultation that Plaintiffs sent to FWS in 2015 and 2017, FWS did not

acknowledge or address them in its 2017 Grizzly Bear Supplement nor explain

why this information does not warrant reinitiation of consultation under the ESA.

The Forest Service likewise failed to address these mortality numbers in the

analysis supporting its Record of Decision approving the project's evaluation

phase.

61.     The agencies' disregard of these mortality data from FWS's own

reports contravenes this Court's 2017 ruling invalidating the biological opinions

and record of decision for the nearby Montanore Mine.  Like the Rock Creek

Mine, the Montanore Mine threatens to exacerbate already unsustainable levels of

human-caused grizzly bear mortality in the Cabinet-Yaak ecosystem, and the

agencies relied on a substantially identical package of mitigation measures to

conclude that the Montanore project, like Rock Creek, would benefit grizzly bears

by ensuring a net reduction in human-caused mortality across the ecosystem.  In

Save Our Cabinets, this Court ruled that FWS and the Forest Service acted

arbitrarily and capriciously and in violation of the ESA by reaching that conclusion

without considering the same mortality data at issue here, which show that the

number of grizzly bear killings has increased over the past decade despite

implementation of the key conflict-reduction measures called for in the mine

mitigation plans.  Save Our Cabinets, 255 F. Supp. 3d at 1063.

## III.   FACTS RELATING TO BULL TROUT CLAIMS

### A.   Bull Trout Status and Conservation Needs

62.    The bull trout, Salvelinus confluentus, is a migratory char (a close

relative of trout) in the salmonid family.  Historically, bull trout thrived in major

river drainages from northern California and Nevada north to Alaska, and from

Puget Sound on the Pacific coast east to Montana and Alberta.

63.    Compared to other salmonid fish species, "bull trout generally have

the most specific habitat requirements."  U.S. Fish & Wildlife Serv., Recovery

Plan for the Coterminous United States Population of Bull Trout, at iv (2015).  To

spawn, develop, and survive, bull trout need water that is very cold—optimally 35

to 39 degrees Fahrenheit—and very clean.  Bull trout display acute sensitivity to

alterations in natural stream flow patterns—particularly stream flow reductions,

which can exacerbate stream warming, concentrate pollutants, and produce

seasonally dry reaches that cut off access to migration corridors and other essential

habitat.

64.    Bull trout are naturally migratory but today exhibit both resident and

migratory life history strategies.  Resident bull trout complete their entire life cycle

in or near the tributary stream in which they spawn and rear.  Migratory bull trout,

in contrast, rear for 1 to 4 years in their natal stream before migrating to a lake, river, or saltwater.  Migratory bull trout have been known to travel more than 150 miles to reach spawning grounds in Montana.  However, all bull trout—whether migratory or resident—depend on viable migratory corridors to access seasonal habitats.  Further, the persistence of migratory populations is critical to the species' persistence as a whole because migratory bull trout tend to be more fecund and therefore contribute a larger share to population maintenance and recovery.  In addition, migration facilitates gene flow among local populations and allows for replenishment of local populations that are extirpated by catastrophic events.

65.    Bull trout can live longer than 12 years and typically spawn more than once in their lifetime.  As a result, and to facilitate foraging, they require safe two-way passage upstream and downstream, which "has important repercussions for the management of this species."  2017 Bull Trout BiOp 16.  Dams obstruct that passage, and most fish ladders designed to enable fish passage across dams were built for salmonid species that spawn only once in their lifetime and then die, such that they require only one-way upstream passage across a dam.  As a result, even dams with fish ladders can fragment bull trout populations if they are not designed specifically to provide safe downstream passage as well.

66.    As described by FWS, "a wide variety of factors" threaten bull trout across their range, including habitat degradation and fragmentation; reduced

stream flows; flow alterations associated with water diversions, road construction and maintenance, mining, and grazing activities; blockage of migratory corridors by dams and other structures; poor water quality; competition and predation from nonnative fish species; intentional or incidental killing of bull trout by anglers; and climate change, which is predicted to reduce stream flows, increase summer stream temperatures, facilitate the expansion of nonnative fish that kill or compete with bull trout, and alter precipitation and stream flow patterns, resulting in further habitat loss and reduced bull trout survival and reproduction.  2017 Bull Trout BiOp 14-15.  As FWS acknowledged in the challenged BiOp, bull trout are "particularly vulnerable" to climate change compared to other salmonids because bull trout require especially cold water to spawn and rear.  Id. at 15.

