Katherine K. O'Brien
Earthjustice
313 East Main Street
Bozeman, MT 59715
Phone:  (406) 586-9699
Fax:  (406) 586-9695
kobrien@earthjustice.org

Elizabeth Forsyth
Earthjustice
800 Wilshire Blvd., Suite 1000
Los Angeles, CA 90017
Phone:  (415) 217-2000
Fax:  (415) 217-2040
eforsyth@earthjustice.org

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| KSANKA KUPAQA XAʾŁ₵IN, ROCK CREEK ALLIANCE, EARTHWORKS, MONTANA ENVIRONMENTAL INFORMATION CENTER, DEFENDERS OF WILDLIFE, SIERRA CLUB, and CENTER FOR BIOLOGICAL DIVERSITY; | CV-19-20-M-DWM |
| Plaintiffs, | |
| v. | **PLAINTIFFS' PRELIMINARY PRETRIAL STATEMENT** |
| UNITED STATES FISH AND WILDLIFE SERVICE; CHERYL PROBERT, Kootenai National Forest Supervisor; and UNITED STATES FOREST SERVICE; | |
| Defendants, | |
| and | |
| RC RESOURCES, INC., | |
| Defendant-Intervenor. | |

Pursuant to this Court's order of March 26, 2019, plaintiffs Ksanka Kupaqa Xaʾɫ¢in, Rock Creek Alliance, Earthworks, Montana Environmental Information Center, Defenders of Wildlife, Sierra Club, and Center for Biological Diversity submit the following Preliminary Pretrial Statement:

## A.     Brief Factual Outline of the Case

In this case, a coalition of traditional cultural leaders from the Ksanka Band of the Ktunaxa Nation and local, regional, and national conservation organizations challenge the failure of the U.S. Fish and Wildlife Service ("FWS") and U.S. Forest Service to comply with the Endangered Species Act ("ESA") in approving commencement of the Rock Creek Mine project.  The Rock Creek Mine project is a proposed large-scale copper and silver mine that would bore beneath the Cabinet Mountains Wilderness in northwest Montana.  Because the project would harm grizzly bears and bull trout in the project area, which both are classified as "threatened" species under the ESA, federal authorizations for the project must satisfy the ESA's procedural and substantive requirements—including the bedrock requirement to ensure that the project will not jeopardize the continued existence of either species.  See 16 U.S.C. § 1536.

Plaintiffs challenge the Defendants' failure to comply with this and other mandates of the ESA and its implementing regulations in issuing three decisions concerning the Rock Creek Mine:

1

First, Plaintiffs challenge FWS's November 2017 determination that it is not required to reinitiate formal consultation under ESA section 7, 16 U.S.C. § 1536, concerning the mine's threats to the highly imperiled Cabinet-Yaak grizzly bear population.  As a consequence of that decision, FWS continues to rely on a biological opinion it issued in 2006, as supplemented in 2007 and 2017, to conclude that the mine will not jeopardize grizzly bears.  Plaintiffs contend that FWS's November 2017 determination not to reinitiate consultation was arbitrary, capricious, and violates the ESA and its implementing regulations because data generated since 2006 and published in FWS's own reports show that the mine's mortality threats to grizzly bears are greater than the agency previously considered, triggering the agency's duty to reinitiate consultation.  See 16 U.S.C. § 1536; 50 C.F.R. § 402.16 (requiring FWS and Forest Service to reinitiate ESA consultation where, inter alia, "new information reveals effects of the action that may affect listed species … in a manner or to an extent not previously considered").

Second, Plaintiffs challenge the Forest Service's issuance of a Record of Decision authorizing the first phase of the Rock Creek Mine project without considering these new grizzly bear mortality data and without reinitiating formal consultation with FWS to address these data.

Third, Plaintiffs challenge two aspects of FWS's 2017 bull trout biological opinion, in which FWS concluded that the Rock Creek Mine will not jeopardize

the survival or recovery of bull trout and authorized "take" of bull trout (defined as harming or killing) as a result of the project.  Plaintiffs challenge FWS's no-jeopardy determination in the 2017 biological opinion on the ground that FWS irrationally dismissed the permanent harm that the mine would inflict on bull trout populations that FWS previously determined have unique conservation significance and must be protected to safeguard the species.  Plaintiffs also challenge the accompanying incidental take authorization because it relies on an unlawful metric for authorized bull trout take from permanent reductions in stream flows that FWS predicts will occur as a result of mining.

