Katherine K. O'Brien
Earthjustice
313 East Main Street
Bozeman, MT 59715
Phone: (406) 586-9699
Fax: (406) 586-9695
kobrien@earthjustice.org

Elizabeth Forsyth *(Pro Hac Vice)*
Earthjustice
707 Wilshire Blvd., Suite 4300
Los Angeles, CA 90017
Phone: (213) 766-1067
Fax: (415) 217-2040
eforsyth@earthjustice.org
*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| KSANKA KUPAQA XAʾȽⱢⱭIN, ROCK CREEK ALLIANCE, EARTHWORKS, MONTANA ENVIRONMENTAL INFORMATION CENTER, DEFENDERS OF WILDLIFE, SIERRA CLUB, and CENTER FOR BIOLOGICAL DIVERSITY; | Case No. CV 19-20-M-DWM |
| Plaintiffs, | |
| v. | **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| UNITED STATES FISH AND WILDLIFE SERVICE; CHAD W. BENSON, Kootenai National Forest Supervisor; and UNITED STATES FOREST SERVICE; | |
| Defendants. | |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION ...................................................................................1

BACKGROUND .....................................................................................2

I.    THE ENDANGERED SPECIES ACT .........................................2

II.   THE ROCK CREEK MINE ..........................................................5

III.  ESA CONSULTATION AND LITIGATION HISTORY.............7

ARGUMENT .........................................................................................18

I.    STANDARD OF REVIEW..........................................................18

II.   THE AGENCIES UNLAWFULLY REFUSED TO REINITIATE
      CONSULTATION ON GRIZZLY BEARS ..................................19

      A.    FWS Unlawfully Determined in the 2017 Grizzly Bear
            Supplement that Reinitiation of Consultation is Not Warranted .......20

      B.    The Forest Service Unlawfully Authorized Phase I Without
            Reinitiating Consultation....................................................32

III.  FWS'S 2017 BULL TROUT BIOP VIOLATES THE ESA .......................33

      A.    Without an Incidental Take Statement for Phase II, FWS's 2017
            Bull Trout BiOp Violates the ESA....................................34

      B.    FWS's No-Jeopardy Determination is Arbitrary and Capricious .......37

CONCLUSION .......................................................................................44

# TABLE OF AUTHORITIES

Alliance for the Wild Rockies v. Zinke,
    265 F. Supp. 3d 1161 (D. Mont. 2017)................................................................21

Ariz. Cattle Growers' Ass'n v. Salazar,
    606 F.3d 1160 (9th Cir. 2010) ............................................................................19

Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.,
    273 F.3d 1229 (9th Cir. 2001) ......................................................................4, 35

Citizens to Preserve Overton Park v. Volpe,
    402 U.S. 402, 419-20 (1971) ..............................................................................32

Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.,
    789 F.3d 1075 (9th Cir. 2015) ............................................................................28

Ctr. for Biological Diversity v. Bureau of Land Mgmt.,
    698 F.3d 1101 (9th Cir. 2012) ......................................................................28, 33

Friends of Yosemite Valley v. Norton,
    348 F.3d 789 (9th Cir. 2003) ..............................................................................18

Kunaknana v. Clark,
    742 F.2d 1145 (9th Cir. 1984) ............................................................................32

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.
    Co.,
    463 U.S. 29 (1983)..............................................................................................43

Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,
    545 U.S. 967, 981 (2005)....................................................................................43

Oceana v. Pritzker,
75 F.Supp.3d 469, 491 (D.D.C. 2014)....................................................................39

Or. Nat. Res. Council v. Allen,
    476 F.3d 1031 (9th Cir. 2007) ......................................................................35, 36

Organized Vill. of Kake v. U.S. Dep't of Agric.,
    795 F.3d 956 (9th Cir. 2015) ..............................................................................43

Rock Creek Alliance v. U.S. Fish & Wildlife Serv.,
    390 F. Supp. 2d 993 (D. Mont. 2005)...................................................................9

Rock Creek Alliance v. U.S. Forest Serv.,
    703 F. Supp. 2d 1152 (D. Mont. 2010).............................................................9

Salmon Spawning & Recovery Alliance v. Gutierrez,
    545 F.3d 1220 (9th Cir. 2008) ............................................................................32

San Luis & Delta-Mendota Water Auth. v. Locke,
    776 F.3d 971 (9th Cir. 2014) ..............................................................................28

Save Our Cabinets v. U.S. Fish & Wildlife Serv.,
    255 F. Supp. 3d 1035 (D. Mont. 2017).......................................................*passim*

Sierra Club v. Marsh,
    816 F.2d 1376 (9th Cir. 1987) ............................................................................28

Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.,
    100 F.3d 1443 (9th Cir. 1996) ............................................................................32

## STATUTES AND REGULATIONS

5 U.S.C. § 706...........................................................................................................18
        § 706(2)(A)...............................................................................................18

16 U.S.C. § 1536(a)(2).................................................................... 2-3, 20, 28, 33
        § 1536(b)(3)(A) .........................................................................................4
        § 1536(b)(4)................................................................................4, 35, 36
        § 1538(a)(1)(B) .........................................................................................4
        § 1539.........................................................................................................4
        § 1540(g) ..................................................................................................18
        § 1540(g)(2)(A)(i) ...................................................................................15

50 C.F.R. § 402.02 .....................................................................................................3
        § 402.14 ......................................................................................................3
        § 402.14(g) ...............................................................................................35
        § 402.14(i)(1) .......................................................................................4, 35
        § 402.16 ...............................................................................20, 27, 32, 33
        § 402.16(a)(2).................................................................................*passim*

84 Fed. Reg. 45,017 (Aug. 27, 2019)....................................................................11

## INTRODUCTION

The proposed Rock Creek Mine in the Cabinet Mountains of northwest Montana threatens critically important but highly imperiled populations of grizzly bears and bull trout protected by the Endangered Species Act ("ESA"). As a result, federal authorizations for the Rock Creek Mine have been the subject of numerous lawsuits since the Defendants U.S. Fish and Wildlife Service and U.S. Forest Service issued their first approvals for the mine roughly twenty years ago. Despite repeated direction from this Court in response to those lawsuits and in litigation concerning the proposed Montanore Mine—which would inflict further harm on the grizzly bear and bull trout populations threatened by the Rock Creek Mine—the Defendants have again violated the ESA.

Two significant developments have occurred since this Court last reviewed ESA challenges to the Rock Creek Mine in 2010. First, the Defendants now have data showing that the key measures they are relying on to mitigate the mine's mortality risks to grizzly bears have failed to reduce the number of grizzly bear killings in the region even without the mine underway. This evidence undermines the Defendants' conclusions that the mitigation measures will be adequate to safeguard the highly vulnerable Cabinet-Yaak grizzly population as the Rock Creek Mine project unfolds. Second, the Defendants concede that the ESA analysis this Court upheld in 2010 failed to address major, permanent harm the

mine would inflict on bull trout by draining water from wilderness streams on which bull trout depend.

The Defendants' decisions in response to these new developments disregard this Court's prior rulings, ignore critical data, and violate the ESA. Indeed, the Defendants have persisted in ignoring the very data set that this Court ruled constitutes an "important aspect of the problem" when evaluating the threats to grizzly bears from the nearby Montanore Mine. Save Our Cabinets v. U.S. Fish & Wildlife Serv., 255 F. Supp. 3d 1035, 1045–63 (D. Mont. 2017). Further, the Fish and Wildlife Service failed to rationally justify its determination that the Rock Creek Mine would not jeopardize bull trout in light of this Court's ruling that the agency's parallel conclusion for the Montanore Mine violated the ESA. Id. at 1048–51. Faced with this defiance of the ESA and this Court's prior rulings, Plaintiffs ask this Court to once again enforce the ESA and set aside the Defendants' unlawful approvals for the Rock Creek Mine.

## BACKGROUND

## I.   THE ENDANGERED SPECIES ACT

Under the ESA, the U.S. Forest Service must ensure through consultation with the U.S. Fish and Wildlife Service ("FWS") that actions it authorizes—such as the Rock Creek Mine—will not jeopardize the continued existence of any species listed under the statute as threatened or endangered. 16 U.S.C.

