Katherine K. O'Brien
Earthjustice
313 East Main Street
Bozeman, MT 59715
Phone:  (406) 586-9699
Fax:  (406) 586-9695
kobrien@earthjustice.org

Elizabeth Forsyth *(Pro Hac Vice)*
Earthjustice
707 Wilshire Blvd., Suite 4300
Los Angeles, CA 90017
Phone:  (213) 766-1067
Fax: (213) 403-4822
eforsyth@earthjustice.org

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| KSANKA KUPAQA XAʼŁⱢCIN, ROCK CREEK ALLIANCE, EARTHWORKS, MONTANA ENVIRONMENTAL INFORMATION CENTER, DEFENDERS OF WILDLIFE, SIERRA CLUB, and CENTER FOR BIOLOGICAL DIVERSITY; <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES FISH AND WILDLIFE SERVICE; CHAD W. BENSON, Kootenai National Forest Supervisor; and UNITED STATES FOREST SERVICE; <br><br> Defendants, <br><br> and <br><br> RC RESOURCES, INC., <br><br> Defendant-Intervenor. | Case No. CV 19-20-M-DWM <br><br> **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      This case challenges the failure of the U.S. Fish and Wildlife Service ("FWS") and U.S. Forest Service to comply with the Endangered Species Act ("ESA") in approving commencement of the Rock Creek Mine project, a major industrial copper and silver mine proposed in the unspoiled Cabinet Mountains of northwest Montana.

2.      The Rock Creek Mine would tunnel beneath the Cabinet Mountains Wilderness—one of the original wilderness areas designated by Congress under the federal Wilderness Act and one of the region's last undeveloped habitats for grizzly bears and bull trout.  Both grizzly bears and bull trout are listed as threatened species under the ESA and both hold profound cultural and spiritual importance for the Ktunaxa (Kootenai) people, in whose aboriginal territory the mine would be built.

3.      The Rock Creek Mine would bring hundreds of people into the remote project area and involve mining and processing up to 10,000 tons of ore per day, seven days per week, for as long as 30 years, generating enough waste to fill a roughly 300-acre impoundment on the doorstep of the wilderness.  The decades-long project and its permanent industrial footprint would alter the wilderness environment forever and irreparably disturb land, waters, wildlife, and sources of traditional foods and medicines that are sacred to the Ktunaxa people.

1

4.      The ESA charges FWS and the Forest Service with ensuring that the Rock Creek Mine would not jeopardize the continued existence of grizzly bears or bull trout.  Plaintiffs—a coalition of traditional cultural leaders from the Ksanka Band of the Ktunaxa Nation and local, regional, and national conservation organizations—challenge the agencies' failure to satisfy that fundamental statutory duty.

## JURISDICTION AND VENUE

5.      Plaintiffs bring this action pursuant to the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701-706, and the citizen suit provision of the ESA, 16 U.S.C. § 1540(g), which waive the Defendants' sovereign immunity.  As required by the ESA citizen suit provision, Plaintiffs sent FWS and the Forest Service a 60-day notice of their intent to sue on August 28, 2018, and supplemental notices on December 12, 2019 and September 3, 2020.  See id. § 1540(g)(2)(A)(i).

6.      This Court has jurisdiction over Plaintiffs' claims under 16 U.S.C. § 1540(g) and 28 U.S.C. § 1331 (federal question) and may issue a declaratory judgment and injunctive relief under 28 U.S.C. §§ 2201-2202.

7.      Venue lies in the District of Montana, Missoula Division, because plaintiff Ksanka Kupaqa Xaʾłȼin is based in Lake County, Montana; the lands at issue in this suit are located primarily in Sanders County, Montana; and a

substantial part of the events giving rise to Plaintiffs' legal claims occurred in the District of Montana.  See 28 U.S.C. § 1391(e)(1); D. Mont. L.R. 1.2(c)(5).

## PARTIES

8.     Plaintiff Ksanka Kupaqa Xaʾɫ¢in (the Ksanka Crazy Dog Society) is an unincorporated organization based on the Flathead Indian Reservation in Montana.  Ksanka Kupaqa Xaʾɫ¢in is a traditional warrior society within the Ksanka Band of the Ktunaxa (Kootenai) Nation.  The society's contemporary membership consists of United States military veterans who play a leadership role within the Ksanka community and serve as special stewards of their Nation's spiritual and cultural traditions.  Society members use the Cabinet Mountains Wilderness and adjacent national forest lands, including areas threatened by the Rock Creek Mine, for traditional cultural, spiritual, and subsistence activities; recreation; and family and community gatherings.  The lands and waters threatened by the Rock Creek Mine lie within the aboriginal territory of the Ktunaxa people and include areas of sacred importance to the Ksanka Kupaqa Xaʾɫ¢in and their broader community.  The Ksanka Kupaqa Xaʾɫ¢in bear a unique responsibility within their community to safeguard those lands and waters, and the wildlife they support, for future generations.

9.     Plaintiff Rock Creek Alliance (the "Alliance") is a non-profit organization with offices in Trout Creek, Montana, and Sandpoint, Idaho, that is

3

dedicated to protecting the Clark Fork-Pend Oreille watershed and the Cabinet Mountains Wilderness from the adverse impacts of the proposed Rock Creek Mine. Alliance members, board members, and staff live, own property, and recreate in and around the Cabinet Mountains, including the wilderness and national forest lands and associated waters threatened by the Rock Creek Mine.

10.     Plaintiff Earthworks is a non-profit organization dedicated to protecting communities and the environment from the adverse effects of mineral and energy development. Earthworks is headquartered in Washington, D.C., and has field offices across the country, including Missoula, Montana. Earthworks members live and regularly recreate in northwest Montana, including the areas of the Cabinet Mountains threatened by development of the Rock Creek Mine.

11.     Plaintiff Montana Environmental Information Center ("MEIC") is a member-supported non-profit organization dedicated to protecting and restoring Montana's natural environment and protecting Montanans' constitutional right to a clean and healthful environment. MEIC members recreate in and otherwise derive benefit from the public lands and waters in the Cabinet Mountains that are threatened by the Rock Creek Mine.

12.     Plaintiff Defenders of Wildlife ("Defenders") is a national nonprofit conservation organization headquartered in Washington, D.C., with offices throughout the country, including Missoula, Montana. Defenders has more than

4

340,000 members, including roughly 1,500 in Montana. Defenders is a science-based advocacy organization focused on conserving and restoring native species and the habitat on which they depend, and has been involved in such efforts since the organization's establishment in 1947. Defenders' members and staff work and recreate on public lands in the Cabinet Mountains that are threatened by the Rock Creek Mine. In addition, Defenders has invested more than $600,000 to implement more than 300 projects to reduce conflicts between humans and grizzly bears, including several in the Cabinet-Yaak grizzly bear recovery area where the Rock Creek Mine is proposed.

13.   Plaintiff Sierra Club is a national nonprofit organization with 67 chapters and roughly 3.5 million members and supporters, including approximately 3,000 members in Montana, dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Sierra Club members recreate in and value the Cabinet Mountains ecosystem and its public lands and waters for the irreplaceable wildlife and outstanding recreational opportunities they provide.

14.   Plaintiff Center for Biological Diversity (the "Center") is a nonprofit organization dedicated to the preservation, protection, and restoration of

biodiversity, native species, and ecosystems.  The Center was founded in 1989 and is based in Tucson, Arizona, with offices throughout the country.  The Center works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction.  The Center is actively involved in species and habitat protection issues and has more than 68,000 members throughout the United States and the world, including 375 members in Montana. Center members recreate in and around the Cabinet Mountains on public lands threatened by the proposed Rock Creek Mine.