67.    FWS listed bull trout across the lower-48 United States as a threatened species under the ESA in 1999.  By the time of that listing decision, bull trout had been extirpated from approximately 60 percent of their historic range.

68.    Since 2015, for management purposes FWS has formally divided the coterminous United States population of bull trout into six recovery units:  Coastal, Klamath, Mid-Columbia, Columbia Headwaters, Saint Mary, and Upper Snake. All six of these recovery-unit populations are "needed to ensure a resilient, redundant, and representative distribution of bull trout populations throughout the range of the listed entity."  2017 Bull Trout BiOp 14.

30

69.     Within each recovery unit, FWS focuses on bull trout conservation at the scale of designated "core areas," which consist of one or more interbreeding local populations and are the basic units on which FWS gauges the species' recovery.

70.     The coterminous United States population of bull trout comprises 109 occupied core areas, each of which plays an important role in the conservation of the recovery-unit population of which they are a part and, by extension, the species as a whole.  As FWS explained in its 2017 Bull Trout BiOp for the Rock Creek Mine, "[g]enerally, if the effects of a proposed federal action, taken together with cumulative effects, are likely to impair the viability of a core area population(s) such an effect is likely to impair the survival and recovery function assigned to a [recovery unit] and may represent jeopardy to the species."  2017 Bull Trout BiOp 31.

71.     In 2005, even with ESA protections in place, FWS concluded that approximately 72% of bull trout core area populations were at risk or at high risk of extirpation.  In its 2005 analysis, FWS determined that just 3.3% of core area populations across the species' range were at low risk of extirpation.

72.     In 2015, based on its finding that bull trout populations are depressed or declining across much of the species' range, FWS reaffirmed its determination that bull trout remain threatened within the meaning of the ESA.

31

### B.    The Rock Creek Mine Project and FWS's 2017 Bull Trout BiOp

73.    The Rock Creek Mine site is located in the Lower Clark Fork River watershed within the Columbia Headwaters bull trout recovery unit, which comprises the Upper Clark Fork, Lower Clark Fork, Flathead, Kootenai, and Coeur d'Alene watersheds in western Montana, northern Idaho, and northeastern Washington.  The Columbia Headwaters recovery unit contains 35 bull trout core areas, 20 of which are "simple" core areas with only a single local population that is isolated in a headwater lake.

74.    FWS's 2017 Bull Trout BiOp identifies population and habitat fragmentation from dams as well as competition and predation by nonnative fish as the most serious threats to bull trout in the Rock Creek Mine project area.  As described by FWS, bull trout in the project area are adversely impacted by "[m]ajor fish passage barriers," including dams at Cabinet Gorge, Noxon Rapids, and Thompson Falls on the Lower Clark Fork River.  2017 Bull Trout BiOp 53.  Though the 2017 Bull Trout BiOp asserts that "[f]ragmentation … is being reduced," it acknowledges that "large barriers (e.g., Noxon Rapids Dam) still remain."  Id.  Further, while the BiOp notes that "steps toward a fish trapping facility at Cabinet Gorge Dam have been approved," id., the BiOp states that further review and approval—including separate ESA consultation—are required before construction of that facility can begin.  Against this backdrop of persistent

32

fragmentation from dams, the BiOp notes that "nonnative species (brook trout, brown trout, lake trout, northern pike, walleye, etc.) are increasingly impacting efforts to recover bull trout and habitat in the reservoirs" within the Clark Fork River system, "which favors many of those populations over native species" such as bull trout. Id.