This is not the first time this Court has been called upon to remedy the defendant agencies' failures to comply with the ESA with regard to the Rock Creek Mine project.  In 2005, this Court ruled that FWS's prior biological opinion concluding that the mine would not jeopardize grizzly bears or bull trout violated the ESA.  Rock Creek All. v. U.S. Fish & Wildlife Serv., 390 F. Supp. 2d 993 (D. Mont. 2005) ("Rock Creek I").  FWS issued a new no-jeopardy biological opinion in 2006.  This Court upheld FWS's 2006 biological opinion but invalidated the Forest Service's authorization for the Rock Creek Mine based on its failure to adequately address project impacts on bull trout.  Rock Creek All. v. U.S. Forest Serv., 703 F. Supp. 2d 1152 (D. Mont. 2010) ("Rock Creek II"), aff'd 663 F.3d 439 (9th Cir. 2011).

In 2017, FWS and the Forest Service determined that they must reinitiate formal consultation under the ESA concerning the mine's impacts on bull trout, based in part on the fact that the biological opinion upheld by this Court in 2010 failed to consider a major impact that mining would have on bull trout—namely, permanent dewatering of their stream habitat.  However, despite repeated requests from Plaintiffs, FWS refused to also reinitiate formal consultation regarding the mine's impacts on grizzly bears to consider significant new data indicating that the mine's mitigation plan cannot rationally be relied upon to neutralize the substantial mortality risks the mine poses to grizzlies.  Instead, in November 2017 FWS issued a supplement to its 2006 biological opinion in which it concluded—without acknowledging or considering the mortality data cited by Plaintiffs—that reinitiation of ESA consultation concerning grizzly bear impacts is not warranted and the agency's 2006 no-jeopardy determination remains valid.

This Court also has had to step in to ensure the defendant agencies' compliance with their ESA obligations regarding the nearby Montanore Mine, a second proposed copper and silver mine that threatens substantially the same adverse effects on grizzly bears and bull trout in the Cabinet Mountains region as the Rock Creek Mine.  In 2017, this Court vacated the federal approvals for the Montanore Mine after determining that, among other legal violations, FWS had arbitrarily concluded that the Montanore project would not jeopardize grizzly bears

4

or bull trout and the Forest Service had unlawfully relied on those FWS

determinations to authorize the project.  Save Our Cabinets v. U.S. Fish & Wildlife

Serv., 255 F. Supp. 3d 1035 (D. Mont. 2017).

Despite the recent guidance provided by this Court, in their most recent

approvals for the Rock Creek Mine, FWS and the Forest Service have again failed

to satisfy their ESA obligations.  Specifically, the Defendants have violated the

ESA by (1) ignoring evidence that the mine poses greater mortality threats to

grizzly bears than the agencies assumed—evidence this Court held in Save Our

Cabinets must be considered before the Defendants could approve the nearby

Montanore Mine; (2) irrationally dismissing the Rock Creek Mine's permanent

adverse impacts on important bull trout populations; and (3) relying on a metric for

authorized "take" of bull trout that is identical to the one this Court found illegal in

Save Our Cabinets.  The agency decisions challenged in this case reflect the

Defendants' refusal to grapple with significant new evidence concerning the Rock

Creek Mine's threats to protected wildlife and defy this Court's rulings in Save

Our Cabinets.

Plaintiffs seek an order from this Court declaring unlawful and vacating the

challenged agency decisions and enjoining the Defendants from further authorizing

or approving implementation of the Rock Creek Mine project, and any associated

take of grizzly bears or bull trout, pending compliance with the ESA.

5

**B.     Jurisdiction and Venue**

Plaintiffs bring this action pursuant to the judicial review provisions of the

Administrative Procedure Act, 5 U.S.C. §§ 701-706, and the ESA citizen suit

provision, 16 U.S.C. § 1540(g), which waive the Defendants' sovereign immunity.