2

§ 1536(a)(2).  An action causes jeopardy if it "reasonably would be expected, directly or indirectly," to reduce appreciably a species' likelihood of survival or recovery "by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.  The consultation process culminates in FWS's issuance of a biological opinion providing the agency's determination, based on the best scientific information available, of whether a proposed action will jeopardize a protected species.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.

For grizzly bears, FWS focuses its analysis on whether a project would jeopardize any of the five designated recovery-zone populations in the lower-48 states, which include the Cabinet-Yaak population threatened by the Rock Creek Mine.  FWS has determined that the survival and recovery of each recovery-zone population, including the Cabinet-Yaak, is essential to the conservation of the species.  See USFWS_037043; USFWS_037083–84; USFWS_003261.[1]

For bull trout, FWS's jeopardy determinations are based on project impacts to the affected "core area" population.  Core areas designated by FWS consist of one or more interbreeding local populations of bull trout and represent the basic unit by which FWS gauges the species' recovery.  USFWS_032574.  FWS has

[1] Citations to the administrative record lodged by FWS are indicated by "USFWS," followed by the bates-stamped page number.  Citations to the Forest Service's administrative record are indicated by "FS," followed by the bates-stamped page number.

explained that actions that jeopardize a core area population may jeopardize the species.  USFWS_003154.

Where, as in the case of the Rock Creek Mine, FWS determines that an action will not cause jeopardy but will "take"—i.e., harm or kill—members of a protected species, FWS is required to issue an "incidental take statement" with its biological opinion.  16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(i)(1).  The incidental take statement must analyze the impact of the anticipated take on the species' conservation, establish conditions for project implementation to mitigate those impacts, and establish a "trigger" that will signal if the project causes excessive take as it unfolds.  16 U.S.C. § 1536(b)(4); Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv., 273 F.3d 1229, 1239, 1249 (9th Cir. 2001).  The ESA prohibits any taking of protected species unless authorized in a valid incidental take statement.  16 U.S.C. §§ 1538(a)(1)(B), 1539.

In certain circumstances, the Forest Service and FWS must reinitiate ESA consultation following FWS's issuance of a biological opinion.  Among other circumstances, reinitiation of consultation is required if "new information reveals effects of the action that may affect listed species . . . in a manner or to an extent not previously considered."  50 C.F.R. § 402.16(a)(2).

## II.    THE ROCK CREEK MINE

This Court is well acquainted with the Rock Creek Mine proposal from this and prior litigation.  In brief, the proposal calls for constructing and operating a large-scale underground copper-silver mine beneath and adjacent to the Cabinet Mountains Wilderness in northwest Montana.  FS_118279.  The mine's industrial footprint would include a 325-foot-high, 324-acre waste-storage facility; an ore-processing mill; power lines; and a wastewater treatment plant.  FS_006517, 006519–22.  Project activities, which would disturb at least 445 acres of land and persist up to 38 years, would be divided into two phases:  Phase I would involve blasting a 6,300-foot underground adit to access the mineral deposit, which would generate 90,000 tons of waste, as well as associated roadwork and facilities construction.  FS_006518–19; FS_006529–30.  Phase II would involve constructing, operating, and reclaiming the mine and mill facilities.  FS_006518.  At full operation, the mine would produce up to 10,000 tons of ore per day, yielding approximately one million tons of waste that would be stored permanently on the doorstep of the wilderness.  FS_006529–30.

These activities would occur within the aboriginal territory of the Ktunaxa (Kootenai) people, permanently degrading areas that members of the Ktunaxa Nation utilize for traditional spiritual, cultural, and subsistence purposes and harming two ESA-protected species that hold profound spiritual and cultural

importance to the Ktunaxa people—grizzly bears and bull trout.  See Friedlander

Decl., ¶¶ 6, 8, 10.

Among other adverse impacts on threatened grizzly bears, mine

development would prompt a major influx of people into the remote project area,

exacerbating the risk that humans will kill grizzlies within the highly vulnerable

Cabinet-Yaak population due to poaching, hunters mistaking grizzlies for black

bears, or a real or perceived need for self-defense.  USFWS_041213–14;

USFWS_041225–26; USFWS_028464–70.  FWS has long taken the position that

even existing levels of human-caused grizzly mortality in the Cabinet-Yaak

ecosystem are "not sustainable with or without the Rock Creek Mine."

USFWS_028491; see also USFWS_003263.  FWS predicts that mortality threats to

grizzly bears would manifest in Phase I due to an initial "rapid influx of workers

and their families to the action area," prompting increased human-grizzly

encounters that are often lethal for bears.  USFWS_041225–26.

Mine development would also threaten bull trout in the Rock Creek and Bull

River drainages—populations FWS has recognized as vital to bull trout

conservation in the region.  USFWS_032451.  Bull trout have highly specific

habitat requirements, including water that is very cold and very clean.

USFWS_032575.  They also require viable migratory corridors to access seasonal

habitat.  Id.  The local bull trout populations the mine would harm already are

impacted by "[m]ajor fish passage barriers," including dams at Cabinet Gorge, Noxon Rapids, and Thompson Falls on the Lower Clark Fork River. USFWS_003038.  Operation of the Rock Creek Mine would further harm these populations by, among other impacts, permanently reducing baseflows in streams that already experience dangerous low-flow periods and polluting their habitat with harmful sediment.  USFWS_003041–51.[2]

## III.   ESA CONSULTATION AND LITIGATION HISTORY

Plaintiffs challenge (1) FWS's 2017 supplement to its 2006 grizzly bear biological opinion for the Rock Creek Mine, (2) FWS's 2017 bull trout biological opinion for the mine, and (3) the Forest Service's 2018 record of decision authorizing Phase I of the mine.  As described below, these decisions follow multiple prior rounds of ESA consultation on the project, which over the past two decades have spawned multiple rounds of litigation and judicial intervention to correct the Defendants' repeated unlawful approvals for the mine.

FWS completed its first biological opinion for the Rock Creek Mine in 2000, in which it concluded that the project would jeopardize grizzly bears but not bull trout.  USFWS_028387–88.  In reaching its jeopardy determination for grizzly

---

[2] Baseflow is the portion of a stream's water volume that derives from groundwater contribution, as opposed to runoff from rain and snowmelt.  During dry conditions, baseflow is the primary, if not exclusive, source of running water in a stream.

bears, FWS identified human-caused mortality as "one of the greatest threats to grizzly bears in [the Cabinet-Yaak] Ecosystem," USFWS_017227, predicted that mortality risks would "increase significantly" as a result of the mine, and concluded that these increased mortality risks "can only be partially offset" through mitigation measures, USFWS_017271; see also USFWS_017272. FWS and the Forest Service ultimately approved the mine based on additional mitigation commitments, but withdrew those approvals in 2002 rather than defend them in litigation. USFWS_028388; USFWS_002987.

FWS issued a second biological opinion for the Rock Creek Mine in 2003, this time determining that the mine would not jeopardize grizzly bears or bull trout. USFWS_028388. FWS's 2003 no-jeopardy determination rested in part on the recent abandonment of plans to develop the Montanore Mine—a second large-scale copper/silver mine proposed to be developed just over the crest of the Cabinet Mountains from the Rock Creek Mine that would inflict additional harm on the grizzly and bull trout populations that the Rock Creek Mine threatens. USFWS_028388–89. According to FWS, abandonment of the Montanore Mine proposal "changed significantly" the environmental baseline against which FWS assessed the Rock Creek Mine's effects. USFWS_028389.

Environmental organizations, including some of the plaintiffs here, challenged FWS's 2003 biological opinion. This Court ruled that FWS had

violated the ESA by (1) irrationally concluding that the Cabinet-Yaak grizzly bear population could withstand additional human-caused mortality from the Rock Creek Mine, and (2) irrationally dismissing the mine's threats to bull trout in Rock Creek as insignificant to the species' conservation. Rock Creek Alliance v. U.S. Fish & Wildlife Serv., 390 F. Supp. 2d 993, 1008–11 (D. Mont. 2005) ("Rock Creek I").