15.     Plaintiffs have longstanding interests in the preservation and recovery of bull trout and grizzly bears in the Northern Rocky Mountains region, including the Cabinet Mountains and broader Cabinet-Yaak ecosystem in northwest Montana.  Over a period of decades, Plaintiffs have invested in the protection and recovery of bull trout and grizzly bears in the region through a variety of actions including public outreach and education, investment in conflict reduction measures, scientific analysis, advocacy, and when necessary, litigation.  Plaintiffs have participated actively in available public comment processes concerning the proposed Rock Creek Mine and its effects on bull trout and grizzly bears, including by filing extensive comments on the proposed and final environmental impact statements and draft record of decision for the Rock Creek Mine issued by the U.S. Forest Service, and by submitting multiple requests to the agencies for ESA-

6

compliant consultation regarding the mine's impacts on grizzly bears and bull trout.

16.     Plaintiffs' members, staff, and volunteers use and enjoy the Cabinet Mountains Wilderness and surrounding national forest lands for a wide range of activities, including traditional cultural, subsistence, and spiritual practices; recreational pursuits such as hiking, camping, backpacking, bird watching, and wildlife watching (including observation of bull trout and grizzly bears); as well as spiritual renewal and aesthetic enjoyment.  Plaintiffs' members, staff, and/or volunteers have viewed bull trout and grizzly bears or signs of grizzly bear presence in and around the Cabinet Mountains Wilderness and have engaged in extensive scientific, educational, and advocacy efforts aimed at maintaining a healthy and intact ecosystem in the Cabinet Mountains that supports native fish and wildlife.

17.     By issuing biological opinions and a record of decision that allow the Rock Creek Mine project to proceed in a manner that will harm threatened grizzly bears and bull trout in the Cabinet Mountains and without rationally ensuring that the project will not jeopardize those species, the Defendants will harm Plaintiffs' interests in viewing bull trout and grizzly bears and maintaining a healthy and intact ecosystem in the Cabinet Mountains that supports the full complement of native wildlife.  Accordingly, the legal violations alleged in this complaint cause

7

direct injury to the cultural, spiritual, aesthetic, conservation, recreational, scientific, educational, and wildlife preservation interests of the Plaintiffs and their members, staff, and volunteers.

18.     Unless Plaintiffs' requested relief is granted, the cultural, spiritual, aesthetic, conservation, recreational, scientific, educational, and wildlife preservation interests of Plaintiffs and their members, staff, board members, and volunteers will be adversely and irreparably injured by the Defendants' failure to comply with federal law.  These are actual, concrete injuries that are traceable to Defendants' conduct and would be redressed by the requested relief.  Plaintiffs have no adequate remedy at law.

19.     Defendant U.S. Fish and Wildlife Service is an agency of the United States Department of Interior and is responsible for administering the ESA with regard to freshwater aquatic and terrestrial species, including bull trout and grizzly bears.

20.     Defendant Chad W. Benson is the United States Forest Service Supervisor for the Kootenai National Forest, in which a majority of the activities and environmental impacts associated with the Rock Creek Mine will occur.  The Kootenai National Forest Supervisor is identified as the responsible federal official for authorization and oversight of the mine project and signed the challenged Record of Decision approving phase one of the project.

21.     Defendant U.S. Forest Service is an agency of the United States Department of Agriculture and is responsible for the management and protection of the Cabinet Mountains Wilderness and Kootenai National Forest.  In that capacity, the Forest Service has jurisdiction and responsibility to authorize the Rock Creek Mine project and ensure the project's compliance with the ESA and other applicable laws.

## LEGAL BACKGROUND

22.     "The ESA is 'the most comprehensive legislation for the preservation of endangered species ever enacted by any nation.'  It represents a commitment 'to halt and reverse the trend toward species extinction, whatever the cost.'"  Ctr. for Biological Diversity v. Zinke, 900 F.3d 1053, 1059 (9th Cir. 2018) (quoting Tenn. Valley Auth. v. Hill, 437 U.S. 153, 180, 184 (1978)) (internal citation omitted).

23.     To that end, section 7(a)(2) of the ESA imposes on federal agencies such as the Forest Service a substantive duty to ensure that actions they authorize or carry out are not likely to jeopardize listed species or destroy or adversely modify critical habitat designated for such species.  16 U.S.C. § 1536(a)(2).  An agency action "jeopardizes" a protected species if it "reasonably would be expected, directly or indirectly," to reduce appreciably the species' likelihood of survival or recovery "by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02; see Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries

Serv., 524 F.3d 917, 932 (9th Cir. 2008) (holding that significant impairment of species' recovery prospects alone may constitute jeopardy).

24.     Before undertaking or authorizing an action that may affect ESA-listed species or their critical habitat, the Forest Service must consult with the appropriate expert fish and wildlife agency, which is FWS in the case of grizzly bears and bull trout.  See 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.01(b).  The formal consultation process culminates in FWS's issuance of a biological opinion, or "BiOp," reflecting FWS's determination—based on "the best scientific and commercial data available"—of whether the proposed action will jeopardize a listed species or destroy or adversely modify designated critical habitat.  16 U.S.C. § 1536(a)(2); see 50 C.F.R. § 402.14.

25.     As the Ninth Circuit has held, the ESA requires FWS to define broadly the "action" subject to review in a biological opinion, because the ESA-mandated "caution can only be exercised if the agency takes a look at all the possible ramifications of the agency action."  Conner v. Burford, 848 F.2d 1441, 1453 (9th Cir. 1988) (internal quotation and alteration omitted).  Accordingly, unless the agencies follow strict procedures set forth in the ESA implementing regulations, biological opinions may not address "only the first, preliminary stage in a multistage project."  Wild Fish Conservancy v. Salazar, 628 F.3d 513, 521 (9th Cir. 2010).

10

26.     Further, the ESA implementing regulations dictate that FWS's biological opinions must analyze comprehensively all "effects of the action," 50 C.F.R. § 402.14(g), proposed on listed species and their critical habitat, "including the consequences of other activities that are caused by the proposed action" even if not formally a part of it, id. § 402.02.  As the regulations explain, "[a] consequence is caused by the proposed action," and therefore must be analyzed in FWS's biological opinion, "if it would not occur but for the proposed action and it is reasonably certain to occur."  Id.; see also id. § 402.17 (elaborating standard for identifying effects of action that FWS must consider in biological opinion).

27.     If FWS concludes that a proposed action is likely to jeopardize a listed species, the action may not proceed.  See 16 U.S.C. § 1536(a)(2).  FWS must determine whether a "reasonable and prudent alternative" exists that would avoid jeopardy.  Id. § 1536(b)(3)(A).

28.     If FWS concludes that implementing a proposed action (or a reasonable and prudent alternative) will not jeopardize a protected species but will nevertheless result in "take" of such species, the agency must issue an incidental take statement with its BiOp.  16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(i)(1). Under the ESA, "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" a protected species "or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  Sections 9 and 10 of the ESA prohibit the taking

of listed species unless specifically authorized in an incidental take statement.  Id. §§ 1538(a)(1)(B), 1539.  The amount of take authorized in an incidental take statement must provide an effective "'trigger' that, when reached, results in an unacceptable level of incidental take …."  Ariz. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv., 273 F.3d 1229, 1249 (9th Cir. 2001).  In that circumstance, the protection from take liability provided by the incidental take statement lapses and the federal agencies must re-initiate consultation to ensure that the actual extent of take resulting from the action will not jeopardize the affected species.  Id.; see 50 C.F.R. § 402.16(a).