75.     The Rock Creek Mine would harm the Rock Creek and Bull River local bull trout populations with stream dewatering, sediment pollution, and other adverse effects.  FWS's 2017 Bull Trout BiOp classifies these local populations as part of the Lake Pend Oreille core area population.  This classification is significant because, as described above, bull trout core areas are the focal point for FWS in analyzing threats to, and progress in, conserving the species.  Further, because even a small adverse impact on an already marginal core area population may require a jeopardy determination, Save Our Cabinets, 255 F. Supp. 3d at 1050, FWS's classification of bull trout populations affected by a project in a relatively weaker or stronger core area can drive the agency's jeopardy analysis.

76.     FWS's classification of the Rock Creek and Bull River local populations as part of the Lake Pend Oreille core area represents a change in agency position:  In its 2006 BiOp for the Rock Creek Mine—as well as its 2014 BiOp for the nearby Montanore Mine—FWS instead classified these local populations as part of a smaller, and weaker, Lower Clark Fork River core area.

FWS now treats the former Lower Clark Fork River core area as part of an

expanded Lake Pend Oreille core area:



Fig. 1.  Regional bull trout core area configurations as reflected in 2006 Rock Creek Mine BiOp (top) versus 2017 BiOp (bottom).

The 2017 Bull Trout BiOp does not explain, or even acknowledge, this change.

77.    FWS's former core-area configuration for bull trout in the region surrounding the Rock Creek Mine site reflected the fragmentation of bull trout populations caused by the dams located at Cabinet Gorge, Noxon Rapids, and Thompson Falls on the Lower Clark Fork River.  Consistent with that fragmented condition, prior to 2006 FWS delineated six separate bull trout core areas in the relevant region:  Lake Pend Oreille, Cabinet Gorge Reservoir, Noxon Reservoir, Thompson Falls Reservoir, Lower Flathead River, and Middle Clark Fork River. In 2006, FWS decided to consolidate four of those extant core areas—Cabinet Gorge Reservoir, Noxon Reservoir, Thompson Falls Reservoir, and Lower Flathead River—into a single Lower Clark Fork River core area, while maintaining the separate Lake Pend Oreille core area to the northwest and the separate Middle Clark Fork River core area to the south in recognition of persistent barriers that continued to fragment bull trout populations in those areas.

78.    According to FWS, the 2006 core-area consolidation was justified by "major progress" made at that time "in reconnecting upstream bull trout passage" within the Lower Clark Fork River system, which enabled bull trout within the four formerly separate core areas to begin functioning as a single, integrated Lower Clark Fork River core area population.  Mem. from R. Mark Wilson, Field Supervisor, FWS Mont. Ecological Servs. Field Office, to Asst. Reg'l Dir., FWS

Region 1 Ecological Servs., Re: Consolidation of bull trout core areas on the

Lower Clark Fork River, at 1 (July 14, 2006) ("Wilson Mem.") (Appendix D to

2006 BiOp).  In an agency memorandum articulating the rationale for delineating

the new, consolidated Lower Clark Fork River core area in 2006, FWS stated that

"[a] natural progression or continuation of this approach" of consolidating core

areas to better reflect the historic integration of bull trout populations presently

fragmented by dams "will eventually incorporate the Lower Clark Fork [River]

core area into Lake Pend Oreille, fully restoring the natural configuration" of bull

trout populations that existed before the dams.  Id. at 2; see also 2006 BiOp at B-

45–B-49.  However, FWS stressed that as of 2006, bull trout passage across the

remaining dams was "primarily limited to trap and haul at Cabinet Gorge Dam,"

i.e., a program of artificially transporting a limited number of fish across that dam.

Wilson Mem. 2.  FWS's 2006 memorandum indicated that further consolidation to

combine the Lower Clark Fork River and Lake Pend Oreille bull trout core areas

would not be justified until fish passage restoration efforts achieve "full numerical

contributions to two-way connectivity with Lake Pend Oreille," which FWS

anticipated would occur "in the next few years" with the installation of a

permanent fishway at Cabinet Gorge Dam and implementation of "additional

passage … at the upstream dams (Noxon Rapids and Thompson Falls)."  Id.