As required by the ESA citizen suit provision, Plaintiffs sent FWS and the Forest

Service a 60-day notice of their intent to sue on August 28, 2018.  See id.

§ 1540(g)(2)(A)(i).  This Court has jurisdiction over Plaintiffs' claims under 16

U.S.C. § 1540(g) and 28 U.S.C. § 1331, and may issue a declaratory judgment and

injunctive relief under 28 U.S.C. §§ 2201-2202.

Venue lies in the District of Montana, Missoula Division, because Plaintiff

Ksanka Kupaqa Xaʾⱡ¢in is based in Lake County, Montana; the lands at issue in

this suit are located primarily in Sanders County, Montana; and a substantial part

of the events giving rise to Plaintiffs' legal claims occurred in the District of

Montana.  See 28 U.S.C. § 1391(e)(1); D. Mont. L.R. 1.2(c)(5).

**C.     Factual Basis for Plaintiffs' Claims**

1.     The Rock Creek Mine

The Rock Creek Mine is proposed for construction beneath and adjacent to

the Cabinet Mountains Wilderness in northwest Montana—one of the original

wilderness areas designated by Congress for special protection under the 1964

Wilderness Act.  Today, the landscape comprising the Cabinet Mountains

Wilderness and surrounding national forest lands is characterized by unspoiled expanses of glaciated peaks, forested valleys, and rivers and streams that are among the purest waters in the continental United States.  The area is part of the aboriginal territory of the Ktunaxa (Kootenai) Nation, and the specific areas threatened by the mine include sites that are sacred to the Ktunaxa people and are used to this day for traditional spiritual, cultural, and subsistence purposes.  The wilderness and national forest lands threatened by the mine provide a last refuge for the vulnerable Cabinet-Yaak grizzly bear population, and the streams that traverse those lands provide one of the last remaining undeveloped habitats for the region's imperiled population of bull trout.

The Rock Creek Mine would permanently transform a significant swath of this wild and culturally important landscape.  The project proposal calls for mining beneath the wilderness for as long as 30 years and construction of ore-processing facilities, a wastewater treatment plant, a roughly 300-acre impoundment for mining waste, and additional industrial infrastructure to facilitate processing of up to 10,000 tons of ore per day, seven days per week.  Among other adverse environmental impacts, development and operation of the mine is predicted to permanently dewater streams in the project area—including streams that are occupied by, and designated as critical habitat for, bull trout.  In addition, the project would prompt an influx of hundreds of people into the remote project area,

which would significantly increase the risks of human-caused mortality among the perilously small Cabinet-Yaak grizzly bear population.

FWS completed its first ESA analysis of the Rock Creek Mine proposal in 2000, and the Forest Service first authorized the project in a 2001 record of decision.  In the intervening years, the agencies' decisions regarding the project's impacts on threatened wildlife have been litigated, invalidated, withdrawn, redone, and updated multiple times.   As relevant here, in 2017 FWS and the Forest Service determined that they must reinitiate formal ESA consultation concerning the mine's impacts on bull trout because FWS's prior biological opinion had not considered the effects of mining-induced stream flow reductions on bull trout and their critical habitat and because additional critical habitat had been designated in the project area.  Plaintiffs challenge the resulting bull trout biological opinion, which FWS issued in November 2017 ("2017 Bull Trout BiOp"), and the associated authorization for take of bull trout as a result of the project.

Despite repeated requests from Plaintiffs, the agencies declined to reinitiate ESA consultation concerning the mine's impacts on grizzly bears at the time they undertook a new review of impacts on bull trout.  Instead, in November 2017 FWS issued a "supplement" to its 2006 grizzly bear biological opinion ("2017 Grizzly Bear Supplement"), in which FWS concluded that no information generated since 2006 warranted reinitiation of consultation under ESA standards.  Plaintiffs

8

challenge that determination and the Forest Service's failure to complete the required consultation with FWS before authorizing the first phase of the mine project in an August 2018 Record of Decision.