Following a remand from this Court, FWS issued a third biological opinion for the Rock Creek Mine in 2006 ("2006 BiOp"), concluding again that the mine would not jeopardize grizzly bears or bull trout. USFWS_028385–86. FWS concluded that the mine's impacts on bull trout would be limited to short-term sediment pollution, USFWS_002020–21, and that the mine would not adversely affect the uniquely important Bull River population, "the principal and most productive local population" in the Lower Clark Fork River Core Area. USFWS_002021. FWS supplemented the 2006 BiOp in September 2007 to address new information regarding grizzly bear status and "to provide corrections and clarifications" to FWS's bull trout analysis. USFWS_002987. In response to legal challenges, this Court upheld the 2006 BiOp but vacated the Forest Service's associated environmental impact statement and record of decision. Rock Creek Alliance v. U.S. Forest Serv., 703 F. Supp. 2d 1152, 1180 (D. Mont. 2010) ("Rock Creek II"), aff'd 663 F.3d 439 (9th Cir. 2011).

9

Five years after <u>Rock Creek II</u>, with the Forest Service's remand process still pending, new information revealed that the Rock Creek Mine threatens impacts to grizzly bears and bull trout that FWS never considered in its 2006 BiOp or 2007 supplement.  First, a 2011 Forest Service analysis showed that the Rock Creek Mine would permanently deplete baseflows in bull trout critical habitat in Rock Creek and East Fork Bull River—a major impact FWS had not disclosed in the 2006 biological opinion upheld by this Court.  USFWS_039501–03.  Second, projects to improve fish passage across dams on the Lower Clark Fork River that fragment bull trout populations had not been completed as FWS had predicted in its prior biological opinion, leaving the bull trout populations threatened by the Rock Creek Mine more vulnerable than FWS had expected.  USFWS_039503–04.  Third, the number of human-caused grizzly bear mortalities in the Cabinet-Yaak ecosystem had not decreased since 2007 despite a rollout of the key conflict-reduction measures in the Rock Creek Mine mitigation plan.  USFWS_039506.  This evidence undermined the determination in FWS's 2006 biological opinion that such measures would deliver a net reduction in grizzly bear killings across the ecosystem even with the mine underway—a contention that was critical to FWS's no-jeopardy conclusion.  USFWS_039504–06.

Accordingly, in March 2015, conservation groups, including two of the plaintiffs here, formally requested that FWS reinitiate ESA consultation with the

Forest Service on the Rock Creek Mine because "new information reveal[ed] effects of the action that may affect listed species . . . in a manner or to an extent not previously considered," 50 C.F.R. § 402.16(a)(2).[3]  USFWS_039500–07.  The groups supplemented their reinitiation request in April 2015 with additional data predicting more severe stream baseflow reductions from the Rock Creek Mine.  USFWS_039571–73.  FWS rejected the groups' request for reinitiation of ESA consultation in May 2015.  USFWS_039612–13.

During this same period, plans for the nearby Montanore Mine were resuscitated, generating further litigation before this Court.  On May 30, 2017, this Court held that FWS and the Forest Service violated the ESA in reviewing and approving the Montanore Mine, addressing several issues that also are relevant to the Rock Creek Mine.  Specifically, this Court held that (1) FWS's determination that mitigation measures would more than offset the increased risks of human-caused grizzly bear mortality from the Montanore Mine was irrational because FWS failed to consider data showing that a test-run of the key measures since 2007—namely, conflict-reduction work by a grizzly bear management specialist and wildlife law enforcement—had failed to reduce grizzly bear killings even

_____

[3] This subsection of the regulation was renumbered, but not substantively amended, in 2019.  See Final Rule, U.S. Fish & Wildlife Serv., Endangered and Threatened Wildlife and Plants; Regulations for Interagency Cooperation, 84 Fed. Reg. 45,017 (Aug. 27, 2019).

without that mine underway; (2) FWS irrationally concluded that the Montanore Mine would not jeopardize bull trout despite FWS's finding that the mine would permanently harm the Rock Creek and Bull River local populations, which FWS had concluded are vital to conserving bull trout in the region; and (3) FWS unlawfully issued an incidental take statement for bull trout that lacked a functional "trigger" for reinitiating consultation in the event of excessive take. Save Our Cabinets, 255 F. Supp. 3d at 1045–63.  This Court further ruled that the Forest Service violated the ESA by approving the Montanore Mine in reliance on FWS's flawed biological opinions.  Id. at 1063.

Following that ruling, conservation groups again asked FWS to reinitiate consultation on the Rock Creek Mine.  USFWS_039386.  The groups stressed that this Court's ruling in Save Our Cabinets that FWS violated the ESA by ignoring the track record of mitigation measures to reduce grizzly bear mortality applied equally to FWS's no-jeopardy determination for the Rock Creek Mine, as both projects present similar mortality risks and rely on substantially identical mitigation measures to avoid jeopardy.  USFWS_039394–95.  The groups also argued that FWS must reconcile its conclusion that the Rock Creek Mine will not jeopardize bull trout with Save Our Cabinets, including by rationally accounting for the harm the Rock Creek project would inflict on important local bull trout populations within an already-degraded core area.  USFWS_039391–93.

12

Despite the conservation groups' requests, FWS did not reinitiate consultation concerning the Rock Creek Mine's impacts on grizzly bears.  Instead, in November 2017 FWS issued a second supplement to its 2006 grizzly bear BiOp in which FWS updated "basic species information" and determined that reinitiating consultation "is not required" because "there is no new information revealing effects of the Rock Creek Mine that may affect grizzly bears in a manner or to an extent not previously considered."  USFWS_003253 ("2017 Grizzly Bear Supplement").  FWS's 2017 Grizzly Bear Supplement did not address the mortality data presented in the conservation groups' reinitiation requests and addressed in Save Our Cabinets.

FWS and the Forest Service did decide, however, that reinitiating consultation concerning bull trout was justified by the new evidence of baseflow impacts that the conservation groups cited in their reinitiation requests as well as FWS's designation of additional bull trout critical habitat in the project area. USFWS_002828–29; USFWS_002833.  Accordingly, the agencies completed a new round of formal consultation culminating in FWS's issuance of a new bull trout biological opinion in November 2017 ("2017 Bull Trout BiOp"). USFWS_002980–81.  The 2017 Bull Trout BiOp states that it "replaces the October 11, 2006 Rock Creek Mine biological opinion on bull trout, as supplemented on September 27, 2007."  USFWS_002982.  Like FWS's prior

13

analyses, FWS's 2017 Bull Trout BiOp addressed both phases of the Rock Creek Mine proposal and concluded that the entire project would not jeopardize bull trout.  USFWS_002988; USFWS_003056.

Unlike its prior analyses, however, in the 2017 Bull Trout BiOp FWS classified the Rock Creek and Bull River local populations threatened by the mine as part of the Lake Pend Oreille core area, instead of the Lower Clark Fork River core area to which FWS previously assigned them.  USFWS_003022–23.  The Lake Pend Oreille core area population is, according to FWS, larger and stronger than the Lower Clark Fork River core area population.  Compare USFWS_003052–53; with USFWS_032368, 032395.  This reclassification therefore diluted the Rock Creek Mine's apparent impacts, and FWS found the mine's threats to the more robust Lake Pend Oreille core area population "negligible."  Id.  The 2017 Bull Trout BiOp contains no explanation for FWS's decision to analyze the local populations affected by the mine as part of the stronger Lake Pend Oreille core area, as opposed to the weaker Lower Clark Fork River core area to which FWS had previously assigned those populations.

In August 2018, the Forest Service issued a record of decision authorizing Phase I of the Rock Creek Mine in reliance on FWS's no-jeopardy determinations for grizzly bears and bull trout.  FS_118269–118618.  With the agencies' ESA review of the project apparently concluded, Plaintiffs provided notice of their

14

intent to sue pursuant to the ESA's citizen suit provision, 16 U.S.C.

§ 1540(g)(2)(A)(i) and filed their complaint in this matter on January 25, 2019.