29.     The Forest Service violates the ESA if it approves or implements an action in reliance on a legally flawed biological opinion or fails in its approval or implementation decision "to discuss information that would undercut the [biological] opinion's conclusion."  Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt., 698 F.3d 1101, 1127-28 (9th Cir. 2012); accord Save Our Cabinets v. U.S. Fish & Wildlife Serv., 255 F. Supp. 3d 1035, 1063 (D. Mont. 2017).

30.     The agencies' ESA obligations do not end with FWS's issuance of a biological opinion for a particular action, or with the Forest Service's issuance of an authorization for the action.  Instead, the agencies must reinitiate formal consultation where, among other circumstances, "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an

12

extent not previously considered."  50 C.F.R. § 402.16.  "The duty to reinitiate

consultation lies with both the action agency and the consulting agency."  Salmon

Spawning & Recovery All. v. Gutierrez, 545 F.3d 1220, 1229 (9th Cir. 2008)

(citing 50 C.F.R. § 402.16).

## FACTUAL BACKGROUND

## I.   THE ROCK CREEK MINE

31.    The Rock Creek Mine is a copper/silver mine project proposed

beneath and adjacent to the Cabinet Mountains Wilderness in northwest Montana.

Today, the landscape comprising the Cabinet Mountains Wilderness and

surrounding national forest lands is characterized by unspoiled expanses of

glaciated peaks, forested valleys, and rivers and streams that are among the purest

waters in the continental United States.  The area is part of the aboriginal territory

of the Ktunaxa Nation, and the specific areas threatened by the Rock Creek Mine

include sites that are sacred to the Ktunaxa people and are used for traditional

spiritual, cultural, and subsistence purposes.

32.    The wilderness and national forest lands threatened by the mine are

home to countless plant species and abundant native wildlife, including mountain

goats, bighorn sheep, pikas, wolverines, elk, moose, deer, mountain lions, and

wolves.  In addition, those lands provide a last refuge for the imperiled Cabinet-

Yaak grizzly bear population, and the streams that traverse those lands provide one

of the last remaining undeveloped habitats for the region's imperiled population of bull trout.

33.     In the midst of this wild landscape, the Rock Creek Mine project would involve mining beneath the wilderness and constructing ore-processing, wastewater treatment, mine-waste storage, and other industrial facilities on adjacent lands.  These facilities would process up to 10,000 tons of ore per day for as long as 30 years.  Mining waste would be warehoused permanently on site in a tailings storage facility covering more than 300 acres.

34.     Project activities are divided into two phases, with "Phase I" consisting of the construction of an evaluation adit and associated facilities and "Phase II" consisting of the construction, operation, and reclamation of commercial-scale mining facilities and associated infrastructure.

35.     Among other adverse environmental impacts, mine operation is predicted to permanently dewater streams in the project area—including streams that are occupied by, and are designated as critical habitat for, bull trout—and wilderness streams designated as "Outstanding Resource Waters" under Montana law.  In addition, mine development would bring hundreds of people into the remote project area, increasing the risk of human-caused mortality of grizzly bears.

36.     FWS completed its first biological opinion for the Rock Creek Mine in December 2000.  In that biological opinion, FWS analyzed the full project

14

proposal, including evaluation adit construction, mine development, production, and reclamation.  At that time, FWS concluded that the project would jeopardize the survival and recovery of grizzly bears, but not bull trout.  In light of its jeopardy determination for grizzly bears, FWS developed a reasonable and prudent alternative consisting of additional mitigation requirements intended to address the combined threats to grizzlies from simultaneously developing both the Rock Creek Mine and the Montanore Mine, a second large-scale copper-silver mine project proposed just over the Cabinet Mountains ridgeline from the Rock Creek Mine project site.

37.     In 2001, the Forest Service issued a record of decision approving the Rock Creek Mine project in reliance on FWS's analysis.  In March 2002, however, FWS withdrew its biological opinion in response to litigation and the Forest Service subsequently withdrew its record of decision.

38.     FWS issued a second biological opinion for the Rock Creek Mine in May 2003.  In that decision, FWS concluded that implementing the full Rock Creek Mine project would not jeopardize grizzly bears or bull trout and would not adversely modify bull trout critical habitat proposed for designation in the area. The Forest Service issued another record of decision approving the project in June 2003.  But in March 2005, this Court ruled that the 2003 BiOp violated the ESA

and vacated the agencies' approvals for the mine. Rock Creek All. v. U.S. Fish & Wildlife Serv., 390 F. Supp. 2d 993, 1011 (D. Mont. 2005).

39.     FWS issued a third biological opinion for the Rock Creek Mine in October 2006 ("2006 BiOp"), in which it again concluded that implementing the full mine project would not jeopardize grizzly bears or bull trout nor destroy or adversely modify bull trout critical habitat.  FWS supplemented that biological opinion for the first time in September 2007 to address new information concerning conditions for grizzly bears in the project area and to correct and clarify aspects of its bull trout analysis.  The 2006 BiOp was upheld in litigation, but this Court vacated and remanded the Forest Service's approval of the project based on violations of the Forest Service Organic Act and the National Environmental Policy Act ("NEPA").  See Rock Creek All. v. U.S. Forest Serv., Nos. CV 05-107-M-DWM and CV 08-028-M-DWM, 2010 WL 1287604 (March 29, 2010).

40.     In March 2015, while the Forest Service's remand process remained pending, Rock Creek Alliance, Earthworks, and the Idaho Council of Trout Unlimited requested that FWS and the Forest Service reinitiate section 7 consultation to consider new evidence concerning the mine's impacts on grizzly bears and bull trout that had emerged in the roughly nine years since FWS issued its 2006 BiOp.  Specifically, the groups contended that reinitiation of consultation was required for FWS to consider new information showing that (1) mine

operation would reduce flows in Rock Creek and East Fork Bull River, which was not anticipated or analyzed in the 2006 BiOp and would result in take of bull trout and permanent harm to their critical habitat; (2) restoration of fish passage over major dams in the Lower Clark Fork River watershed where the mine site is located, which FWS determined is essential for bull trout recovery in the region, had not occurred as FWS anticipated in the 2006 BiOp; and (3) the number of human-caused grizzly bear mortalities in the Cabinet-Yaak ecosystem had increased between 2007-2015, despite implementation of the key mitigation measures called for in the 2006 BiOp to reduce such mortalities.

41.     FWS responded in May 2015, claiming that it cannot require the Forest Service to reinitiate ESA consultation and that FWS and the Forest Service would determine through the Forest Service's pending review under NEPA whether reinitiation of consultation would be required.

42.     In March 2017, the Forest Service determined that reinitiation of consultation on the Rock Creek Mine was required in light of the new evidence that mine development would permanently reduce stream flows in the Rock Creek and Bull River drainages as well as the designation of additional bull trout critical habitat in the project area in 2010.