79.    Twelve years later, however, the conditions FWS anticipated would justify consolidation of the Lower Clark Fork River and Lake Pend Oreille core areas have not materialized as FWS expected.  The 2017 Bull Trout BiOp describes the fish passage facility at Cabinet Gorge Dam as still in the pre-construction stage, and progress toward installation of fish passage facilities at Noxon Rapids Dam has been deferred until at least 2022.  Nevertheless, in its 2017 Bull Trout BiOp FWS treated the former Lower Clark Fork River core area and its constituent local populations as part of the Lake Pend Oreille core area and expressly relied on the strength of local populations outside the boundaries of the former Lower Clark Fork River core area to dismiss the Rock Creek Mine's impacts on bull trout as insignificant.  See, e.g., 2017 Bull Trout BiOp 72 (asserting that no-jeopardy determination is supported by the fact that "[n]early 87 percent of bull trout spawning in the [Lake Pend Oreille core area] occurs in tributaries that are not [a]ffected by the Rock Creek Mine Project (i.e., below Cabinet Gorge Reservoir)," which separated the former Lake Pend Oreille and Lower Clark Fork River core areas.  "These local populations are healthy and robust ….").

80.    While the 2017 Bull Trout BiOp does not explain the rationale for consolidating the Lower Clark Fork River core area into the Lake Pend Oreille core area, the significance of that change to FWS's jeopardy analysis for the Rock

37

Creek Mine is apparent:  By grouping the populations threatened directly by the mine with more robust populations in the Lake Pend Oreille core area, FWS made the permanent damage the mine would inflict on bull trout in the project area look less significant to the species' conservation.

81.    The Lower Clark Fork River core area to which FWS previously assigned the bull trout populations threatened by the mine was smaller and considerably weaker than the Lake Pend Oreille core area to which FWS now assigns those populations.  In 2014, FWS described bull trout numbers in the Lower Clark Fork River core area as "very low" and concluded that the core area population was "at high risk" due to "very limited and/or declining numbers, range, and/or habitat, making bull trout in this core area vulnerable to extirpation." U.S. Fish & Wildlife Serv., Final Biological Opinion on the Effects to Bull Trout and Bull Trout Critical Habitat from the Implementation of Proposed Actions Associated with the Plan of Operations for the Montanore Minerals Corp. Copper/Silver Mine 39, 66 (March 31, 2014) ("Montanore Aquatic BiOp"). Within that context, FWS recognized that the Rock Creek and Bull River local populations that the Rock Creek Mine would harm have substantial conservation significance.  For example, FWS's 2006 BiOp for the Rock Creek mine described the Bull River local population as "the principal and most productive local population in the [Lower Clark Fork River] core area," and FWS's no-jeopardy

38

determination relied on the agency's belief at that time that the Rock Creek Mine would have no adverse impact on the uniquely important Bull River population. 2006 BiOp at B-86–87. Similarly, in evaluating the impacts of the Montanore Mine, which also would threaten the Rock Creek and Bull River local populations, FWS stated that "maintaining spawning and rearing success in these two local populations is essential to maintaining the existing survival status and potential for recovery of the [Lower Clark Fork River] bull trout core area population." Montanore Aquatic BiOp 122 (emphasis added). Indeed, in 2017 this Court ruled that FWS's no-jeopardy determination for the Montanore Mine could not be sustained given the agency's acknowledgment that the project—like the Rock Creek Mine—would inflict permanent harm on the Rock Creek and Bull River local populations and its determination that those populations play a vital role in conserving bull trout within the larger Lower Clark Fork River core area. See Save Our Cabinets, 255 F. Supp. 3d at 1048-51.

82. Like Montanore, the Rock Creek Mine would inflict permanent harm on the Rock Creek and Bull River local populations of bull trout. Among other impacts, development of the Rock Creek Mine is expected to reduce baseflows in project-area streams. Baseflow is the portion of a stream's water volume that derives from groundwater contribution, as opposed to runoff. During dry conditions, baseflow is the primary, if not exclusive, source of running water in a

39

stream. Because seasonally dry conditions in northwest Montana coincide with the most sensitive periods in the bull trout life cycle—spawning and egg incubation—the adverse effects of baseflow reductions on bull trout are severe.