2.    Facts Relating to Grizzly Bear Claims

Plaintiffs' grizzly bear claims focus on the substantial threat of increased grizzly bear mortality posed by the Rock Creek Mine.  Specifically, Plaintiffs challenge the agencies' failure to consider data in FWS's own reports indicating that conflict-reduction measures in the mine's mitigation plan will not be capable of neutralizing that threat as the agencies previously assumed.

FWS has determined that preserving the Cabinet-Yaak grizzly bear population threatened by the Rock Creek Mine is essential to the conservation of grizzly bears in the lower-48.  But today, the Cabinet-Yaak population stands at roughly half of FWS's recovery goal and faces a high risk of extinction—even without mines on the landscape—because of its extremely small size and the unsustainable level of human-caused mortality it suffers.  Development of the Rock Creek Mine threatens to substantially exacerbate the mortality risks that already have pushed the Cabinet-Yaak grizzly population to the brink.  Indeed, FWS has determined that the mine's greatest impact on grizzly bears would be the substantial increase in human-caused mortality risks associated with the project. Nevertheless, FWS concluded in its 2006 grizzly bear biological opinion that mine

development will actually benefit Cabinet-Yaak grizzly bears because, according to FWS, strategies for reducing human-grizzly conflicts in the mine's mitigation plan will ensure that:  (1) no grizzlies are killed during the project's first, or "evaluation," phase; (2) no more than one grizzly bear is killed as a result of the mine during its entire 35-year life; and (3) more than one human-caused mortality of a female grizzly bear that would have occurred in the mine's absence is prevented.  In other words, FWS determined that the mitigation measures—specifically, the work of two grizzly bear conflict management specialists and a wildlife law enforcement officer—would completely neutralize the mortality threats associated with the mine and reduce the background rate of human-caused grizzly mortality that exists today across the Cabinet-Yaak ecosystem.  FWS's determination that mine development will not jeopardize Cabinet-Yaak grizzly bears depends on the agency's conclusion that these conflict-reduction strategies will deliver a net reduction in human-caused mortality across the ecosystem, as compared to the pre-mine baseline.

Since 2007, the Rock Creek Mine proponent has been implementing a key component of the mine's mitigation plan—namely, funding the work of a Montana Fish, Wildlife and Parks grizzly bear management specialist dedicated specifically to reducing human-caused grizzly bear mortality in the Cabinet-Yaak Ecosystem. For more than a decade, that specialist has implemented many of the conflict-

reduction measures identified as essential in FWS's 2006 biological opinion.  In addition, wildlife law enforcement has been in place in the ecosystem during this time period.  Nevertheless, FWS's own data show that the number of human-caused grizzly bear mortalities in the Cabinet-Yaak ecosystem has <u>increased</u> since 2007—even without the Rock Creek Mine and its associated population influx underway.  These results from a test-run of the mine's key mitigation measures undermine FWS's conclusion that the mitigation plan will be capable of ensuring a net reduction in human-caused mortalities with the Rock Creek Mine project in progress.

Although these mortality data come from FWS's own reports and were highlighted by Plaintiffs in multiple formal requests to Defendants to reinitiate ESA consultation, FWS did not acknowledge or address these data in its 2017 Grizzly Bear Supplement nor explain why the data do not warrant reinitiation of consultation.  The Forest Service likewise failed to address these mortality numbers in its 2018 Record of Decision approving the mine's evaluation phase or the supporting environmental impact statement.

### 3.   Facts Relating to Bull Trout Claims

The bull trout is a migratory char (a close relative of trout) that historically thrived in major river systems from northern California and Nevada north to Alaska, and from Puget Sound on the Pacific coast east to Montana and Alberta.

11

But by 1999, when FWS listed bull trout as a threatened species under the ESA, bull trout had been extirpated from roughly 60 percent of their historic range.  This major range contraction and associated population decline resulted from a variety of factors that have fragmented and degraded bull trout habitat, including dam construction, deterioration of water quality, and competition and predation by nonnative fish species.  In 2015, FWS concluded that bull trout populations remain depressed or declining across much of the species' range and reaffirmed the species' classification as "threatened" under the ESA.