Compl. (Doc. 1).  Plaintiffs challenged (1) FWS's determination in the 2017

Grizzly Bear Supplement that no new information generated since 2007

necessitates reinitiation of consultation, and the Forest Service's August 2018

record of decision approving Phase I of the Rock Creek Mine without reinitiating

consultation; (2) FWS's 2017 no-jeopardy determination for bull trout, which rests

on FWS's unexplained reclassification of the local bull trout populations the mine

would harm to a stronger core area; and (3) FWS's bull trout incidental take

statement, which relied on the identical trigger for reinitiating consultation that this

Court invalidated in Save Our Cabinets, 255 F. Supp. 3d at 1058–59.  See id.

     In response, on May 20, 2019, Federal Defendants moved this Court to stay

this litigation "to permit the agencies to review and (as warranted) amend,

supplement, or withdraw the ESA documents challenged in this case" in light of

"events that have occurred since those documents were completed," including

specifically the Forest Service's issuance of a record of decision authorizing only

Phase I of the mine—an event that occurred five months before Plaintiffs filed

their complaint.  Federal Defs.' Br. in Supp. of Mot. to Stay at 3 (Doc. 27).

Plaintiffs opposed the stay and on June 7, 2019, this Court denied Federal

Defendants' motion, stating that "Defendants are free to withdraw or amend their

decisional documents at any time" but "cannot delay ongoing litigation to shore up

the administrative record or search for post-hoc rationalizations based on new

information."  Order (Doc. 30) at 2 (citation omitted).

Eleven days after this Court denied the agencies' stay motion, FWS received

a letter from the Forest Service purportedly "informing" FWS that the record of

decision the Forest Service had issued roughly one year earlier approved only

Phase I of the Rock Creek Mine.  USFWS_041233; USFWS_041195.  According

to FWS, it then "studied" the Forest Service's 2018 record of decision and FWS's

own 2017 Bull Trout BiOp and, on September 30, 2019, recommended that the

agencies reinitiate ESA consultation "[b]ecause the proposed action has been

modified" by the Forest Service's August 2018 record of decision to encompass

Phase I only.  USFWS_041195; USFWS_041233.  On October 22, 2019, the

Forest Service agreed to reinitiate consultation.  USFWS_041199.

The ensuing consultation process concluded less than one month later with

FWS's issuance of a "Supplement" to the 2017 Bull Trout BiOp and 2006 grizzly

bear BiOp.  USFWS_041199.  The 2019 Supplement's stated purpose was to

"update" the proposed action under review to consist only of Phase I and remove

the incidental take statement for Phase II that Plaintiffs had challenged on the basis

that it is "no longer relevant."  USFWS_041199, 041218.  Otherwise, the 2019

Supplement did not withdraw or supersede FWS's 2017 Bull Trout BiOp or 2006

grizzly bear BiOp (as previously supplemented in 2007 and 2017). Id. Indeed, the 2019 Supplement consists largely of text cut-and-pasted or incorporated by reference from FWS's prior biological opinions and "affirms the no jeopardy and no adverse modification [of critical habitat] determinations" reached in the prior opinions, which cover both phases of the mine. USFWS_041216–17. In the 2019 Supplement, FWS stated that it "understand[s] that activities in Phase II will be subject to additional Endangered Species Act consultation" when the Forest Service approves that phase. USFWS_041199. Nevertheless, FWS has not withdrawn its existing no-jeopardy determinations for Phase II. Accordingly, FWS's operative final agency actions regarding ESA consultation for the Rock Creek Mine determine that the entire project—including Phases I and II—will not jeopardize grizzly bears or bull trout.

Plaintiffs filed an amended complaint on February 11, 2020, in light of this agency maneuvering. First Am. and Suppl. Compl. (Doc. 61). Plaintiffs now move for summary judgment on all claims, seeking an order that (1) FWS unlawfully determined in the 2017 Grizzly Bear Supplement that no information generated since 2007 necessitates reinitiation of consultation, and the Forest Service's August 2018 record of decision unlawfully approved Phase I of the Rock Creek Mine without reinitiating consultation; (2) FWS's 2017 Bull Trout BiOp is invalid because FWS withdrew the incidental take statement for Phase II while

leaving its no-jeopardy determination for Phase II in effect; and (3) FWS's 2017

no-jeopardy determination for bull trout is unlawful because it arbitrarily analyzes

the mine's impacts on a more robust core area population, which masks the mine's

impacts.  Plaintiffs ask this Court to vacate the challenged decisions and enjoin the

Defendants from authorizing commencement of the Rock Creek Mine project until

they comply with the ESA.

## ARGUMENT

## I.   STANDARD OF REVIEW

Plaintiffs bring this action pursuant to the Administrative Procedure Act

("APA"), 5 U.S.C. § 706, and the ESA's citizen suit provision, 16 U.S.C.

§ 1540(g).  The APA directs the reviewing court to set aside agency action that is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law."  5 U.S.C. § 706(2)(A).  Under this standard, "[c]ourts must carefully review

the record to ensure that agency decisions are founded on a reasoned evaluation of

the relevant factors, and may not rubber-stamp administrative decisions that they

deem inconsistent with a statutory mandate or that frustrate the congressional

policy underlying a statute."  Friends of Yosemite Valley v. Norton, 348 F.3d 789,

793 (9th Cir. 2003) (quotation and alterations omitted).  Even where an agency

with "technical expertise" is acting "within its area of competence," "the court

need not defer to the agency when the agency's decision is without substantial

basis in fact, and there must be a rational connection between the facts found and the determinations made." Ariz. Cattle Growers' Ass'n v. Salazar, 606 F.3d 1160, 1163 (9th Cir. 2010) (citations omitted).

## II.  THE AGENCIES UNLAWFULLY REFUSED TO REINITIATE CONSULTATION ON GRIZZLY BEARS

The agencies violated the ESA by refusing to reinitiate consultation before approving commencement of the Rock Creek Mine to address evidence that the mitigation measures on which FWS's no-jeopardy determination depends have failed to reduce grizzly bear killings even without the mine underway.  FWS and the Forest Service have long recognized that the Rock Creek Mine poses major mortality threats to Cabinet-Yaak grizzly bears—a population that is essential to the species' recovery and already suffers from unsustainable human-caused mortality without a major mine in the ecosystem.  Accordingly, FWS's no-jeopardy determination depends on its conclusion that measures to reduce human-grizzly conflicts in the Rock Creek Mine's mitigation plan will ensure that zero grizzly bear killings result from Phase I of the project and will deliver a net reduction in human-caused mortality across the ecosystem over the life of the mine.

As this Court is aware from the Save Our Cabinets litigation, a bear management specialist funded by the Rock Creek Mine proponent has implemented key components of FWS's conflict-reduction strategy since 2007.

19

Nevertheless, FWS's own data show that the number of grizzly bear killings in the Cabinet-Yaak <u>increased</u> in the following decade.  As this Court already ruled in addressing a substantively identical issue concerning the Montanore Mine, these data critically undermine FWS's reliance on conflict-reduction measures to more than offset the Rock Creek Mine's mortality threat to grizzlies.  <u>Save Our Cabinets</u>, 255 F. Supp. 3d at 1063.  Contrary to this Court's direction in <u>Save Our Cabinets</u>, and despite Plaintiffs' multiple reinitiation requests, the agencies have stubbornly refused to consider the track record of the key mitigation measures they relied upon to approve the mine.  The agencies' refusal to reinitiate ESA consultation to address evidence that those measures have failed to deliver their anticipated benefits is arbitrary and capricious and violates the ESA, 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.16.