43.     However, neither the Forest Service's reinitiation request to FWS nor FWS's response indicated that the agencies would evaluate new information

17

concerning the efficacy of mine mitigation measures for preventing grizzly bear mortalities.  Accordingly, in August 2017, Rock Creek Alliance, Earthworks, Montana Environmental Information Center, Defenders of Wildlife, the Idaho Council of Trout Unlimited, Clark Fork Coalition, Sierra Club, and the Center for Biological Diversity sent FWS a letter requesting that the agencies expand the apparent scope of their consultation to address this information.  In that letter, the conservation groups invoked this Court's 2017 ruling in Save Our Cabinets v. U.S. Fish and Wildlife Service, 255 F. Supp. 3d 1035 (D. Mont. 2017), which invalidated the ESA analysis and authorizations for the Montanore Mine based on the agencies' failure to consider the very same data showing that a roll-out of the key conflict reduction measures in that mine's mitigation plan, which are substantially identical to those required for the Rock Creek project, had not yielded a reduction in grizzly killings in the Cabinet-Yaak ecosystem.  FWS never responded to the letter.

44.    Instead, in November 2017, FWS issued a revised biological opinion analyzing the effects of the Rock Creek Mine on bull trout only.  U.S. Fish & Wildlife Serv., Revised Biological Opinion on the Effects of the Rock Creek Mine Project on Bull Trout and Designated Bull Trout Critical Habitat (Nov. 2017) ("2017 Bull Trout BiOp").  In its 2017 Bull Trout BiOp, FWS again concluded that—regardless of the new evidence that mining would permanently deplete

stream baseflows in bull trout critical habitat in the project area, including in the uniquely important Bull River drainage—the project would not jeopardize bull trout nor destroy or adversely modify their critical habitat.

45.     The 2017 Bull Trout BiOp states that it "replaces the October 11, 2006 Rock Creek Mine biological opinion on bull trout, as supplemented on September 27, 2007."  Like FWS's prior analyses, FWS's 2017 Bull Trout BiOp addressed both phases of the Rock Creek Mine proposal and concluded that the entire project would not jeopardize bull trout.

46.     FWS simultaneously issued a second supplement to its 2006 grizzly bear BiOp that updated basic species information and articulated FWS's conclusion that no new information had emerged since 2006 that would warrant reinitiating formal consultation under the ESA.  U.S. Fish & Wildlife Serv., Supp. No. 2 to the 2006 Biological Opinion on the Effects to Grizzly Bears from the Rock Creek Mine Project (Nov. 2017) ("2017 Grizzly Bear Supplement"). The 2017 Grizzly Bear Supplement does not acknowledge or address the data concerning grizzly bear mortality risks and mitigation effectiveness that were the focus of the conservation groups' 2015 and 2017 requests that FWS reinitiate and complete ESA-compliant consultation on the mine.

19

47.     In August 2018, the Forest Service issued a record of decision authorizing Phase I of the Rock Creek Mine in reliance on FWS's no-jeopardy determinations for grizzly bears and bull trout.

48.     With the agencies' ESA review of the project apparently concluded, Plaintiffs provided notice of their intent to sue pursuant to the ESA's citizen suit provision, 16 U.S.C. § 1540(g)(2)(A)(i), and filed their complaint in this matter on January 25, 2019.  Compl. (Doc. 1).  Plaintiffs challenged (1) FWS's determination in the 2017 Grizzly Bear Supplement that no new information generated since 2007 necessitates reinitiation of consultation, and the Forest Service's August 2018 record of decision approving Phase I of the Rock Creek Mine without reinitiating consultation; (2) FWS's 2017 no-jeopardy determination for bull trout, which rested on FWS's unexplained reclassification of the local bull trout populations the mine would harm to a stronger core area; and (3) FWS's bull trout incidental take statement, which relied on the identical trigger for reinitiating consultation that this Court invalidated in Save Our Cabinets, 255 F. Supp. 3d at 1058–59.  See Compl. (Doc. 1).

49.     On September 30, 2019, while this litigation was pending, FWS recommended that the Forest Service reinitiate consultation on the Rock Creek Mine Evaluation Project on the basis that, while the 2017 Bull Trout BiOp and 2017 Grizzly Bear Supplement evaluated the effects of both phases of the Rock

Creek Mine project, the Forest Service's 2018 Final Record of Decision approved only Phase I.

50.     On November 20, 2019, FWS released a "Supplement to the Biological Opinions on the Effects of the Rock Creek Project on Bull Trout, Designated Bull Trout Critical Habitat, and Grizzly Bear" ("2019 Supplement"). The 2019 Supplement provided an update on the status of grizzly bears since the 2017 Grizzly Bear Supplement, including noting that there were four known human-caused grizzly bear mortalities in the Cabinet-Yaak population in 2018 and two so far in 2019.  It did not disturb the 2017 Supplement's finding that reinitiation of formal consultation concerning new information on the mine's impacts on grizzly bears is not warranted.

51.     Instead, the 2019 Supplement's stated purpose was to "update" the proposed action under review to consist only of Phase I and remove the bull trout incidental take statement for Phase II of the mine that Plaintiffs had challenged on the basis that it is "no longer relevant."  2019 Supplement at 22.  Unlike FWS's 2017 Bull Trout BiOp, which was styled as a new biological opinion and stated clearly on the cover page that it "replaces" FWS's prior bull trout biological opinions for the Rock Creek Mine, the 2019 Supplement is denominated a "Supplement to the Biological Opinions" FWS previously issued for the mine and nowhere states that it replaced, withdrew, superseded, or otherwise invalidated

21

FWS's prior biological opinions.  Indeed, the 2019 Supplement consists largely of text cut-and-pasted or incorporated by reference from FWS's prior biological opinions.  And while FWS stated in the 2019 Supplement that it "understand[s] that activities in Phase II will be subject to additional Endangered Species Act consultation" when the Forest Service approves that phase, id. at 3, FWS also stated in the 2019 Supplement that it "affirms the no jeopardy and no adverse modification [of critical habitat] determinations" reached in its prior biological opinions covering both phases of the mine, id. at 21.

52.    Plaintiffs filed an amended complaint to address FWS's issuance of the 2019 Supplement on February 11, 2020.  First Am. and Suppl. Compl. (Doc. 61).  Plaintiffs alleged that "[t]he 2019 Supplement removed the incidental take statement for Phase II of the Rock Creek Mine from the 2017 Bull Trout BiOp but did not disturb the 2017 Bull Trout BiOp's take finding and no jeopardy determination for Phase II."  Id. ¶ 116.  Plaintiffs therefore amended their complaint to remove their original Claim III that the incidental take statement was invalid, and replaced it with a claim alleging that FWS's 2017 Bull Trout BiOp was invalid because FWS withdrew the incidental take statement for Phase II while leaving its no-jeopardy determination for Phase II in effect.  Id. ¶¶ 113-117.

53.    Federal Defendants' Answer to Plaintiffs' amended complaint did not expressly deny Plaintiffs' allegation that the "2019 Supplement removed the

incidental take statement for Phase II of the Rock Creek Mine from the 2017 Bull

Trout BiOp but did not disturb the 2017 Bull Trout BiOp's take finding and no

jeopardy determination for Phase II." Id. ¶ 116. Instead, Federal Defendants

answered that the 2019 Supplement "speaks for itself." Fed. Defs' Answer to

Amended and Suppl. Compl. ¶ (Doc. 62).

54.   Plaintiffs filed their motion for summary judgment on June 17, 2020,

pursuing the claims in their First Amended Complaint.

55.   In response to Plaintiffs' summary judgment motion, Federal

Defendants asserted that the 2019 Supplement effectively withdrew, superseded,

and rendered invalid FWS's prior biological opinions for the Rock Creek Mine.