83.    To estimate the magnitude and extent of baseflow reductions from mine development, FWS relied on a three-dimensional groundwater modeling exercise, "Hydrometrics 2014." Based on the modeling results, FWS predicts that the maximum baseflow reductions from the mine would occur in project year 70 and the adverse impacts on bull trout and their critical habitat would persist permanently.

84.    In analyzing the effects of predicted baseflow reductions on bull trout, FWS considered model-predicted impacts at three stream locations in the project area: Rock Creek above its confluence with the Clark Fork River, East Fork Bull River above its confluence with the Bull River, and Bull River above its confluence with the Clark Fork River. However, Hydrometrics 2014 itself explains that the most significant baseflow reductions are not expected to occur at these locations, which are situated far downstream within the relevant drainages where baseline flows are highest. Instead, more severe baseflow reductions would occur "in the small headwater drainages adjacent to the mine site." Hydrometrics, Inc., Groundwater Modeling Assessment for the Rock Creek Project, Sanders County, MT, at 4-14 (rev'd Oct. 2014). Although some of these headwater

drainages support bull trout and are designated as bull trout critical habitat, the 2017 Bull Trout BiOp contains no discussion or analysis of the baseflow reductions that would occur in those upstream reaches nor the impact of such reductions on bull trout.

85.     Notwithstanding the limited scope of its analysis, FWS acknowledged that even the magnitude of baseflow reductions discussed in the BiOp may impede bull trout movement and access to habitat, particularly for migratory bull trout; reduce juvenile bull trout survival; cause direct loss of spawning areas and other habitat; increase stream temperatures, which would directly harm bull trout and enhance conditions for nonnative fish species that kill or compete with bull trout; and reduce the dissolved oxygen content of stream water to the detriment of bull trout.

86.     In addition to reduced baseflows, the BiOp also predicts that mining activity would cause "short-term" sediment increases—lasting for seven years—in a number of project-area streams, which would kill bull trout eggs and young fish and degrade critical habitat.  FWS anticipates that this harmful sediment pollution would occur notwithstanding the mine operator's plans to implement "best management practices" to reduce sediment pollution from the project.

87.     As a result of increased sediment pollution, reduced stream baseflows, and other impacts, FWS concluded in the BiOp that mine development would harm and kill bull trout in the Rock Creek and Bull River local populations.

88.     Nevertheless, FWS determined that any impact on the larger Lake Pend Oreille core area population "would be negligible because of the relatively small contribution from these local populations"; "assuming fish passage at the dams [on the Lower Clark Fork River] and habitat restoration continues and is successful," FWS expected "[a]t most, the rate of recovery of the core area population may slow slightly" as a result of the mine.  2017 Bull Trout BiOp 67. FWS explained that it reached this conclusion "largely because of the strength and stability of the remaining local populations [in the Lake Pend Oreille core area], the relatively small contribution of Rock Creek and Bull River bull trout to the core area, and the recovery efforts now underway with fish passage … and habitat restoration activities …" Id. at 68.  Based on its determination that the Rock Creek Mine would not jeopardize bull trout at the scale of the Lake Pend Oreille core area, FWS concluded that the project would not jeopardize the species.

89.     Because FWS concluded that the Rock Creek Mine would nevertheless harm and kill bull trout, the agency was required to include in its BiOp an incidental take statement authorizing limited bull trout "take" as a result of the project.  50 C.F.R. § 402.14(i)(1).

42

90.     In developing its incidental take statement, FWS determined that it would be difficult to quantify the precise number of bull trout that would be harmed or killed as a result of the project.  Accordingly, pursuant to agency policy, FWS decided to rely on habitat surrogates to measure the authorized extent of bull trout take.  To measure take due to mining-induced baseflow reductions, FWS decided to use the maximum baseflow reductions predicted by Hydrometrics 2014 at the three downstream locations in Rock Creek, Bull River, and East Fork Bull River described above.  As discussed in the BiOp, under this approach FWS will consider the authorized level of incidental take to be exceeded "if the measured level of baseflow depletions exceeds the predicted baseflow depletions" at any of the three locations, in which case "reinitiation of consultation will be required" to ensure that the actual level of take does not jeopardize bull trout.  2017 Bull Trout BiOp 80.