For management purposes, FWS has divided the persisting bull trout populations in the coterminous United States into 109 "core areas."  Core areas consist of one or more interbreeding local populations of bull trout and are the basic units on which FWS gauges the species' conservation.  Each core area population plays an important role in conservation of the larger recovery-unit population of which it is a part and, by extension, conservation of the species as a whole.  Accordingly, FWS explained in the 2017 Bull Trout BiOp for the Rock Creek Mine that an action which threatens the viability of a core area population is likely to threaten the survival and recovery of the larger recovery unit of which it is a part and therefore may jeopardize the species.

The Rock Creek Mine would harm the Rock Creek and Bull River local populations of bull trout with seven years of sediment pollution, permanent stream

dewatering, and other adverse effects.  Prior to 2017—in both its 2006 biological opinion for the Rock Creek Mine and its 2014 biological opinion for the nearby Montanore Mine, which threatens these same local populations—FWS classified the Rock Creek and Bull River local populations as part of the Lower Clark Fork River core area.  Moreover, FWS identified the Bull River local population as the most productive and important local population in that core area and determined in 2014 that maintaining spawning and rearing success in both the Bull River and Rock Creek local populations is essential to conserving the larger Lower Clark Fork River core area population.

FWS's 2017 Bull Trout BiOp for the Rock Creek Mine represents a change of agency position on these issues:  in that decision document, FWS classified the Bull River and Rock Creek local populations as part of the Lake Pend Oreille core area.  The BiOp does not contain any explanation for that change, but its significance is apparent:  In contrast to the Lower Clark Fork River core area to which FWS formerly assigned the affected local populations—which FWS determined was at "high risk" of extirpation in 2014—the Lake Pend Oreille core area is substantially more robust.  Indeed, FWS's conclusion in the 2017 Bull Trout BiOp that the Rock Creek Mine will not jeopardize bull trout expressly relies on the strength of other local populations within the Lake Pend Oreille core area to

dismiss the mine's impacts on the Rock Creek and Bull River local populations as insignificant.

As required by the ESA, the 2017 Bull Trout BiOp includes an incidental take statement that specifies the amount or extent of bull trout take that is authorized as a result of the stream flow reductions, sediment pollution, and other adverse impacts FWS expects from the mine project.  With regard to mining-induced depletions of stream flows, FWS determined that it would be impracticable to quantify the precise number of bull trout that will be harmed or killed during life of the mine.  Therefore, FWS chose to rely on the magnitude of stream flow reductions predicted in a three-dimensional groundwater modeling study known as "Hydrometrics 2014" to measure the level of authorized take. Under this approach, the mine operator is authorized to harm or kill bull trout as a result of stream flow reductions consistent with the modeled predictions; but if actual, measured flow reductions exceed modeled predictions at any of three specified locations, then the authorized level of take will be exceeded and the Defendants would be required to reinitiate ESA consultation to ensure that the actual level of take does not jeopardize bull trout.  The model predicted that stream-flow reductions caused by the mine will not reach their peak until 70 years after the project begins (more than 30 years after mining ends), and that adverse impacts on bull trout and their habitat will persist permanently thereafter.  Thus, it

14

will not be clear whether actual stream flow depletions from the mine exceed the levels predicted in Hydrometrics 2014 until decades after mining concludes.

### D.    Legal Theory Underlying Plaintiffs' Claims

#### 1.    Legal Background

"The ESA is 'the most comprehensive legislation for the preservation of endangered species ever enacted by any nation.'  It represents a commitment 'to halt and reverse the trend toward species extinction, whatever the cost.'"  Ctr. for Biological Diversity v. Zinke, 900 F.3d 1053, 1059 (9th Cir. 2018) (quoting Tenn. Valley Auth. v. Hill, 437 U.S. 153, 180, 184 (1978)) (internal citation omitted).