### A.      FWS Unlawfully Determined in the 2017 Grizzly Bear Supplement that Reinitiation of Consultation is Not Warranted

Since FWS conducted its first ESA analysis of the Rock Creek Mine twenty years ago, it has recognized that human-caused mortality from the mine poses an existential threat to the Cabinet-Yaak grizzly population.  As FWS repeatedly has affirmed, the Cabinet-Yaak population is "essential to long-term survival and recovery of grizzly bears throughout a significant portion of [their] range in the U.S."  USFWS_028406 (2006 BiOp); USFWS_003262 (2017 Grizzly Bear Supplement).  Today, however, FWS's most optimistic estimate places the

Cabinet-Yaak population at 55–60 grizzlies, USFWS_041208, a number that falls

well short of FWS's minimum recovery goal of 100 and places the population at

high risk of extinction—even without the mine underway, USFWS_028407–08,

028412 (2006 BiOp acknowledging that grizzly "[p]opulations with fewer than

50–100 adults are at high risk of extinction") (citation omitted).  Just 24 grizzlies

are believed to persist in the Cabinet Mountains where the mine would be built,

USFWS_041830, and those bears are functionally isolated from other populations

that could bolster their numbers, USFWS_041832; USFWS_028416.[4]

Excessive human-caused mortality is the principal driver of the Cabinet-

Yaak grizzly population's dangerously low numbers, USFWS_041833, and FWS

has determined that "[t]he existing human-caused mortality rate, given the small

grizzly bear population, is not sustainable with or without the Rock Creek Mine,"

USFWS_028491 (2006 BiOp) (emphasis added); FS_021544 (same conclusion in

2014 Montanore BiOp); see also USFWS_003263 (2017 Supplement affirming

---

[4] In the record, FWS cites various estimates of the size of the Cabinet-Yaak grizzly
population.  See, e.g., USFWS_003262 (2017 Grizzly Bear Supplement citing
minimum estimate of 41 bears); USFWS_003264 (same document citing 2016
population estimate of 55 bears); see also Alliance for the Wild Rockies v. Zinke,
265 F. Supp. 3d 1161, 1166 (D. Mont. 2017) (observing, in decision overturning
FWS's decision not to elevate Cabinet-Yaak grizzlies from "threatened" to
"endangered" status under the ESA, that "it is undisputed that less than 50
individual bears can be found in the [Cabinet-Yaak] recovery zone").  Regardless
of which number one utilizes, it is beyond dispute that the population remains
precariously small and far below FWS's minimum recovery standard.

that "[i]mproving survival by reducing human-caused mortality is crucial for

recovery of this population") (citation omitted)).

Against this backdrop, FWS determined that the mine's greatest threat to

grizzly bears would be the increased risk of human-caused mortality

accompanying the influx of mine workers and their families into the remote project

area.  USFWS_028464–65.  As FWS acknowledged, "[i]ncidental or accidental

human caused grizzly bear mortality, combined with a few people intent on

illegally shooting bears, can collectively result in serious, detrimental effects to

grizzly bear populations."  USFWS_028441.  According to FWS, the mortality risk

from the mine would manifest during Phase I and increase in Phase II.  See

USFWS_028465 (2006 BiOp stating that "[t]he initial influx of workers into

grizzly bear habitat would be associated with the evaluation phase of the project"

and threaten Cabinet-Yaak grizzlies without adequate mitigation);

USFWS_028466 (FWS predicting substantial influx of people into project area

"would occur over a very short time frame once hiring for the mine begins").

Accordingly, FWS's no-jeopardy determination for grizzlies depends on the

agency's conclusion that conflict-reduction work by a bear management specialist

and wildlife law enforcement capacity called for by the mine's mitigation plan

would (1) ensure that zero grizzly bear killings result from Phase I of the mine; (2)

ensure that no more than one grizzly bear killing results from the project over its

roughly 35-year life; and (3) prevent more than one killing of female grizzly bears

that would have occurred in the Cabinet-Yaak ecosystem in the mine's absence,

thereby delivering a net reduction in human-caused mortality compared to the pre-

mine baseline.  USFWS_028472, 028480, 028500.  This ambitious conclusion—

that mitigation measures would not only completely neutralize the mortality risks

from a large-scale mine in the middle of a narrow band of vital grizzly bear habitat

but also prevent additional mortalities that would have occurred in the mine's

absence—was essential to FWS's no-jeopardy finding.  See, e.g., USFWS_028492

(2006 BiOp stating measures are required "to improve the current population status

of grizzly bears in the [Cabinet-Yaak Ecosystem]" so "the population could sustain

potential adverse impacts from the mine and not result in jeopardy to the species");

USFWS_028470 (2006 BiOp stating mitigation plan "was fashioned in recognition

that current levels of human-caused grizzly bear mortality in the [Cabinet-Yaak

Ecosystem] were too high, and that measures to reduce mortality were needed with

or without the proposed action"); USFWS_028500 (2006 BiOp stating that

"augmentation of the [Cabinet-Yaak] population and a reduction in mortality are

essential factors in reducing the probability of extinction") (emphasis in original).

Further, while the mine's mitigation plan includes additional measures, FWS relied

specifically on the anticipated benefits of public education and sanitation work by

the bear specialist and law enforcement officer to conclude that no human-caused

mortality would result from Phase I, USFWS_028474, and determined that specifically "[a]s a result of the agency bear specialist and law enforcement positions" required by the plan, there would be "a net reduction in the overall existing mortality risks to grizzly bears on both national forest and private lands within the action area and across the [Cabinet-Yaak]," USFWS_028476 (emphasis added). In short, FWS made the anticipated efficacy of conflict-reduction work by the specialist with law enforcement support a linchpin of its conclusion that the mine would not jeopardize grizzly bears.

Despite the major emphasis FWS placed on the success of these conflict-reduction measures, FWS and the Forest Service have failed to rationally evaluate the results from a test run of those measures that has been underway since 2007. Pursuant to FWS's mitigation plan, a bear specialist position for the Cabinet-Yaak ecosystem was established in 2007. USFWS_041293–94. Since then, the specialist has implemented the very measures called for in the mitigation plan, such as working with area residents to secure grizzly bear attractants, responding to human-grizzly conflicts, and educating the public about coexisting with grizzlies. See USFWS_041215–16 (listing mitigation requirements); USFWS_041295–96 (specialist's annual report). A wildlife law-enforcement officer also is in place to address human-grizzly bear conflicts in the Cabinet-Yaak. USFWS_041295; FS_021541. Nevertheless, the number of human-caused grizzly bear mortalities in

the Cabinet-Yaak _increased_ in the decade following implementation of these measures, as compared to the prior ten-year period.  Specifically, 16 known human-caused mortalities occurred in 2007–2016, compared to 13 in 1997–2006.  USFWS_041689–91; USFWS_041588–89.[5]  Importantly, this increased level of grizzly bear mortality occurred even without the influx of new mine workers and associated risk of increased mortality that FWS assumed the mitigation measures would address.

Plaintiffs twice alerted FWS that this documented increase in human-caused mortality triggered the agencies' obligation to reinitiate ESA consultation.  USFWS_039504–06; USFWS_039386.  ESA implementing regulations dictate that "[r]einitiation of consultation is required and shall be requested" by FWS or the Forest Service where, _inter alia_, "new information reveals effects of the action that may affect listed species … in a manner or to an extent not previously considered."  50 C.F.R. § 402.16(a)(2).  Here, data showing that grizzly bear killings increased in the decade following the initiation of conflict-reduction measures in the mine's mitigation plan undermine FWS's conclusion that those

---

[5] Consistent with the scope of the mitigation efforts, these figures exclude mortalities in Canada and domestic areas more than ten miles outside the Cabinet-Yaak recovery zone.  These figures also exclude FWS's estimates of additional human-caused mortalities not reported to authorities.  FWS estimates there were an additional 5 unreported mortalities during 1999–2006 and an additional 11 during 2007–2016.  USFWS_041604.

measures can be counted on to more than offset the mine's mortality threats.
Accordingly, the data demonstrate that the project may pose greater mortality risks
to grizzlies than FWS considered in its 2006 BiOp or 2007 supplement, triggering
the requirement for renewed consultation.  See id.

Indeed, this conclusion follows ineluctably from this Court's Save Our
Cabinets ruling concerning the Montanore Mine.  As this Court is aware, the
Montanore Mine is proposed just over the Cabinet Mountains ridgeline from the
Rock Creek project and threatens the same grizzly population.  Save Our Cabinets,
255 F. Supp. 3d at 1040, 1059.  Just as it did regarding the Rock Creek Mine, in its
review of the Montanore proposal FWS determined that the greatest impact on
grizzlies would be increased human-caused mortality risks from an influx of
people into the project area.  Id. at 1060.  And just as with Rock Creek, FWS
recognized that the existing level of human-caused mortality in the Cabinet-Yaak
grizzly bear population is unsustainable and predicated its no-jeopardy
determination on its conclusion that conflict-reduction measures in the Montanore
Mine's mitigation plan—which are substantively identical to those proposed for
Rock Creek—would more than offset the increased mortality risks from the mine.
Id. at 1060–61.  The Save Our Cabinets plaintiffs challenged FWS's no-jeopardy
determination because, among other flaws, FWS failed to consider the same body

of data at issue here showing that grizzly bear killings increased in the years since mitigation efforts began.  Id. at 1062.