Accordingly, at this time, the only FWS analysis of the Rock Creek Mine project

under the ESA is the 2019 Supplement.

## II.   FACTS RELATING TO GRIZZLY BEAR IMPACTS

56.   Grizzly bears once ranged throughout western North America, from

central Mexico to Alaska. In the lower 48 states alone, there were an estimated

50,000 grizzly bears. But as European settlers moved west around the turn of the

19th Century, their persecution of grizzly bears caused dramatic population

declines and substantial habitat loss. By the 1930s, grizzlies had been extirpated

from 98% of their former range. In 1975, two years after the ESA's enactment,

FWS listed grizzly bears across the lower-48 United States as a threatened species

under the ESA.  Amendment Listing the Grizzly Bear of the 48 Conterminous States as a Threatened Species, 40 Fed. Reg. 31,734 (July 28, 1975).  FWS has long recognized that in order to conserve and recover grizzly bears, it must reduce human-caused mortality and curb habitat loss.

57.    FWS has determined that conserving each of the grizzly bear populations that remain in the lower 48 is essential to the conservation of the species.  One of these remnant populations persists in the Cabinet-Yaak ecosystem, a roughly 2,600-square-mile area of primarily federal public lands in northwest Montana and northeastern Idaho, which includes the site of the proposed Rock Creek Mine.  FWS affirmed in its 2017 Grizzly Bear Supplement that conserving the Cabinet-Yaak grizzly population is "essential to long-term survival and recovery of grizzly bears throughout a significant portion of [their] range in the U.S." as a whole.  2017 Grizzly Bear Suppl. 11.

58.    FWS has established a population size of 100 individuals as a minimum recovery goal for the Cabinet-Yaak grizzly population.

59.     Today, the population falls far short of that goal, even without large mines on the landscape.  FWS's 2017 Grizzly Bear Supplement cites a minimum population estimate of just 41 grizzlies in the Cabinet-Yaak recovery zone—less than half the agency's recovery goal—based on captures of individual bears, genetic information, known mortality, and sightings of unique individuals between

2013–2015.  The 2017 Supplement also cites a more optimistic population estimate of 55 bears, which is based on FWS's extrapolation from a 2012 population estimate generated by the United States Geological Survey.  According to FWS, a population with fewer than 50–100 adults faces a high risk of extinction.  Indeed, FWS scientists have stated that the grizzly bear population in the Cabinet-Yaak ecosystem persists at all only because the State of Montana has been "augmenting" it with grizzlies relocated from other areas.

60.    Today, human killing of grizzly bears in the Cabinet-Yaak ecosystem poses a leading threat to the grizzly population's survival and a major obstacle to significant population growth.  The risk of human-caused grizzly bear mortality increases proportionally with increased human presence in grizzly habitat.  Most of these killings involve poaching, hunters misidentifying grizzlies as black bears, or people shooting grizzly bears because of a real or perceived need for self-defense.

61.    From 1982–2017, more than 70% of known grizzly deaths in the Cabinet-Yaak ecosystem were caused by humans.  In its 2006 BiOp for the Rock Creek Mine, FWS observed that "[h]uman-caused mortality in the [Cabinet-Yaak ecosystem] is limiting population increase and contributing to extinction risk," and concluded that "[t]he existing human-caused mortality rate, given the small grizzly bear population, is not sustainable with or without the Rock Creek Mine."  U.S. Fish & Wildlife Serv., Biological Opinion on the Effects to Grizzly Bears, Bull

25

Trout, and Bull Trout Critical Habitat from the Implementation of Proposed

Actions Associated with Plan of Operation for the Revett RC Res., Inc. Rock

Creek Copper/Silver Mine at A-95. These conclusions were not disturbed in

FWS's 2017 Grizzly Bear Supplement, in which FWS affirmed that "[i]mproving

[grizzly bear] survival by reducing human-caused mortality is crucial for recovery

of [the Cabinet-Yaak ecosystem] population." 2017 Grizzly Bear Suppl. 12

(quotation omitted). FWS's grizzly bear recovery plan establishes a goal of zero

human-caused mortality to facilitate recovery of the Cabinet-Yaak population.

62.     In its 2006 BiOp, FWS recognized that "[t]he most prominent direct

and indirect effects on grizzly bears from the implementation of the proposed Rock

Creek Mine project would stem from the influx of mine employees into th[e]

relatively remote [project] area" and the associated increase in human-caused

mortality risk. 2006 BiOp at A-68, A-70. FWS's determination that the Rock

Creek Mine will not jeopardize grizzly bears depends on the agency's conclusion

that measures in the mine's mitigation plan designed to reduce human-grizzly

conflicts would more than offset the increased risks of human-caused mortality

associated with the mine. Specifically, FWS concluded that those mitigation

measures would be sufficient to (1) ensure zero grizzly bear killings attributable to

the mine during the project's evaluation phase; (2) ensure that no more than one

grizzly bear will be killed as a result of the mine project over its 35-year life; and

(3) prevent the killing of more than one <u>female</u> grizzly bear that would have occurred in the ecosystem in the mine's absence, thereby ensuring that project implementation yields a net reduction in human-caused grizzly bear mortality ecosystem-wide as compared to the pre-mine baseline.

63.    In reaching these conclusions, FWS placed particular weight on the anticipated effectiveness of public education and outreach efforts, management measures for bear attractants, and conflict resolution work that would be implemented by two grizzly bear management specialists assigned to the Cabinet-Yaak ecosystem as part of the mine's mitigation plan.  Indeed, FWS's 2006 BiOp asserts that the work of bear management specialists plus increased law enforcement would <u>alone</u> yield "a net reduction in the overall existing mortality risks to grizzly bears on both national forest and private lands within the action area and across the [Cabinet-Yaak ecosystem]."  2006 BiOp at A-80.

64.    It is difficult to overstate the ambitiousness of FWS's assessment that such conflict-reduction measures can be counted on to more than neutralize all mortality risks to grizzly bears from the Rock Creek Mine.  From 2011–2016— without the Rock Creek Mine or proposed Montanore Mine on the landscape— there were ten known or probable human-caused grizzly bear mortalities in the United States portion of the Cabinet-Yaak ecosystem, a mortality rate of nearly two bears per year.  The agencies predict that the Rock Creek Mine would bring a

major influx of people into the ecosystem, starting with more than 100 people during the mine's evaluation phase and increasing to nearly 800 people during the construction phase.

65.     Moreover, since 2007, the Rock Creek Mine proponent has been implementing a key component of the mine's mitigation plan for reducing human-caused grizzly bear mortality by funding the work of a Montana Fish, Wildlife and Parks grizzly bear management specialist dedicated specifically to reducing human-caused grizzly mortality in the Cabinet-Yaak ecosystem.  That specialist has implemented many of the conflict-reduction measures FWS identified as essential in reaching a no-jeopardy determination for the Rock Creek Mine, including conducting extensive public education and outreach activities, providing bear-resistant garbage containers and electric fencing kits to community members to reduce the accessibility of bear attractants, and responding to conflict situations in the communities near the proposed mine.