91.     In its 2014 biological opinion for the Montanore Mine, FWS relied on an identical surrogate to measure authorized take of bull trout due to mining-induced baseflow reductions from that project.  In 2017, this Court ruled that FWS's use of this surrogate was unlawful because, as is true with the Rock Creek Mine, maximum baseflow reductions from the Montanore Mine are not anticipated to occur until decades after mining is complete.  As a result, in the event that maximum baseflow reductions exceed modeled predictions, by the time they occur

43

it would be far too late for FWS to "halt the project to meaningfully reinitiate consultation" and ensure that the true magnitude of baseflow reductions and associated bull trout take would not jeopardize the species.  Save Our Cabinets, 255 F. Supp. 3d at 1058-59.

## FIRST CLAIM FOR RELIEF
### (Against all Defendants for Failure to Reinitiate Formal Consultation on the Impact to Grizzly Bears from Implementing the Rock Creek Mine Project)

92.     Plaintiffs hereby reallege and incorporate paragraphs 1 through 91.

93.     The ESA's implementing regulations require FWS and the Forest Service to reinitiate formal consultation when "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered."  50 C.F.R. § 402.16(b).  "The duty to reinitiate consultation lies with both the action agency and the consulting agency."  Salmon Spawning & Recovery All., 545 F.3d at 1229 (citing 50 C.F.R. § 402.16).

94.     FWS's determination that the Rock Creek Mine project will not jeopardize grizzly bears depends upon FWS's conclusions that measures to reduce human-caused grizzly bear mortality in the mine's mitigation plan will be sufficiently effective to ensure that (1) zero grizzly bear killings will occur as a result of the mine's evaluation phase and the associated influx of people into the project area; (2) no more than one grizzly bear killing will occur as a result of the project over its 35-year life; and (3) mine mitigation measures will prevent more

44

than one human-caused mortality of a female grizzly bear that would have

occurred in the mine's absence, thereby more than offsetting mortality attributable

to the mine.  In reaching those conclusions, FWS placed particular weight on the

anticipated effectiveness of conflict-reduction measures to be implemented by

grizzly bear management specialists, whose work the mine proponent is required to

fund.  FWS concluded that those conflict reduction efforts, in conjunction with

increased law enforcement, could alone be counted upon to ensure "a net reduction

in the overall existing mortality risks to grizzly bears on both national forest and

private lands within the action area and across the [Cabinet-Yaak Ecosystem]"

during the life of the mine.  2006 BiOp at A-80.

95.     As described above, since 2007 one of the two grizzly bear

management specialists required by the Rock Creek Mine mitigation plan has been

at work in the Cabinet-Yaak ecosystem implementing the key mitigation measures

designed to reduce human-caused mortality throughout the life of the mine.

Despite those efforts, the number of human-caused grizzly bear mortalities in the

Cabinet-Yaak ecosystem increased from 2007-2016 compared to the prior ten-year

period—even without the Rock Creek Mine on the landscape and the associated

influx of people into the remote project area.

96.     The picture does not improve if one considers available mortality data

up through 2018:  from 2007-2018, 19 known or probable human-caused

45

mortalities occurred in the United States portion of the Cabinet-Yaak ecosystem, as compared to 14 from 1995-2006.

97.     These data critically undermine FWS's conclusions that conflict-reduction measures in the mine mitigation plan will be capable of ensuring zero grizzly killings attributable to the mine's evaluation phase and a net reduction in human-caused grizzly bear mortality across the Cabinet-Yaak ecosystem during the 35-year life of the mine, notwithstanding the roughly 800-person influx and substantial industrial disturbance associated with the project.  Accordingly, the data reveal that implementing the project may unleash greater threats of human-caused mortality than FWS considered in its 2006 BiOp.