To that end, ESA section 7(a)(2) imposes on federal agencies such as the Forest Service a substantive duty to ensure that actions they authorize or carry out are not likely to jeopardize listed species or destroy or adversely modify critical habitat designated for such species.  16 U.S.C. § 1536(a)(2).  That core substantive mandate is implemented through the ESA's formal consultation requirements:  Before undertaking or authorizing any action that may affect ESA-listed species or their critical habitat, agencies such as the Forest Service must consult with the appropriate expert fish and wildlife agency, which is FWS in the case of grizzly bears and bull trout.  See id.; 50 C.F.R. § 402.01(b).  The consultation process culminates in FWS's issuance of a biological opinion, or "BiOp," reflecting FWS's determination—which must be based on "the best scientific and commercial data

15

available"—of whether the proposed action will jeopardize a listed species or destroy or adversely modify its critical habitat.  16 U.S.C. § 1536(a)(2); see 50 C.F.R. § 402.14.  If FWS concludes that a proposed action is likely to cause jeopardy, the action may not proceed.  See 16 U.S.C. § 1536(a)(2).

In addition, the ESA prohibits the taking (harming or killing) of protected fish and wildlife unless specifically authorized in an incidental take statement.  16 U.S.C. §§ 1538(a)(1)(B), 1539.  If FWS concludes that implementing a proposed action will not jeopardize a protected species but will nevertheless result in take, FWS must issue an incidental take statement with its biological opinion.  50 C.F.R. § 402.14(i)(1).  The incidental take statement sets a limit on authorized take, and that limit must be articulated in a manner that will functions as an effective "trigger" that will signal if the authorized level of take is exceeded.  Ariz. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv., 273 F.3d 1229, 1249 (9th Cir. 2001).  In that circumstance, the protection from take liability provided by the incidental take statement lapses and FWS and the Forest Service must reinitiate ESA consultation to ensure that the actual level of take resulting from the project will not cause jeopardy.  Id.; see 50 C.F.R. § 402.16(a).

The agencies also must reinitiate ESA consultation if "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered."  50 C.F.R. § 402.16.  "The duty

to reinitiate consultation lies with both the action agency"—here, the Forest

Service—"and the consulting agency"—here, FWS.  Salmon Spawning &

Recovery All. v. Gutierrez, 545 F.3d 1220, 1229 (9th Cir. 2008).

>    2.    First Claim for Relief

Plaintiffs' first claim challenges FWS's determination in the 2017 Grizzly

Bear Supplement that no information generated since 2006 requires FWS and the

Forest Service to reinitiate consultation concerning the Rock Creek Mine's impacts

on grizzly bears, as well as the Forest Service's failure to reinitiate consultation

before issuing its Record of Decision for the project's first phase.  Plaintiffs

contend that FWS's own data—which show that human-caused grizzly bear

mortalities in the Cabinet-Yaak ecosystem have increased since 2007 despite

implementation of the key conflict-reduction measures in the mine mitigation

plan—trigger the reinitiation duty.  Specifically, those data undermine FWS's

conclusion in the 2006 biological opinion that planned mitigation measures can

ensure a net reduction in human-caused mortality with the mine project underway

and reveal that implementing the mine project may unleash greater mortality

threats than FWS considered in its 2006 biological opinion.  See 50 C.F.R.

§ 402.16(b) (mandating reinitiation of consultation if "new information reveals

effects of the action that may affect listed species or critical habitat in a manner or

to an extent not previously considered").

17

In light of these data, FWS's determination in the 2017 Grizzly Bear Supplement that no information generated since 2006 warrants reinitiation of consultation violates the ESA and its implementing regulations.  See id.; 16 U.S.C. § 1536.  Further, by reaching that conclusion without acknowledging or rationally addressing the new mortality data, "the agency failed to consider an important aspect of the problem," rendering its determination arbitrary and capricious.  Save Our Cabinets, 255 F. Supp. 3d at 1063.  The Forest Service likewise acted arbitrarily, capriciously, and in violation of the ESA and its implementing regulations by issuing a Record of Decision authorizing the mine's first phase without considering these mortality data and reinitiating formal consultation to address them.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.16(b); see Salmon Spawning & Recovery All., 545 F.3d at 1229 (holding that duty to reinitiate consultation "lies with both the action agency and the consulting agency") (citation omitted).

3.    Second Claim for Relief

Plaintiffs' second claim challenges FWS's determination in its 2017 Bull Trout BiOp that the Rock Creek Mine will not jeopardize the survival or recovery of bull trout.