This Court agreed, ruling that the agencies "failed to consider an important aspect of the problem" and violated the ESA by reaching a no-jeopardy determination for the Montanore Mine without considering the same body of mortality data Plaintiffs invoke here.  Id. at 1063.  As the Court explained, "the fact that the number of mortalities with these mitigation measures in place is, at best, the same as it was prior to their implementation, undercuts the agency's blanket reliance on their efficacy to more than make up for the Mine's negative impacts." Id.

Nevertheless, just six months after this Court's Save Our Cabinets ruling, FWS concluded in its 2017 Grizzly Bear Supplement that no new information generated since 2007 warranted reinitiation of consultation concerning the Rock Creek Mine's impacts on grizzly bears.  USFWS_003253.  That determination violates the ESA implementing regulations, 50 C.F.R. § 402.16, and cannot be reconciled with Save Our Cabinets.  As this Court held, data showing increased grizzly bear killings since 2007 constitute an "important aspect of the problem" that the agencies must consider in analyzing the magnitude of mortality threats posed to grizzly bears by a major mine in the Cabinet Mountains and the ability of conflict-reduction measures to neutralize those threats.  Save Our Cabinets, 255 F.

Supp. 3d at 1063.  Further, because the data "undercuts the agency's blanket

reliance on the[] efficacy" of mitigation measures, id., the data indicate that the

Rock Creek Mine may threaten grizzly bears with human-caused mortality "to an

extent not previously considered," triggering the agencies' duty to reinitiate

consultation.  50 C.F.R. § 402.16(a)(2).

Indeed, even before Save Our Cabinets, it was well settled that the agencies

must reinitiate consultation when mitigation measures fail to produce their

anticipated benefits.  See Ctr. for Biological Diversity v. Bureau of Land Mgmt.,

698 F.3d 1101, 1115 (9th Cir. 2012) ("[W]here an action agency does not reinitiate

consultation with the FWS despite the failure of promised conservation measures,

the Biological Opinion for the proposed action becomes invalid.") (citation

omitted); Sierra Club v. Marsh, 816 F.2d 1376, 1388–89 (9th Cir. 1987) (holding

reinitiation was required where the agency failed to acquire mitigation lands),

abrogation on other grounds recognized by Cottonwood Envtl. Law Ctr. v. U.S.

Forest Serv., 789 F.3d 1075 (9th Cir. 2015).  Further, to satisfy the ESA's mandate

to utilize the best scientific information available, FWS may not "ignore available

studies" relevant to its decision.  San Luis & Delta-Mendota Water Auth. v. Locke,

776 F.3d 971, 995 (9th Cir. 2014); see also 16 U.S.C. § 1536(a)(2).  FWS's failure

even to address the post-2007 mortality data in its 2017 Supplement—let alone

rationally explain why it does not require renewed consultation—violates that mandate.

Nothing in the 2017 Grizzly Bear Supplement fills this fatal gap in FWS's analysis. FWS's only reference to the decade-plus track record of mitigation measures undergirding its no-jeopardy determination is to express the agency's "opinion"—unsupported by any data—that the bear specialist "has had its intended benefit, by preventing some grizzly bear mortality that would have otherwise occurred due to management action or defense of life (as evidenced by pre-management incidents in Montana)." USFWS_003265. This opinion does not supply the reasoned analysis the ESA and Save Our Cabinets demand. More fundamentally, while Plaintiffs do not doubt that the specialist's work likely prevented some grizzly bear killings that otherwise would have occurred, FWS's no-jeopardy determination depends on those efforts achieving much more than "some" unquantified mortality reduction. As described, FWS's no-jeopardy determination rests on its conclusion that the specialist's work will, in tandem with law enforcement, ensure that no mortality results from Phase I, ensure only one mortality results from the decades-long project overall, and prevent more than one killing of female grizzlies that would have occurred in the mine's absence. USFWS_ 028472; USFWS_028474; USFWS_028476; USFWS_028480; USFWS_028500. That the number of human-caused mortalities since 2007 might

have been even worse without the specialist does little to shore up FWS's

ambitious prediction that continued conflict-reduction efforts will deliver a net

reduction in mortality with a large-scale mine in the ecosystem.

FWS's claim in the 2017 Supplement that the Cabinet-Yaak grizzly

population has "improved" since 2006 also cannot justify the agency's decision.

USFWS_003262; USFWS_003265.  Regardless of any alleged improvement FWS

cites, FWS has never determined that the population has improved to a point where

it could withstand additional mortality from the mine if mitigation measures fail to

live up to FWS's promises.  See USFWS_003262–65.  Indeed, the 2017

Supplement reaffirmed FWS's longstanding position that reducing existing human-

caused mortality levels remains "crucial for recovery of this population."

USFWS_003262–63 (citing Proctor, et al. 2004); see also USFWS_041836 (2016

study cited by FWS affirming that "[i]n the small Cabinet and Yaak populations,

the difference between [population] growth and decline is 1 or 2 adult females

being killed annually or not"); FS_021544 (FWS stating in 2014 Montanore Mine

biological opinion that "[a] population of only 40 to 50 grizzly bears [in the

Cabinet-Yaak] makes any number of human-caused mortalities, in addition to

natural mortality, a significant factor in population decline").  Thus, regardless of

any claimed improvements, the record contains no finding by FWS that avoiding

jeopardy to grizzly bears requires anything less of the mitigation measures than the

agency judged necessary in the 2006 BiOp—namely, delivering a <u>net reduction</u> in

human-caused mortality with the mine underway.  USFWS_028470;

USFWS_028472.[6]

In sum, by concluding in the 2017 Grizzly Bear Supplement that no

information generated since 2007 indicates greater risks to grizzlies from the Rock

Creek Mine than FWS previously evaluated—without considering data showing

<u>more</u> human-caused mortalities in the decade after mitigation efforts began—FWS

"failed to consider an important aspect of the problem" and violated the ESA

regulations.  <u>Save Our Cabinets</u>, 255 F. Supp. 3d at 1063; <u>see</u> 50 C.F.R.

---

[6] Moreover, FWS's population-improvement claim is irrational because, among other flaws, it ignores the segments of the Cabinet-Yaak grizzly population that suffer from the highest mortality rates—namely, adult and sub-adult males, bears that have been captured due to conflicts with humans, and bears that are part of the population-augmentation program.  USFWS_035513; <u>see</u> USFWS_035535–37 (reporting higher survival rates for females and grizzlies that were not management-trapped nor part of the augmentation program compared to the male, management-trapped, and augmentation bears excluded from FWS's population-growth estimate).  FWS's approach is like claiming that life expectancy has improved in Montana based on an analysis that excludes mortality data for the elderly and chronically ill.

§ 402.16(a)(2).  This Court should set aside FWS's determination that reinitiation

of consultation is not warranted.[7]

### B.    The Forest Service Unlawfully Authorized Phase I Without Reinitiating Consultation

While FWS's 2017 determination is unlawful, the ESA equally demands that

the Forest Service consider the increased grizzly bear killings since 2007 through

renewed ESA consultation.  See 50 C.F.R. § 402.16 (enumerating circumstances

when "[r]einitiation of consultation is required and shall be requested by the

Federal agency" with authority for approving a proposed action "or by the [Fish

and Wildlife] Service"); Salmon Spawning & Recovery Alliance v. Gutierrez, 545

F.3d 1220, 1229 (9th Cir. 2008) ("The duty to reinitiate consultation lies with both

the action agency and the consulting agency.").  Indeed, the ultimate responsibility

for preventing jeopardy to listed species from the Rock Creek Mine falls on the

---

[7] FWS's issuance of the 2019 Supplement in the midst of this litigation does not change the result, as it postdates—and cannot be used to justify—the 2017 Grizzly Bear Supplement and 2018 record of decision that Plaintiffs challenge.  It is well settled that "[a]gency actions are reviewed by examining the administrative record at the time the agency made its decision," Kunaknana v. Clark, 742 F.2d 1145, 1149 (9th Cir. 1984) (citing Citizens to Preserve Overton Park v. Volpe, 402 U.S. 402, 419-20 (1971)), and "post-decision information . . . may not be advanced as a new rationalization either for sustaining or attacking an agency's decision," Sw. Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1450 (9th Cir. 1996) (citation omitted).  Accord Order denying Federal Defs.' Mot. to Stay (Doc. 30) at 2 (affirming that agencies may not, in the midst of litigation, "shore up the administrative record" or develop "post-hoc rationalizations based on new information").