66.     However, despite the importance of such conflict-reduction efforts to begin addressing the already unsustainable levels of human-caused grizzly bear mortality in the ecosystem, their rollout over the past decade has not coincided with a reduction in the number of human-caused grizzly bear mortalities in the Cabinet-Yaak ecosystem—even without the Rock Creek Mine and its associated population influx underway.  Instead, FWS's own data show that the number of

human-caused mortalities in the U.S. portion of the Cabinet-Yaak ecosystem
increased during the ten years after the grizzly bear management specialist began
work in 2007: 16 known human-caused mortalities occurred in that ten-year time
period compared with 13 during the preceding ten years.

67.     Though these data come from FWS's own reports and were
highlighted in the two requests for reinitiation of consultation that Plaintiffs sent to
FWS in 2015 and 2017, FWS did not acknowledge or address them in its 2017
Grizzly Bear Supplement nor explain why this information does not warrant
reinitiation of consultation under the ESA. The Forest Service likewise failed to
address these mortality numbers in the analysis supporting its Record of Decision
approving the project's evaluation phase.

68.     The 2019 Supplement similarly does not acknowledge or address the
mortality data presented by Plaintiffs. Nor does it alter the 2017 Grizzly Bear
Supplement's formal conclusion that reinitiation of consultation regarding the
impacts of the mine to grizzly bears is not warranted, or provide any rational
support for the 2017 Supplement's conclusion.

69.     The agencies' disregard of these mortality data from FWS's own
reports contravenes this Court's 2017 Save Our Cabinets ruling invalidating the
biological opinions and record of decision for the nearby Montanore Mine. Like
the Rock Creek Mine, the Montanore Mine threatens to exacerbate already

unsustainable levels of human-caused grizzly bear mortality in the Cabinet-Yaak

ecosystem, and the agencies relied on a substantially identical package of

mitigation measures to conclude that the Montanore project, like Rock Creek,

would benefit grizzly bears by ensuring a net reduction in human-caused mortality

across the ecosystem.  In Save Our Cabinets, this Court ruled that FWS and the

Forest Service acted arbitrarily and capriciously and in violation of the ESA by

reaching that conclusion without considering the same mortality data at issue here,

which show that the number of grizzly bear killings has increased over the past

decade despite implementation of the key conflict-reduction measures called for in

the mine mitigation plans.  Save Our Cabinets, 255 F. Supp. 3d at 1063.

## III.    FACTS RELATING TO BULL TROUT IMPACTS

### A.    Bull Trout Status and Conservation Needs

70.    The bull trout, Salvelinus confluentus, is a migratory char (a close

relative of trout) in the salmonid family.  Historically, bull trout thrived in major

river drainages from northern California and Nevada north to Alaska, and from

Puget Sound on the Pacific coast east to Montana and Alberta.

71.    Compared to other salmonid fish species, "bull trout generally have

the most specific habitat requirements."  U.S. Fish & Wildlife Serv., Recovery

Plan for the Coterminous United States Population of Bull Trout, at iv (2015).  To

spawn, develop, and survive, bull trout need water that is very cold—optimally 35

to 39 degrees Fahrenheit—and very clean. Bull trout display acute sensitivity to alterations in natural stream flow patterns—particularly stream flow reductions, which can exacerbate stream warming, concentrate pollutants, and produce seasonally dry reaches that cut off access to migration corridors and other essential habitat.

72.     Bull trout are naturally migratory but today exhibit both resident and migratory life history strategies. Resident bull trout complete their entire life cycle in or near the tributary stream in which they spawn and rear. Migratory bull trout, in contrast, rear for 1 to 4 years in their natal stream before migrating to a lake, river, or saltwater. Migratory bull trout have been known to travel more than 150 miles to reach spawning grounds in Montana. However, all bull trout—whether migratory or resident—depend on viable migratory corridors to access seasonal habitats. Further, the persistence of migratory populations is critical to the species' persistence as a whole because migratory bull trout tend to be more fecund and therefore contribute a larger share to population maintenance and recovery. In addition, migration facilitates gene flow among local populations and allows for replenishment of local populations that are extirpated by catastrophic events.

73.     Bull trout can live longer than 12 years and typically spawn more than once in their lifetime. As a result, and to facilitate foraging, they require safe two-way passage upstream and downstream, which "has important repercussions for

31

the management of this species." 2017 Bull Trout BiOp 16.  Dams obstruct that

passage, and most fish ladders designed to enable fish passage across dams were

built for salmonid species that spawn only once in their lifetime and then die, such

that they require only one-way upstream passage across a dam.  As a result, even

dams with fish ladders can fragment bull trout populations if they are not designed

specifically to provide safe downstream passage as well.

74.    As described by FWS, "a wide variety of factors" threaten bull trout

across their range, including habitat degradation and fragmentation; reduced

stream flows; flow alterations associated with water diversions, road construction

and maintenance, mining, and grazing activities; blockage of migratory corridors

by dams and other structures; poor water quality; competition and predation from

nonnative fish species; intentional or incidental killing of bull trout by anglers; and

climate change, which is predicted to reduce stream flows, increase summer stream

temperatures, facilitate the expansion of nonnative fish that kill or compete with

bull trout, and alter precipitation and stream flow patterns, resulting in further

habitat loss and reduced bull trout survival and reproduction.  2017 Bull Trout

BiOp 14-15.  As FWS acknowledged, bull trout are "particularly vulnerable" to

climate change compared to other salmonids because bull trout require especially

cold water to spawn and rear.  Id. at 15.

75.     FWS listed bull trout across the lower-48 United States as a threatened species under the ESA in 1999.  By the time of that listing decision, bull trout had been extirpated from approximately 60 percent of their historic range.

76.     Since 2015, for management purposes FWS has formally divided the coterminous United States population of bull trout into six recovery units:  Coastal, Klamath, Mid-Columbia, Columbia Headwaters, Saint Mary, and Upper Snake. All six of these recovery-unit populations are "needed to ensure a resilient, redundant, and representative distribution of bull trout populations throughout the range of the listed entity."  2017 Bull Trout BiOp 14.

77.     Within each recovery unit, FWS focuses on bull trout conservation at the scale of designated "core areas," which consist of one or more interbreeding local populations and are the basic units on which FWS gauges the species' recovery.

78.     The coterminous United States population of bull trout comprises 109 occupied core areas, each of which plays an important role in the conservation of the recovery-unit population of which they are a part and, by extension, the species as a whole.  As FWS explained in its 2017 Bull Trout BiOp for the Rock Creek Mine, "[g]enerally, if the effects of a proposed federal action, taken together with cumulative effects, are likely to impair the viability of a core area population(s) such an effect is likely to impair the survival and recovery function assigned to a

[recovery unit] and may represent jeopardy to the species." 2017 Bull Trout BiOp 31.

79.     In 2005, even with ESA protections in place, FWS concluded that approximately 72% of bull trout core area populations were at risk or at high risk of extirpation. In its 2005 analysis, FWS determined that just 3.3% of core area populations across the species' range were at low risk of extirpation.

80.     In 2015, based on its finding that bull trout populations are depressed or declining across much of the species' range, FWS reaffirmed its determination that bull trout remain threatened within the meaning of the ESA.

81.     The Rock Creek Mine site is located in the Lower Clark Fork River watershed within the Columbia Headwaters bull trout recovery unit, which comprises the Upper Clark Fork, Lower Clark Fork, Flathead, Kootenai, and Coeur d'Alene watersheds in western Montana, northern Idaho, and northeastern Washington. The Columbia Headwaters recovery unit contains 35 bull trout core areas, 20 of which are "simple" core areas with only a single local population that is isolated in a headwater lake.