98.     Notwithstanding these data, FWS's 2017 Grizzly Bear Supplement determined that reinitiation of ESA consultation was not required concerning the Rock Creek Mine's impacts on grizzly bears.  FWS's determination in the 2017 Grizzly Bear Supplement that no new information warrants reinitiation of consultation is arbitrary, capricious, and violates the ESA and its implementing regulations.  The mortality data described above constitute new information revealing that implementation of the Rock Creek Mine project may affect grizzly bears in a manner or to an extent not previously considered.  50 C.F.R. § 402.16(b).  Further, by concluding in the 2017 Grizzly Bear Supplement that reinitiation of consultation is not warranted without acknowledging or rationally

46

addressing the mortality data, "the agency failed to consider an important aspect of the problem," rendering its determination arbitrary and capricious.  Save Our Cabinets, 255 F. Supp. 3d at 1063.

99.     By issuing a Record of Decision authorizing the first phase of the Rock Creek Mine project without considering these mortality data and reinitiating formal consultation to address them, the Forest Service likewise acted arbitrarily, capriciously, and in violation of the ESA and its implementing regulations.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.16(b).

## SECOND CLAIM FOR RELIEF
### (Against FWS for Arbitrary and Unlawful No-Jeopardy Determination for Bull Trout)

100.   Plaintiffs hereby reallege and incorporate paragraphs 1 through 99.

101.   Under section 7 of the ESA, 16 U.S.C. § 1536, FWS must rationally determine, based on the best scientific and commercial information available, whether a proposed action will jeopardize a protected species.

102.   FWS's conclusion that the Rock Creek Mine project will not jeopardize bull trout depends upon the agency's determination that, despite predicted permanent harm to the Rock Creek and Bull River local bull trout populations, the mine's effects on the larger Lake Pend Oreille core area will be "relatively minor" because the remaining local populations in that core area "are healthy and robust" and will not be affected by the mine.  2017 Bull Trout BiOp

72.  In other words, FWS determined that the harm the mine is predicted to inflict on the Rock Creek and Bull River local bull trout populations will be insignificant to the species' conservation because the core area population to which FWS now assigns those local populations, Lake Pend Oreille, is relatively strong.

103.  As described above, FWS's classification of the Rock Creek and Bull River local bull trout populations as part of the Lake Pend Oreille core area is a departure from the agency's approach in both its 2006 BiOp for the Rock Creek Mine and its 2014 BiOp for the Montanore Mine.  In both of those prior analyses, FWS treated the Rock Creek and Bull River local populations as part of the Lower Clark Fork River core area, in which bull trout populations are significantly weaker than in the Lake Pend Oreille core area.

104.  FWS's determination in the 2017 Bull Trout BiOp that the mine's impacts on the Rock Creek and Bull River populations would be inconsequential to bull trout conservation at the core-area scale is arbitrary and unlawful.  Because "even a small additional impact … may require a jeopardy determination" where "baseline conditions are already dire," a project that will harm a weak core area population is more likely to cause jeopardy than one that will harm a relatively strong core area population.  Save Our Cabinets, 255 F. Supp. 3d at 1050 (quoting Oceana v. Pritzker, 75 F. Supp. 3d 469, 491 (D.D.C. 2014)).  Applying this principle, this Court invalidated FWS's last biological opinion addressing mining

48

impacts on bull trout in the Rock Creek and Bull River drainages because the
agency failed to rationally support its determination that permanent harm to those
important populations, given the degraded baseline status of the Lower Clark Fork
River core area of which they were a part, would not cause jeopardy.  See id. at
1046-51.  FWS's BiOp for the Rock Creek Mine purports to get around this
Court's ruling by treating the Rock Creek and Bull River populations as part of a
bigger, stronger Lake Pend Oreille core area, which makes baseline conditions
look better and the mine's impacts look less severe at the core-area scale.  The
problem is that FWS's reclassification of the affected bull trout populations to the
Lake Pend Oreille core area is neither rationally explained nor justified, because
the Rock Creek and Bull River local populations are not fully reintegrated with
populations in the Lake Pend Oreille system.  Accordingly, FWS's no-jeopardy
determination, which rests on that reclassification, is arbitrary and unlawful.  5
U.S.C. § 706(2)(A); 16 U.S.C. § 1536; see also Organized Vill. of Kake v. U.S.
Dep't of Agric., 795 F.3d 956, 966 (9th Cir. 2015) (en banc) (affirming that
"[u]nexplained inconsistency between agency actions" supports conclusion that
action was arbitrary and capricious) (quoting Nat'l Cable & Telecomms. Ass'n v.
Brand X Internet Servs., 545 U.S. 967, 981 (2005)) (internal quotation marks
omitted).