FWS's no-jeopardy determination rests on the agency's conclusion that, despite the serious harm the mine would inflict on bull trout in the Rock Creek and

18

Bull River local populations, the mine's effects on the larger Lake Pend Oreille core area population will be minor.  This is so, FWS asserted, because the remaining local populations in that core area are healthy and robust and will not be affected by the mine.  In other words, FWS reached a no-jeopardy determination on the basis that the mine's impacts, while serious at the local level, will be insignificant to the conservation of bull trout at the scale of the relevant core area.

That determination is arbitrary, capricious, and violates the ESA because it depends upon FWS's unexplained and unjustified reassignment of the affected local bull trout populations from the highly vulnerable Lower Clark Fork River core area to the significantly more robust Lake Pend Oreille core area.  FWS previously determined that protecting the Rock Creek and Bull River local populations is essential to bull trout conservation at the core-area scale, and its 2006 no-jeopardy determination for the Rock Creek Mine depended in part on FWS's incorrect belief at that time that the mine would not harm the uniquely important Bull River local population.  FWS may not now dismiss the mine's impacts on these important local populations as insignificant by reassigning them to a more robust core area where that reassignment is both unexplained and undermined by evidence that the Rock Creek and Bull River populations are not functionally integrated with stronger populations in the Lake Pend Oreille core area.  5 U.S.C. § 706(2)(A); 16 U.S.C. § 1536; see Organized Vill. of Kake v. U.S.

19

Dep't of Agric., 795 F.3d 956, 966 (9th Cir. 2015) (en banc) (affirming that

"unexplained inconsistency between agency actions" supports conclusion that

action was arbitrary and capricious) (quotation omitted).

       4.    Third Claim for Relief

Plaintiffs' third claim challenges the incidental take statement accompanying

FWS's 2017 Bull Trout BiOp, which incorporates an unlawful surrogate for

quantifying authorized take of bull trout due to mining-induced stream flow

reductions.

ESA implementing regulations required FWS to issue an incidental take

statement with the 2017 Bull Trout BiOp, as the agency concluded that

implementing the Rock Creek Mine project will harm and kill bull trout.  50 C.F.R.

§ 402.14(h), (i)(1)(i).  In that incidental take statement, FWS elected to rely on the

extent of model-predicted stream flow reductions at three locations in the project

area as a surrogate for specifying the number of individual fish who may be taken

as a result of these flow reductions.  Under that approach, the authorized level of

take will be exceeded if measured stream flow reductions exceed those predicted

by the Hydrometrics 2014 modeling study.

 FWS's chosen take surrogate is unlawful because it does not "set forth a

'trigger' that, when reached, results in an unacceptable level of incidental take,

invalidating the safe harbor [from take liability], and requiring [FWS] to re-initiate

consultation." <u>Ariz. Cattle Growers</u>, 273 F.3d at 1249; <u>see</u> 50 C.F.R.

§ 402.14(i)(1)(i).  FWS predicts that mining-induced stream flow reductions will

not reach their peak until project year 70, more than 30 years after mining ends.

Accordingly, in the event that the Rock Creek Mine's maximum impacts on stream

flows exceed those predicted by the model, mining operations will be long over

and it will be too late to reinitiate consultation and modify the project to protect

bull trout.  Indeed, this Court invalidated FWS's 2014 incidental take statement for

the nearby Montanore Mine because it relied on the identical unlawful metric for

take associated with stream flow reductions that project would cause.  <u>Save Our</u>

<u>Cabinets</u>, 255 F. Supp. 3d at 1058-59.  The same result should apply here.

### E.     Computation of Damages

Plaintiffs seek declaratory and injunctive relief only.

### F.     Pendency or Disposition of Any Related State or Federal Litigation

Plaintiffs are not aware of any related litigation pending in federal court.

This Court has decided two prior cases concerning the Defendants'

compliance with the ESA in authorizing the Rock Creek Mine project:  In <u>Rock</u>

<u>Creek Alliance v. U.S. Fish and Wildlife Service</u>, 390 F. Supp. 2d 993 (D. Mont.