Forest Service, 16 U.S.C. § 1536(a)(2); FS_118308, and that agency violates the

ESA by approving project activities without "discuss[ing] information that would

undercut" FWS's biological opinion.  Ctr. for Biological Diversity, 698 F.3d at

1127–28; accord Save Our Cabinets, 255 F. Supp. 3d at 1063.

By issuing a record of decision approving Phase I of the mine without

reinitiating consultation to address data showing increased human-caused grizzly

bear mortality since 2007—or, indeed, even mentioning those data—the Forest

Service violated the ESA.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.16; see

FS_118309–10 (Forest Service record of decision relying on FWS's

determinations in 2006 BiOp and 2007 supplement that Rock Creek Mine will not

jeopardize grizzly bears).  Accordingly, the Forest Service's 2018 record of

decision should be set aside.

## III.   FWS'S 2017 BULL TROUT BIOP VIOLATES THE ESA

FWS's actions regarding the Rock Creek Mine's impacts on bull trout

equally violated the ESA.  Unlike with grizzly bears, FWS did reinitiate ESA

consultation to address new information demonstrating that the mine would present

an even graver threat to bull trout than previously acknowledged.  However,

FWS's resulting 2017 Bull Trout BiOp fails to satisfy ESA requirements.  First, in

the midst of this litigation, FWS withdrew the BiOp's incidental take statement for

Phase II, which Plaintiffs challenged in their original complaint.  USFWS_041218;

Compl. ¶¶ 105–07 (Doc. 1).  At the same time, FWS "affirm[ed] the no jeopardy"

determination in the 2017 BiOp covering Phase II.  USFWS_041217.  Because the

ESA requires FWS to issue an incidental take statement whenever it concludes that

a proposed action will not jeopardize a protected species but will result in "take,"

this half-measure is unlawful.  Second, FWS's 2017 Bull Trout BiOp is unlawful

because its no-jeopardy determination rests on FWS's arbitrarily reclassifying the

local bull trout populations the mine would harm as part of a more robust Lake

Pend Oreille core area, which masks the mine's impacts on bull trout conservation.

Either flaw alone warrants vacatur of the 2017 Bull Trout BiOp.[8]

**A.**    **Without an Incidental Take Statement for Phase II, FWS's 2017 Bull Trout BiOp Violates the ESA**

The ESA is clear: if FWS concludes that a proposed action will not

jeopardize a protected species but will nevertheless result in take of such species,

the agency must issue an incidental take statement with its biological opinion.

Accordingly, by affirming its finding that Phase II of the Rock Creek Mine will

---

[8] While FWS has suggested that it will engage in future consultation concerning Phase II, USFWS_041199, the fact remains that FWS has left in place a no-jeopardy determining encompassing both phases of the project, USFWS_041217. Further, this Court has already held that Plaintiffs' challenge to the BiOp's conclusions regarding Phase II is ripe now, notwithstanding FWS's suggestion that it will engage in future consultation concerning Phase II.  See Opinion and Order 11 (Doc. 42) (rejecting FWS's ripeness challenge and explaining that "procedural injuries are ripe when the procedural violation occurs").

cause take of bull trout but not result in jeopardy, while simultaneously

withdrawing the accompanying incidental take statement for Phase II, FWS

violated the ESA.

Under the plain language of the ESA, FWS "shall provide" an incidental

take statement whenever it finds that take will occur but no jeopardy to the species

will result.  16 U.S.C. § 1536(b)(4) (emphasis added); see also 50 C.F.R.

§ 402.14(i)(1) ("[i]n those cases where the Service concludes that an action . . . and

the resultant incidental take of listed species will not violate section 7(a)(2), . . . the

Service will provide with the biological opinion a statement concerning incidental

take" (emphasis added)); Arizona Cattle Growers' Ass'n, 273 F.3d at 1242

(explaining that the plain language of the ESA and regulations "require the

issuance of an Incidental Take Statement when the 'resultant incidental take of

listed species will not violate section 7(a)(2)'") (emphasis omitted); Or. Nat. Res.

Council v. Allen, 476 F.3d 1031, 1036 (9th Cir. 2007) ("Both the BiOp and the

Incidental Take Statement must be formulated by the FWS during the formal

consultation process; indeed, the regulations specifically require the FWS to

provide the incidental take statement 'with the biological opinion.'") (quoting 50

C.F.R § 402.14(g), (i)(1)).  This required statement serves an important purpose in

safeguarding imperiled species from unanticipated impacts, ensuring that taking is

truly incidental, capping incidental take, and establishing a trigger for "invalidating

the safe harbor provision of the ESA, and requiring the parties to re-initiate

consultation."  Or. Nat. Res. Council, 476 F.3d at 1038 (quotations, alteration, and

citation omitted).

Here, FWS concluded in the 2017 Bull Trout BiOp that Phase II will cause

take of bull trout, but not jeopardy.  USFWS_003061–65.  Accordingly, the 2017

Bull Trout BiOp initially included an incidental take statement providing a trigger

for reinitiation of consultation "if the measured level of baseflow depletions

exceeds the predicted baseflow depletions."  USFWS_003065.  Plaintiffs

challenged this trigger as inadequate following this Court's ruling in Save Our

Cabinets, 255 F. Supp. 3d at 1058–59, which invalidated an identical incidental

take authorization for the Montanore Mine.  Compl. ¶¶ 105–07 (Doc. 1).

Then, months into this litigation, FWS withdrew the challenged incidental

take statement while affirming its conclusion that Phase II of the Rock Creek Mine

will harm and kill bull trout.  USFWS_041217–20.  This approach violates the

plain language of the ESA, which requires that FWS shall include an incidental

take statement when it issues a biological opinion finding that a project will cause

take, but not jeopardy, of a protected species.  16 U.S.C. § 1536(b)(4).  FWS may

not simply excise the take authorization Plaintiffs challenged while leaving the

remainder of its biological opinion in place, effectively green-lighting full mine

development while kicking down the road the task of figuring out how to ensure

36

that the magnitude of take that ultimately occurs does not jeopardize bull trout. The Court should accordingly declare unlawful and set aside FWS's 2017 Bull Trout BiOp for failure to include an incidental take statement commensurate with its no jeopardy finding.

### B.     FWS's No-Jeopardy Determination is Arbitrary and Capricious

In addition, the Court should vacate the BiOp because FWS's no-jeopardy determination for Phase II is arbitrary and capricious.  FWS's conclusion that the mine would have "negligible" impacts on bull trout conservation, USFWS_003052, rests on its reclassification of the local populations the mine would harm to a larger and stronger core area than the core area to which it previously assigned them.  This change was neither explained in the BiOp nor rationally justified in the record, and unlawfully masked the mine's effect on bull trout.