82.     The Rock Creek Mine would harm the Rock Creek and Bull River local bull trout populations with stream dewatering, sediment pollution, and other adverse effects. FWS's 2017 Bull Trout BiOp classifies these local populations as part of the Lake Pend Oreille core area population. This classification is

34

significant because, as described above, bull trout core areas are the focal point for

FWS in analyzing threats to, and progress in, conserving the species.  Further,

because even a small adverse impact on an already marginal core area population

may require a jeopardy determination, Save Our Cabinets, 255 F. Supp. 3d at 1050,

FWS's classification of bull trout populations affected by a project in a relatively

weaker or stronger core area can drive the agency's jeopardy analysis.

     83.     FWS's classification of the Rock Creek and Bull River local

populations as part of the Lake Pend Oreille core area represents a change in

agency position:  In its 2006 BiOp for the Rock Creek Mine—as well as its 2014

BiOp for the nearby Montanore Mine—FWS instead classified these local

populations as part of a smaller, and weaker, Lower Clark Fork River core area.

FWS now treats the former Lower Clark Fork River core area as part of an

expanded Lake Pend Oreille core area:



Fig. 1.  Regional bull trout core area configurations as reflected in 2006 Rock Creek Mine BiOp (top) versus 2017 BiOp (bottom).

84.     FWS's former core-area configuration for bull trout in the region

surrounding the Rock Creek Mine site reflected the fragmentation of bull trout

populations caused by the dams located at Cabinet Gorge, Noxon Rapids, and

Thompson Falls on the Lower Clark Fork River.  Consistent with that fragmented condition, prior to 2006 FWS delineated six separate bull trout core areas in the relevant region:  Lake Pend Oreille, Cabinet Gorge Reservoir, Noxon Reservoir, Thompson Falls Reservoir, Lower Flathead River, and Middle Clark Fork River.  In 2006, FWS decided to consolidate four of those extant core areas—Cabinet Gorge Reservoir, Noxon Reservoir, Thompson Falls Reservoir, and Lower Flathead River—into a single Lower Clark Fork River core area, while maintaining the separate Lake Pend Oreille core area to the northwest and the separate Middle Clark Fork River core area to the south in recognition of persistent barriers that continued to fragment bull trout populations in those areas.

85.    According to FWS, the 2006 core-area consolidation was justified by "major progress" made at that time "in reconnecting upstream bull trout passage" within the Lower Clark Fork River system, which enabled bull trout within the four formerly separate core areas to begin functioning as a single, integrated Lower Clark Fork River core area population.  Mem. from R. Mark Wilson, Field Supervisor, FWS Mont. Ecological Servs. Field Office, to Asst. Reg'l Dir., FWS Region 1 Ecological Servs., Re: Consolidation of bull trout core areas on the Lower Clark Fork River, at 1 (July 14, 2006) ("Wilson Mem.") (Appendix D to 2006 BiOp).  In an agency memorandum articulating the rationale for delineating the new, consolidated Lower Clark Fork River core area in 2006, FWS stated that

37

"[a] natural progression or continuation of this approach" of consolidating core areas to better reflect the historic integration of bull trout populations presently fragmented by dams "will eventually incorporate the Lower Clark Fork [River] core area into Lake Pend Oreille, fully restoring the natural configuration" of bull trout populations that existed before the dams. Id. at 2; see also 2006 BiOp at B-45–B-49.  However, FWS stressed that as of 2006, bull trout passage across the remaining dams was "primarily limited to trap and haul at Cabinet Gorge Dam," i.e., a program of artificially transporting a limited number of fish across that dam. Wilson Mem. 2.  FWS's 2006 memorandum indicated that further consolidation to combine the Lower Clark Fork River and Lake Pend Oreille bull trout core areas would not be justified until fish passage restoration efforts achieve "full numerical contributions to two-way connectivity with Lake Pend Oreille," which FWS anticipated would occur "in the next few years" with the installation of a permanent fishway at Cabinet Gorge Dam and implementation of "additional passage … at the upstream dams (Noxon Rapids and Thompson Falls)."  Id.

86.     More than a decade later, however, the conditions FWS anticipated would justify consolidation of the Lower Clark Fork River and Lake Pend Oreille core areas have not materialized as FWS expected.  The 2017 Bull Trout BiOp and the 2019 Supplement describe the fish passage facility at Cabinet Gorge Dam as still in the pre-construction stage, and progress toward installation of fish passage

facilities at Noxon Rapids Dam has been deferred until at least 2022.  The Rock

Creek Mine would inflict permanent harm on the Rock Creek and Bull River local

populations of bull trout.  Among other impacts, operation of the Rock Creek Mine

is expected to reduce baseflows in project-area streams.  Baseflow is the portion of

a stream's water volume that derives from groundwater contribution, as opposed to

runoff.  During dry conditions, baseflow is the primary, if not exclusive, source of

running water in a stream.  Because seasonally dry conditions in northwest

Montana coincide with the most sensitive periods in the bull trout life cycle—

spawning and egg incubation—the adverse effects of baseflow reductions on bull

trout are severe.

87.     In addition to reduced baseflows, FWS predicts that the Rock Creek

Mine project would cause "short-term" sediment increases—lasting for seven

years—in a number of project-area streams, which would kill bull trout eggs and

young fish and degrade critical habitat.  FWS anticipates that this harmful sediment

pollution would occur notwithstanding the mine operator's plans to implement

"best management practices" to reduce sediment pollution from the project.

### FIRST CLAIM FOR RELIEF
**(Against all Defendants for Failure to Reinitiate Formal Consultation on the Impact to Grizzly Bears from Implementing the Rock Creek Mine Project)**

88.     Plaintiffs hereby reallege and incorporate the preceding paragraphs.

89.     The ESA's implementing regulations require FWS and the Forest Service to reinitiate formal consultation when "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(b).  "The duty to reinitiate consultation lies with both the action agency and the consulting agency." Salmon Spawning & Recovery All., 545 F.3d at 1229 (citing 50 C.F.R. § 402.16).

90.     FWS's determinations that the Rock Creek Mine project will not jeopardize grizzly bears depend upon FWS's conclusions that measures to reduce human-caused grizzly bear mortality in the mine's mitigation plan will be sufficiently effective to ensure that (1) zero grizzly bear killings will occur as a result of the mine's evaluation phase and the associated influx of people into the project area; (2) no more than one grizzly bear killing will occur as a result of the project over its 35-year life; and (3) mine mitigation measures will prevent more than one human-caused mortality of a female grizzly bear that would have occurred in the mine's absence, thereby more than offsetting mortality attributable to the mine.  In reaching those conclusions, FWS placed particular weight on the anticipated effectiveness of conflict-reduction measures to be implemented by grizzly bear management specialists, whose work the mine proponent is required to fund.  FWS concluded that those conflict reduction efforts, in conjunction with increased law enforcement, could alone be counted upon to ensure "a net reduction

40

in the overall existing mortality risks to grizzly bears on both national forest and private lands within the action area and across the [Cabinet-Yaak Ecosystem]" during the life of the mine.  2006 BiOp at A-80.

91.     As described above, since 2007 one of the two grizzly bear management specialists required by the Rock Creek Mine mitigation plan has been at work in the Cabinet-Yaak ecosystem implementing the key mitigation measures designed to reduce human-caused mortality throughout the life of the mine. Despite those efforts, the number of human-caused grizzly bear mortalities in the Cabinet-Yaak ecosystem increased from 2007-2016 compared to the prior ten-year period—even without the Rock Creek Mine on the landscape and the associated influx of people into the remote project area.