## THIRD CLAIM FOR RELIEF
### (Against FWS for Reliance on Unlawful Surrogate for Measuring Incidental Take of Bull Trout)

105.   Plaintiffs hereby reallege and incorporate paragraphs 1 through 104.

106.   The ESA's implementing regulations require FWS to include in a "no jeopardy" biological opinion an incidental take statement specifying the amount or extent of any taking of protected species that is authorized as a result of the proposed action.  50 C.F.R. § 402.14(h), (i)(1)(i).  Where, as here, FWS establishes the level of authorized take using a habitat surrogate instead of specifying the number of individual animals who may be harmed or killed as a result of the proposed action, the surrogate selected must "set forth a 'trigger' that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor [from take liability], and requiring [FWS] to re-initiate consultation."  Ariz. Cattle Growers, 273 F.3d at 1249; accord Save Our Cabinets, 255 F. Supp. 3d at 1057; 50 C.F.R. § 402.14(i)(1)(i).

107.   In the Incidental Take Statement accompanying its 2017 Bull Trout BiOp, FWS relied on the predicted maximum reductions in stream baseflows at three locations in Rock Creek, Bull River, and East Fork Bull River to measure allowable take of bull trout.  FWS's reliance on this surrogate to measure allowable take is arbitrary and unlawful because the chosen surrogate cannot serve as an effective trigger for re-initiating section 7 consultation if the threshold of

50

anticipated take is exceeded.  As stated in the BiOp, FWS predicts that mining-induced baseflow reductions will reach their peak in project year 70, more than 30 years after mining operations end.  Accordingly, in the event that measured baseflow reductions exceed the maximum levels predicted in the BiOp, mining operations will be long over and it will be too late to reinitiate consultation and modify the project to protect bull trout.  Because their exceedance cannot effectively trigger reinitiation of consultation, the use of predicted maximum baseflow reductions to measure authorized take of bull trout is arbitrary and violates the ESA implementing regulations, 50 C.F.R. § 402.14(i)(1)(i).  Save Our Cabinets, 255 F. Supp. 3d at 1058-59.

## REQUEST FOR RELIEF

Therefore, Plaintiffs respectfully request that this Court:

108.   Declare unlawful and set aside FWS's 2017 Grizzly Bear Supplement;

109.   Declare unlawful and set aside FWS's 2017 Bull Trout BiOp, including its incidental take statement;

110.   Declare unlawful and set aside the Forest Service's Record of Decision for phase one of the Rock Creek Mine project;

111.   Enjoin Defendants from further authorizing or approving implementation of the Rock Creek Mine project, and any take of grizzly bears or bull trout from such implementation, pending compliance with the ESA;

112.    Award Plaintiffs their reasonable costs, fees, and expenses, including

attorney's fees, associated with this litigation; and

113.    Grant Plaintiffs such further relief as the Court may deem just and

proper, including, if necessary, preliminary injunctive relief.

Respectfully submitted this 25th day of January, 2019.

/s/Katherine K. O'Brien
Katherine K. O'Brien
Earthjustice
313 East Main Street
Bozeman, MT 59715
Phone:  (406) 586-9699
Fax:  (406) 586-9695
kobrien@earthjustice.org

Elizabeth Forsyth *(Pro Hac Vice Pending)*
Earthjustice
800 Wilshire Blvd., Suite 1000
Los Angeles, CA 90017
Phone:  (415) 217-2000
Fax:  (415) 217-2040
eforsyth@earthjustice.org

*Counsel for Plaintiffs*