2005), this Court held that FWS's 2003 biological opinion for the Rock Creek

Mine violated the ESA and vacated the agency's decision.  In <u>Rock Creek Alliance</u>

<u>v. U.S. Forest Service</u>, 703 F. Supp. 2d 1152 (D. Mont. 2010), this Court upheld

against ESA challenge FWS's 2006 biological opinion for the Rock Creek Mine

but invalidated the Forest Service's authorization for the project under that

agency's Organic Act and the National Environmental Policy Act.  The Ninth

Circuit affirmed the ESA ruling on appeal.  Rock Creek All. v. U.S. Fish &

Wildlife Serv., 663 F.3d 439 (9th Cir. 2011).

Two lawsuits concerning the Rock Creek Mine project are currently pending

in Montana's First Judicial District Court, Lewis and Clark County:  In Clark Fork

Coalition, et al. v. Montana Department of Natural Resources and Conservation, et

al., No. DDV 2018-150, a coalition of conservation organizations challenged the

water use permit for the mine pursuant to Montana's Water Use Act and the

Montana Constitution.  The District Court granted the conservation organizations'

petition for review on April 9, 2019, and vacated the challenged permit.  A motion

for attorney fees and costs is pending.  In Montanore Minerals Corporation, et al.

v. Montana Department of Environmental Quality, No. ADV 2018-363, the

Montana Department of Environmental Quality is seeking a judicial order barring

the president and chief executive officer of the Rock Creek Mine's owner, Hecla

Mining Company, from conducting mining or mineral exploration activities in

Montana pursuant to the so-called "bad actor" provisions of Montana's Metal Mine

Reclamation Act.

There has been additional prior litigation in the Montana state courts concerning the Rock Creek Mine project, but Plaintiffs are not aware of any such litigation that bears on the issues presented in this case.

### G.     Proposed Additional Stipulations of Fact and Law Not Included in the Statement of Stipulated Facts

The parties have not prepared a statement of stipulated facts under L.R. 16.2, and such statements generally are not applicable to cases like this one that are reviewed under the APA on the basis of an administrative record.  See L.R. 16.2(a).

### H.     Proposed Deadlines for Joining Parties or Amending the Pleadings

Plaintiffs propose a deadline for joining parties or amending the pleadings sixty (60) days after Federal Defendants lodge the administrative record(s) (as supplemented if necessary and appropriate).

### I.     Controlling Issues of Law Suitable for Pretrial Disposition

Resolution of this action will involve interpretation of the ESA and its implementing regulations and application of relevant case law to the facts contained in the administrative record(s) supporting the challenged agency decisions.  Therefore, this entire action may be resolved without a trial by cross-motions for summary judgment.

23

### J.      Individuals with Information Useful to Proving Plaintiffs' Claims

Plaintiffs will rely on the administrative record(s) to prove their claims, as supplemented if necessary and appropriate.

### K.      Insurance Agreement that May Cover any Judgment

Plaintiffs seek only declaratory and injunctive relief.

### L.      Status of Settlement Discussions and Prospects for Compromise

No settlement discussions have occurred to date.  Plaintiffs are open to negotiations regarding settlement if Defendants are willing to reconsider the agency determinations challenged in this case.

### M.      Suitability of Special Procedures

Plaintiffs anticipate that this action will be resolved on cross-motions for summary judgment based on the facts contained in the administrative record(s). Therefore, special procedures should not be needed.  In the event that Plaintiffs need to seek a preliminary injunction, Plaintiffs will advise the Court as early as possible of their intention to seek such relief.

Respectfully submitted this 6th day of May, 2019.

<u>/s/Katherine K. O'Brien</u>
Katherine K. O'Brien
Earthjustice
313 East Main Street
Bozeman, MT 59715
Phone:  (406) 586-9699
Fax:  (406) 586-9695
kobrien@earthjustice.org

Elizabeth Forsyth
Earthjustice
800 Wilshire Blvd., Suite 1000
Los Angeles, CA 90017
Phone:  (415) 217-2000
Fax:  (415) 217-2040
eforsyth@earthjustice.org

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2019, I filed the foregoing with the Clerk of the Court using the CM/ECF system, which will cause a copy to be served on all counsel of record.

/s/Katherine K. O'Brien