The 2017 Bull Trout BiOp acknowledges that the Rock Creek Mine would harm the Rock Creek and Bull River local populations of bull trout through permanent stream dewatering, sediment pollution, and other adverse effects. USFWS_003041–54.  Among other impacts, FWS predicted that baseflow reductions caused by the mine would impede bull trout movement; reduce juvenile bull trout survival; eliminate spawning areas and other habitat; and increase stream

temperatures, which would harm bull trout and enhance conditions for nonnative fish that kill or compete with bull trout.  USFWS_003045–47, 003050.[9]

Prior to the 2017 Bull Trout BiOp, FWS repeatedly asserted that bull trout populations in Rock Creek and the Bull River are crucial for conserving the species at the core-area scale—the scale at which FWS focuses its jeopardy analyses.  In its 2006 BiOp for the Rock Creek Mine—as well as its 2014 BiOp for Montanore—FWS classified the Rock Creek and Bull River local populations as part of the Lower Clark Fork River core area.  USFWS_002021; USFWS_032374. Within that context, FWS recognized that both populations have substantial conservation significance.  For example, FWS's 2006 Rock Creek BiOp described the Bull River local population as "the principal and most productive local population in the [Lower Clark Fork River] core area."  USFWS_ 002021.[10] Similarly, in its 2014 Montanore Mine BiOp, FWS stated that "maintaining spawning and rearing success in these two local populations is essential to

---

[9] The 2006 Rock Creek BiOp, in contrast, asserted that the mine's only impacts on bull trout would be sediment pollution in the project's first 5-7 years. USFWS_002020–21.

[10] Indeed, FWS's 2006 no-jeopardy determination relied on the agency's belief at that time that the Rock Creek Mine would have no adverse impact on the uniquely important Bull River population.  USFWS_002021–22.  FWS reinitiated consultation, and produced the 2017 Bull Trout BiOp, after determining that the mine would in fact reduce baseflows in the East Fork and main stem Bull River to the detriment of bull trout there.  USFWS_000088–89 (letter from FWS explaining why reinitiation of consultation was required).

maintaining the existing survival status and potential for recovery" of bull trout at the core-area scale.  USFWS_032451 (emphasis added).

FWS had also recognized that the Lower Clark Fork River core area, to which it previously assigned the Rock Creek and Bull River local populations, suffered from "very low" bull trout numbers and—even without the impacts of the Rock Creek Mine—faced "high risk" of extirpation due to "very limited and/or declining numbers, range, and/or habitat."  USFWS_032368, 032395.  That finding presented a significant obstacle to FWS signing off on a major mine that would seriously harm the Rock Creek and Bull River populations.  In its <u>Save Our Cabinets</u> decision, this Court ruled that FWS's no-jeopardy determination for the Montanore Mine could not be sustained given the agency's acknowledgment that Montanore—like the Rock Creek Mine—would permanently harm the Rock Creek and Bull River local populations and FWS's determination that those populations play a vital role in conserving bull trout within the already vulnerable Lower Clark Fork River core area.  <u>Save Our Cabinets</u>, 255 F. Supp. 3d at 1048–51.  The baseline status of the affected core area population can be dispositive because, as this Court held, "even a small additional impact . . . may require a jeopardy determination" where the conditions in the relevant core area "are already dire." <u>Id.</u> (quoting <u>Oceana v. Pritzker</u>, 75 F.Supp.3d 469, 491 (D.D.C. 2014)).

The 2017 Bull Trout BiOp purports to address this Court's concern in <u>Save Our Cabinets</u> by reclassifying the important local populations the Rock Creek Mine would harm from the severely degraded Lower Clark Fork River core area to the stronger Lake Pend Oreille core area, as depicted below, and then concluding the mine's impacts are "negligible" at the new core-area scale.  USFWS_003052.



FWS determined in the 2017 Bull Trout BiOp that most of the Lake Pend Oreille

core area local populations are "str[ong]" and "stab[le]" and that the Rock Creek

and Bull River populations provide a "relatively small contribution" to this larger

core area.  USFWS_003052–53.  Thus, FWS found that impacts from the Rock

Creek Mine would not jeopardize bull trout, even though the project will harm the

Rock Creek and Bull River local populations that the FWS previously found vital

to protect.

Despite the significance of this reclassification to FWS's no-jeopardy

determination and its obvious departure from prior agency analyses, the BiOp

provides no explanation for the change.  Nor can any rational explanation be

discerned from the underlying agency record.  To the contrary, the record indicates

that FWS's decision to reclassify the Rock Creek and Bull River local populations

was arbitrary and irrational because the Rock Creek and Bull River bull trout

populations are not functionally connected to the stronger and more stable Lake

Pend Oreille populations.  As the 2017 Bull Trout BiOp explains, "[t]he movement

of adult bull trout upstream from Lake Pend Oreille to at least 9 local populations

in Montana (97.2 percent of the watershed) was blocked by Thompson Falls Dam

in 1913.  Construction of Cabinet Gorge Dam in 1952 blocked access to an

additional 6 local populations in Montana tributaries."  USFWS_003164.  A 2006

FWS memo indicates that combining the Lower Clark Fork River and Lake Pend

Oreille bull trout core areas would be justified only once fish passage

improvements across the dams achieve "full numerical contributions to two-way

connectivity with Lake Pend Oreille," which FWS anticipated would occur with

the installation of a permanent fishway at Cabinet Gorge Dam and implementation

of "additional passage . . . at the upstream dams (Noxon Rapids and Thompson

Falls)."  USFWS_002155.

     Critically, however, this full two-way connectivity between the populations

in the former Lower Clark Fork River core area and the Lake Pend Oreille core

area has yet not occurred.  The 2017 Bull Trout BiOp describes the fish passage

facility at Cabinet Gorge Dam as in the pre-construction phase, USFWS_003026,

and progress toward installing fish passage facilities at Noxon Rapids Dam has

been deferred until at least 2022, USFWS_004118.  The 2017 Bull Trout BiOp

provides no justification for combining the Lower Clark Fork River and Lake Pend

Oreille core areas now, prior to completion of projects that would fully reconnect

them.[11]

     Accordingly, FWS's unexplained reclassification of the Rock Creek and

Bull River local populations as part of the Lake Pend Oreille core area, and its

---

[11] FWS's 2015 Bull Trout Recovery Plan reflects the agency's consolidation of the Lower Clark Fork River core area with the Lake Pend Oreille core area, USFWS_032673, but it too lacks any explanation for that consolidation.

resulting conclusion that the mine will not jeopardize bull trout because the effect on the Lake Pend Oreille core area would be "negligible," were arbitrary and capricious.  FWS failed even to consider its prior view that combining the Lower Clark Fork River and Lake Pend Oreille bull trout core areas would only be justified once there is "full numerical contributions to two-way connectivity with Lake Pend Oreille"—something that has not yet happened.  See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, (1983) (agency decision-making is arbitrary and capricious when it "entirely fail[s] to consider an important aspect of the problem").  FWS further failed to explain the inconsistency between its 2017 no-jeopardy determination and its prior classification of the Rock Creek and Bull River local populations as important parts of the weaker Lower Clark Fork River core area in its 2006 BiOp for the Rock Creek Mine and in its 2014 BiOp for the Montanore Mine.  See Organized Vill. of Kake v. U.S. Dep't of Agric., 795 F.3d 956, 966 (9th Cir. 2015) (en banc) (affirming that "[u]nexplained inconsistency between agency actions" supports conclusion that action was arbitrary and capricious) (quoting Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 981 (2005)) (internal quotation marks omitted).  For these reasons, the Court should declare FWS's no jeopardy conclusion unlawful and set aside the 2017 Bull Trout BiOp.

43

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court vacate FWS's 2017 Grizzly Bear Supplement, FWS's 2017 Bull Trout BiOp, and the Forest Service's 2018 record of decision and prohibit the agencies from further authorizing implementation of the Rock Creek Mine project until they comply with the ESA.

Respectfully submitted this 17th day of June, 2020.

/s/Katherine K. O'Brien
Katherine K. O'Brien
Earthjustice
313 East Main Street
Bozeman, MT 59715
Phone: (406) 586-9699
Fax: (406) 586-9695
kobrien@earthjustice.org

Elizabeth Forsyth *(Pro Hac Vice)*
Earthjustice
707 Wilshire Blvd., Suite 4300
Los Angeles, CA 90017
Phone: (213) 766-1067
Fax: (415) 217-2040
eforsyth@earthjustice.org

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2020, I filed the foregoing with the Clerk of the Court using the CM/ECF system, which will cause a copy to be served on all counsel of record.

/s/ Katherine K. O'Brien

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(d)(2), I hereby certify that the foregoing

brief contains 9,774 words, as determined by the word count function of Microsoft

Word.  The Court has granted leave for Plaintiffs to file a brief in excess of the

word limit in the Local Civil Rules (Doc. 31).

<u>/s/ Katherine K. O'Brien</u>