92.     The picture does not improve if one considers available mortality data up through 2018:  from 2007–2018, 19 known or probable human-caused mortalities occurred in the United States portion of the Cabinet-Yaak ecosystem, as compared to 14 from 1995–2006.

93.     These data critically undermine FWS's conclusions that conflict-reduction measures in the mine mitigation plan will be capable of ensuring zero grizzly killings attributable to the mine's evaluation phase and a net reduction in human-caused grizzly bear mortality across the Cabinet-Yaak ecosystem during the 35-year life of the mine, notwithstanding the roughly 800-person influx and

substantial industrial disturbance associated with the project.  Accordingly, the

data reveal that implementing the project may unleash greater threats of human-

caused mortality than FWS considered in its 2006 BiOp.

94.     Notwithstanding these data, FWS's 2017 Grizzly Bear Supplement

determined that reinitiation of ESA consultation was not required concerning the

Rock Creek Mine's impacts on grizzly bears.  FWS's determination in the 2017

Grizzly Bear Supplement that no new information warrants reinitiation of

consultation is arbitrary, capricious, and violates the ESA and its implementing

regulations.  The mortality data described above constitute new information

revealing that implementation of the Rock Creek Mine project may affect grizzly

bears in a manner or to an extent not previously considered.  50 C.F.R.

§ 402.16(b).  Further, by concluding in the 2017 Grizzly Bear Supplement that

reinitiation of consultation is not warranted without acknowledging or rationally

addressing the mortality data, "the agency failed to consider an important aspect of

the problem," rendering its determination arbitrary and capricious.  Save Our

Cabinets, 255 F. Supp. 3d at 1063.

95.     By issuing a Record of Decision authorizing the first phase of the

Rock Creek Mine project without considering these mortality data and reinitiating

formal consultation to address them, the Forest Service likewise acted arbitrarily,

capriciously, and in violation of the ESA and its implementing regulations.  16
U.S.C. § 1536(a)(2); 50 C.F.R. § 402.16(b).

96.     The 2019 Supplement does not alter the 2017 Grizzly Bear
Supplement's formal conclusion that reinitiation of consultation regarding the
impacts of the mine to grizzly bears is not warranted.  Nor does it provide any
rational support for the 2017 Supplement's conclusion. To the extent that
Defendants may now seek to invoke the 2019 Supplement in this case as a
supplemental rationale for the agencies' conclusion that reinitiation of consultation
is not required, or as support for the Forest Service's Record of Decision
authorizing the first phase of the Rock Creek Mine project, this Court should not
consider the 2019 Supplement because it represents an impermissible post hoc
rationalization for Defendants' challenged determinations. Assuming for the sake
of argument that the Court were to consider the 2019 Supplement, it still fails to
provide a legitimate rationale for the Service's challenged determinations because
the 2019 Supplement is arbitrary, capricious, and in violation of the ESA and its
implementing regulations.

## SECOND CLAIM FOR RELIEF
### (Against FWS for Arbitrary and Unlawful Biological Opinion)

97.     Plaintiffs hereby reallege and incorporate the preceding paragraphs.

98.     In defining the scope of the action subject to review in a biological
opinion, FWS may not limit its analysis to "only the first, preliminary stage in a

multistage project." <u>Wild Fish Conservancy v. Salazar</u>, 628 F.3d 513, 521 (9th

Cir. 2010).  Further, FWS's regulations defining "effects of the action" for

purposes of ESA consultation require FWS to evaluate all consequences of the

relevant action on listed species and their critical habitat, including the

consequences of other activities that would not occur but for the proposed action

and are reasonably certain to occur.  50 C.F.R. § 402.14(g); <u>id.</u> § 402.02; <u>id.</u>

§ 402.17.

99.    FWS's 2019 Supplement withdrew all analysis of Phase II of the

Rock Creek Mine Project contained in the 2017 Bull Trout BiOp, the 2017 Grizzly

Bear Supplement, and the grizzly bear portions of FWS's 2006 biological opinion

and 2007 supplement while affirming only the analysis pertaining to Phase I.

100.   The 2019 Supplement thus violates the ESA because, by considering

only Phase I of the Rock Creek Mine Project, FWS failed to analyze the full scope

of the relevant action and/or its effects as required by the ESA and its

implementing regulations.

## THIRD CLAIM FOR RELIEF
### (Against the Forest Service for Approving Phase I of the Rock Creek Mine Project Without a Valid Biological Opinion)

101.   Plaintiffs hereby reallege and incorporate the preceding paragraphs.

102.   The Forest Service has a substantive duty to ensure that its

authorization of the Rock Creek Mine Project or any component thereof will not

jeopardize the survival or recovery of grizzly bears or bull trout or adversely

modify the species' critical habitat.

103.   An action agency "cannot meet its section 7 obligations by relying on

a Biological Opinion that is legally flawed." Ctr. for Biological Diversity v. U.S.

Bureau of Land Mgmt., 698 F.3d 1101, 1127–28 (9th Cir. 2012).

104.   The 2019 Supplement withdrew and rendered invalid the biological

opinions on which the Forest Service relied to conclude that the actions approved

in its 2018 Record of Decision for the Rock Creek Mine will not jeopardize grizzly

bears and bull trout.

105.   Even assuming for the sake of argument that the 2019 Supplement

could somehow support a Forest Service decision that predates the 2019

Supplement by more than a year, the 2019 Supplement is itself is invalid for failing

to analyze the full scope of the relevant action and/or its effects as required by the

ESA and its implementing regulations.

106.   The Forest Service has not complied with the regulatory process in 50

C.F.R. § 402.14(k) that would allow the agency to approve Phase I of the Rock

Creek Mine project without a biological opinion in place that evaluates all phases

of the Project.

107.   The Forest Service's approval of Phase I of the Rock Creek Mine

without a valid biological opinion violates its substantive duty under the ESA to

ensure that the actions it authorized will not jeopardize the survival of grizzly bears or bull trout or adversely modify the species' critical habitat and is arbitrary and capricious.

## REQUEST FOR RELIEF

Therefore, Plaintiffs respectfully request that this Court:

108. Declare unlawful and set aside FWS's 2019 Supplement;

109. Declare unlawful and set aside the Forest Service's Record of Decision for Phase I of the Rock Creek Mine project;

110. Enjoin Defendants from further authorizing or approving implementation of the Rock Creek Mine project, and any take of grizzly bears or bull trout from such implementation, pending completion of a new consultation process that complies with the ESA;

111. Award Plaintiffs their reasonable costs, fees, and expenses, including attorney's fees, associated with this litigation; and

112. Grant Plaintiffs such further relief as the Court may deem just and proper, including, if necessary, preliminary injunctive relief.

Respectfully submitted this 6th day of November, 2020.

/s/Elizabeth B. Forsyth
Katherine K. O'Brien
Earthjustice
313 East Main Street
Bozeman, MT 59715
Phone:  (406) 586-9699
Fax:  (406) 586-9695
kobrien@earthjustice.org

Elizabeth Forsyth *(Pro Hac Vice)*
Earthjustice
707 Wilshire Blvd., Suite 4300
Los Angeles, CA 90017
Phone:  (213) 766-1067
Fax: (213) 403-4822
eforsyth@earthjustice.org

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2020, I filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will cause a copy to be served

on all counsel of record.

/s/ Elizabeth B. Forsyth