IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| KSANKA KUPAQA XA'ŁƇIN, et al., | CV 19–20–M–DWM |
| Plaintiffs, | |
| vs. | OPINION and ORDER |
| UNITED STATES FISH AND WILDLIFE SERVICE, et al., | |
| Defendants, | |
| and | |
| RC RESOURCES, INC., | |
| Defendant-Intervenor. | |

This case again challenges decisions by the United States Fish and Wildlife Service and the United States Forest Service (collectively "Federal Defendants") regarding the Rock Creek Mine Project, a proposed mine beneath and adjacent to the Cabinet Mountains Wilderness. The substantive and procedural history of the mine extends back over two decades. To the parties, this litigation must seem a Sisyphean task; to the agencies, a Procrustean bed. Nonetheless, the byzantine legal and administrative issues must be resolved before any adit or mining can lawfully be approved. In sum, the Project has been proposed, evaluated, approved, and litigated as a two-phased venture since at least 2000, entailing an evaluation

adit (Phase I) and mine development, operations, and reclamation (Phase II). FWS_012450–51[1] (2003 ROD); *see* FS_118334–35 (summary of ESA history). Most recently, however, the agencies have narrowed their analysis and approval to Phase I.

Defendant-Intervenor RC Resources holds the Project's principal permits and owns the mineral estate for the Rock Creek deposit.  FS_118275–76.  Plaintiffs are tribal and environmental organizations that claim Federal Defendants violated the Endangered Special Act ("ESA") by failing to reinitiate consultation on the grizzly bear (Count I); issuing an unlawful biological opinion (Count II); and approving a record of decision without a valid biological opinion, (Count III). (Doc. 99.)  Having reviewed the briefing and heard argument, Plaintiffs are correct that it was arbitrary and capricious for Federal Defendants to approve Phase I without considering the environmental effects of Phase II.  Because this warrants setting aside the relevant decision documents and remanding to the agency, it is not necessary to address the merits of Plaintiffs' grizzly bear challenge.

BACKGROUND

I.    **Project Background**

While the Mining Act of 1872 and the Organic Act of 1897 confer certain

---

[1] The administrative record is cited as FWS_[BATES NO.] for Fish and Wildlife Service documents and FS_[BATES NO.] for Forest Service documents.

mining rights within national forests, 30 U.S.C. § 26; 16 U.S.C. § 478, Section 7(a)(2) of the ESA requires the Secretary of the Interior to ensure that any action "authorized, funded, or carried out by" a federal agency is not likely to jeopardize the continued existence of any threatened or endangered species, 16 U.S.C. § 1536(a)(2). If the proposed action "may affect" a listed species or critical habitat, the agency proposing the action (action agency) must enter into formal consultation with the consulting agency, which then issues to the Secretary a "biological opinion" evaluating the nature and extent of jeopardy posed to that species by the action. § 1536(b). The action agency must provide the Secretary with the "best scientific and commercial data available." § 1536(a)(2).

In this case, the authorization process began in the late 1980s when the ASARCO first considered the development of a hard rock mine at the Rock Creek site. *See* FS_118276. In 2000, the Fish and Wildlife Service issued its first biological opinion for the project, which "proposed [a] 10,000-ton-per-day" mine that included "the development of an evaluation adit, a 5.5-year construction period, a 27.5-year operation/production period, and a 2-year reclamation period, for a 35-year or more life of mine." FWS_017202 (2000 BiOp). The Fish and Wildlife Service concluded that the project would not jeopardize bull trout but would jeopardize grizzly bears, though the risks for grizzly bears could be mitigated. FS_118334; FWS_028387–88. The Forest Service issued an

3

environmental impact statement ("EIS") in 2001 and a record of decision ("ROD")
approving the project in 2003. FS_006517, 118334; FWS_028387–88. But,
following legal challenges, the agencies voluntarily withdrew their decision
documents and additional consultation on grizzly bears and bull trout occurred
during 2002 and 2003. FWS_023721 (2003 BiOp), FWS_028388.

In May 2003, the Fish and Wildlife Service issued a second biological
opinion containing no-jeopardy determinations for both grizzly bears and bull
trout. FS_118334; FWS_028388. Conservation groups challenged that opinion in
this Court, which ruled in 2005 that the Fish and Wildlife Service had violated the
ESA as it relates to both species. FWS_028388; *Rock Creek All. v. U.S. Fish &
Wildlife Serv.*, 390 F. Supp. 2d 993 (D. Mont. 2005). In December 2004, while
that litigation was pending, the agencies determined reinitiation of consultation
was required "based on new information that revealed effects of the action that
may affect grizzly bears in the Cabinet-Yaak Ecosystem to an extent not
previously considered," specifically due to new mortality data. FWS_028388.

In 2006, the Fish and Wildlife Service issued a third biological opinion,
addressing the new grizzly bear information and the Court's 2005 order.
FWS_028383. That opinion also reflected the abandonment of a nearby mining
project, the Montanore Mine, which improved the environmental baseline for both
grizzly bears and bull trout. FWS_028389. The Fish and Wildlife Service

"supplemented" the opinion in 2007.  FWS_002987.  In response to further legal

challenges, this Court invalidated the Forest Service's 2001 EIS and 2003 ROD,

citing deficiencies in the analysis of and mitigation for project impacts on bull

trout.  FWS_002987;  FS_006517, 006567; *Rock Creek All. v. U.S. Forest Serv.*,

2010 WL 1287604 (D. Mont. Mar. 29, 2010); *Rock Creek All. v. U.S. Forest Serv.*,

703 F. Supp. 2d 1152 (D. Mont. 2010), *aff'd in part* 663 F.3d 439 (9th Cir. 2011).

Meanwhile, plans to develop the nearby Montanore Mine were resuscitated,

leading to the Fish and Wildlife Service's issuance of a 2014 biological opinion for

that project in which the agency concluded that the Montanore Mine would not

jeopardize grizzly bears or bull trout.  FS_021428 (bears), 021191 (trout).  As was

the case with the Rock Creek Project, the Fish and Wildlife Service determined

that the influx of mine employees would have the most effect on grizzly bears, but

that bear specialist and wildlife law enforcement positions in the mine mitigation

plan would yield "a net reduction in the overall existing mortality risks to grizzly

bears on both national forest and private lands within the action area and across the

[Cabinet-Yaak ecosystem]."  FS_021530.  In 2017, this Court set aside the

agencies' approval of the Montanore Project and vacated the 2014 biological

opinions and 2016 ROD.  *Save Our Cabinets v. U.S. Fish & Wildlife Serv.*, 255 F.

Supp. 3d 1035 (D. Mont. 2017) (ESA merits decision); *Save Our Cabinets v.

U.S.D.A.*, 254 F. Supp. 3d 1241 (D. Mont. 2017) (CWA and NFMA merits

decision); *Save Our Cabinets v. U.S. Fish & Wildlife Serv.*, 2017 WL 2829679 (D. Mont. June 29, 2017) (vacatur order).  Relevant here, the Court concluded the Fish and Wildlife Service's no-jeopardy determination was arbitrary and capricious in the case of both bull trout and grizzly bears.  255 F. Supp. 3d at 1051, 1063.

In 2017, the Fish and Wildlife Service determined that reinitiation of consultation concerning the Rock Creek Mine's impact on bull trout was necessary due to reduced flows.  FWS_039793–94.  This resulted in the issuance of a new bull trout biological opinion.  FWS_002980–81, 002982–3092.  The agency also issued a second supplement to its 2006 grizzly bear biological opinion in which it updated "basic species information" but determined that reinitiation of consultation "was not necessary."  FWS_002980-81, 003093–119.

In August 2018, the Forest Service issued its most recent record of decision for the Rock Creek Mine Project ("2018 ROD").  FS_118269–618.  However, breaking with prior decision documents, the 2018 ROD analyzed and approved only Phase I of the Project.  FS_118275–76.  Unsurprisingly, removing Phase II from consideration drastically reduced both the scope of the activity and the potential environmental impacts.  For comparison, Phase II, or mine development, would involve the removal of 10,000 tons of ore per day with a production life of 26 to 30 years.  FWS_002989.  Mine activity would disturb over 400 acres of land, cause drawdown of stream levels, and require the construction of roads.

FWS_002989–91.  On the other hand, Phase I involves only the excavation of an evaluation adit.  FWS_002989.  Construction of the adit is anticipated to take two years and the estimated disturbance area encompasses approximately 19.6 acres, including only 10.4 acres of National Forest System land.  FWS_002989; FS_118281.  Existing roads would be used to access the site, FWS_002989, although two new culverts would be installed and road improvements would be necessary, FWS_041201.  Only 131 workers would be required, including four employees associated with wildlife work.  FS_0118290.  Though the evaluation adit will result in groundwater drawdown, the proposal is not expected to affect stream baseflows.  FS_118287.  The purpose of the adit is to obtain additional data to evaluate the Rock Creek deposit, future mine design, and potential environmental impacts in anticipation of Phase II.  FS_118280.

The Forest Service determined that the implementation of Phase I would comply with the ESA based on the analysis of the Fish and Wildlife's 2006 grizzly bear biological opinion (as supplemented in 2007 and 2017) and the Fish and Wildlife Service's 2017 bull trout biological opinion.  FS_118308–10.  But because the scope of the 2018 ROD was limited to Phase I, the Fish and Wildlife Service subsequently recommended that the agencies reinitiate consultation to focus on the limited activities "approved" in the 2018 ROD.  FWS_041233.  The Forest Service agreed, though it reaffirmed that the effect of Phase I activities

7

remained the same.  FWS_041232.  On November 20, 2019, the agencies

concluded their latest round of consultation with the Fish and Wildlife Service's

transmittal of the 2019 Supplement to the Biological Opinions on the Effects of the

Rock Creek Project on Bull Trout, Designated Bull Trout Critical Habitat, and

Grizzly Bear ("2019 Supplement").  Though the exact nature of the 2019

Supplement is disputed, (*see, e.g.*, Doc. 97), Federal Defendants have labelled it a

"biological opinion" and state that it "has the effect of withdrawing all prior

analysis, conclusions, and take statements that do not relate specifically to the

Evaluation Project, or Phase I."  (Doc. 114 at 8 n.1.)

## II.    Procedural History

Plaintiffs filed this action in January 2019, challenging Federal Defendants'

failure to reinitiate formal consultation on the Rock Creek Mine's impact to grizzly

bears, the Fish and Wildlife Service's no-jeopardy determination for bull trout, and

the Fish and Wildlife Service's reliance on a surrogate for measuring incidental

take of bull trout.  (Doc. 1.)  Following the Federal Defendants' and Defendant-

Intervenor's unsuccessful motion for judgment on the pleadings, (*see* Docs. 32,

42), Plaintiffs amended their complaint in February 2020 to address the 2019

Supplement, (Doc. 61).  The amended pleading maintained the same three claims.

(*Id.*)  However, Plaintiffs learned during the summary judgment process that

Federal Defendants viewed the 2019 Supplement as more than a supplemental

ESA document; rather, the agencies insist that the 2019 Supplement "supplemented" prior consultation regarding Phase I and "withdr[ew]" prior biological opinions, analysis, and take statements for the now-shelved Phase II. (Doc. 114 at 8 n.1.)  As a result, Plaintiffs were allowed to amend their complaint in November 2020, (*see* Doc. 97), and now allege ESA violations based on (1) Federal Defendants' failure to reinitiate formal consultation on the Rock Creek Mine's impact to grizzly bears (Count I); (2) the Fish and Wildlife Service's structuring of the 2019 Supplement to consider only Phase I (Count II); and (3) the Forest Service's approval of Phase I based on an allegedly invalid biological opinion (Count III).  (Doc. 99.)

## SUMMARY CONCLUSION

Plaintiffs ask this Court to declare unlawful and vacate the 2019 Supplement and 2018 ROD authorizing Phase I of the Rock Creek Mine Project.  Though Plaintiffs also challenge the agencies' consideration of mortality data as it relates to grizzly bears, the crux of this dispute is the agencies' decision to limit their analysis to Phase I.  Federal Defendants and Defendant-Intervenor maintain that "[t]he decision not to approve the entire mine build-out reflected the current availability of crucial information" and reassert that any future development beyond the scope of Phase I will require independent, additional ESA consultation. (Doc. 114 at 21–22.)  Ultimately, it was arbitrary and capricious for agencies to not

consider the environmental effects of Phase II in their approval of Phase I or adequately explain why the impacts of Phase II could be omitted.

## LEGAL STANDARD

Actions under the ESA are evaluated under the standards set forth in the Administrative Procedure Act ("APA"), which authorizes a court to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), and to "hold unlawful and set aside agency action, findings and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).  An agency action is unlawfully withheld if the agency fails to take a "discrete agency action that it is required to take," i.e., an action that is "demanded by law," including "agency regulations that have the force of law." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64–65 (2004) (emphasis omitted).  Agency action is arbitrary and capricious if the administrative record demonstrates that the "agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Where an agency's administrative record is complete and constitutes the whole and undisputed facts underlying agency decisionmaking, summary judgment is the appropriate vehicle

10

to address claims under both § 706(1) and (2).  *City & Cty. of S.F. v. United States*,

130 F.3d 873, 877 (9th Cir. 1997) ("[T]he function of the district court is to

determine whether or not as a matter of law the evidence in the administrative

record permitted the agency to make the decision it did.").

ANALYSIS

Plaintiffs challenge the Rock Creek Mine Project on two grounds.  First,

they challenge the agencies' decision to analyze only Phase I, or the evaluation

adit.  Second, they challenge the Fish and Wildlife Service's analysis and

conclusions regarding grizzly bear mortality and mitigation measures.  Because

Plaintiffs succeed on their first argument, which will result in setting aside the

existing decision documents, the Court does not reach the merits of Plaintiffs' bear

mortality challenge.

## I.   Unlawful Segmentation

Following the Forest Service's issuance of the 2018 ROD, the Fish and

Wildlife Service recommended reinitiation of consultation to pare back its

environmental review to address only Phase I.  In doing so, Plaintiffs argue Federal

Defendants "unlawfully segmented" the Rock Creek Mine Project.  (Doc. 108 at

23–24.)  Accordingly, Plaintiffs insist (1) that the 2019 Supplement violates the

ESA because the Fish and Wildlife Service failed to analyze the full scope of the

relevant action, including Phase II and (2) the Forest Service's 2018 ROD

11

approving Phase I is therefore not supported by a valid biological opinion.  Given the unique history of this Project, Plaintiffs are correct.

## A.    2019 Supplement

Plaintiffs persuasively argue that the Fish and Wildlife Service was required to consider Phase II in its biological opinion as part of a multi-phased  "agency action."  And, even if that were not the case, Phase II should have been addressed as an "effect" of that action.

### 1.    Agency Action

Plaintiffs first argue that "agency action" is broadly defined to include all foreseeable activities associated with a multi-stage project, which in this case includes Phase II.[2]  Federal Defendants and Defendant-Intervenor reject that characterization and insist that the scope of analysis is appropriately limited to the authorized activity, or Phase I.  Plaintiffs have the better argument.

The ESA requires federal agencies to ensure that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered or threatened species . . . ."  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02.  Courts have interpreted "agency action" broadly, emphasizing

---

[2] The parties agree that the ESA's implementing regulations specifically permit incremental-step authorizations in certain circumstances. *See* 50 C.F.R. § 402.14(k).  But the parties also seem to agree that those requirements are not met here.  (*See* Doc. 117 at 15.)

that determining "the scope of the agency action is crucial because the ESA
requires the biological opinion to analyze the effects of the *entire* agency action."
*Conner v. Burford*, 848 F.2d 1441, 1453 (9th Cir. 1988).  Put differently, "[t]he
delineation of the scope of an action can have a determinative effect on the ability
of a biological opinion fully to describe the impact of the action on the viability of
the threatened species[.]"  *Wild Fish Conserv. v. Salazar*, 628 F.3d 513, 522 (9th
Cir. 2010).

      The parties present three cases to guide the Court's analysis.  In *Conner v.
Burford*, the Ninth Circuit held that the Fish and Wildlife Service violated the ESA
by issuing biological opinions that analyzed only the effects of granting oil and gas
leases, without addressing post-leasing activities "through production and [well]
abandonment."  848 F.2d at 1453.  Similarly, in *Wild Fish*, the Ninth Circuit
rejected the Fish and Wildlife Service's decision to limit its analysis to an artificial
term of five years when the activity at issue—the operation of a fish hatchery—
was anticipated beyond that term.  628 F.3d at 522.  Conversely, however, in
*Cabinet Mountains Wilderness v. Peterson*, the D.C. Circuit upheld a biological
opinion addressing only four years of "exploratory" mineral drilling in the Cabinet
Mountains Wilderness.  685 F.2d 678, 687 (D.C. Cir. 1982).

      To start, the persuasive authority of *Cabinet Mountains* to compel the same
result in this case is immediately undercut by the fact that the question of whether

the agency correctly determined the scope of the action was not before the court.

Notably, *Wild Fish* distinguished *Cabinet Mountains* on this ground. *See* 628 F.3d

at 522 n.6. Thus, while the DC Circuit may have tacitly approved a segmented

analysis, the case itself provides little guidance for assessing the proper scope of

the agency action here. That said, *Cabinet Mountains* appears to actualize the

Court's hypothetical at oral argument of a case where limited environmental

review may have been justified for nascent mining operations. But as discussed in

the context of *Conner* and *Wild Fish* below, that is not the case here.

In *Conner*, the Fish and Wildlife Service limited its analysis to the first,

preliminary stage of a multistage leasing project. 848 F.2d at 1452–53. It

provided two primary justifications for doing so. First, it concluded that there was

"insufficient information available to render a comprehensive biological opinion

beyond the initial lease stage." *Id.* at 1452. Second, it felt that the danger posed by

future leasing operations could be addressed by future environmental review. *Id.*

at 1455. It therefore included in the lease stipulations requirements for additional

environmental consultation prior to any "surface-disturbing activities." *Id.* While

the court rejected both arguments, similar justifications are raised here.

First, the Forest Service based its decision to approve only Phase I in the

2018 ROD at least in part on the need for more data regarding the environmental

impacts of full mine development and operations: "Proceeding with Phase I

14

construction of the evaluation adit to the Rock Creek ore body will generate additional hydrologic and geologic data relevant to making an informed decision regarding Phase II." FS_118269. This makes some sense in response to the criticism leveled against the agencies in the context of the Montanore Mine: that they did not have enough information to analyze Phase II. *See, e.g. Save Our Cabinets*, 255 F. Supp. 3d at 1047–54. And, as argued by Defendant-Intervenor, "[a]gencies are entitled to change their minds." *Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1262 (9th Cir. 2017). Nevertheless, *Conner* foreclosed reliance on an absence of information to avoid environmental review, emphasizing that "Congress, in enacting the ESA, did not create an exception to the statutory requirement of a comprehensive biological opinion on that basis." 848 F.2d at 1454.

Moreover, the court in *Conner* explicitly stated that the Fish and Wildlife Service "cannot ignore available biological information . . . which may indicate potential conflicts between development and the preservation of protected species," *id.*, and an analysis of the "*entire* agency action" required consideration of post-leasing activity, *id.* at 1453. Fundamentally, the court was concerned that the agency's "incremental-step consultation" could result in a "piecemeal chipping away of habitat" for endangered species. *Id.* Thus, it determined that "biological opinions must be coextensive with the agency action." *Id.* at 1458. Here the

extended consultation history of the Rock Creek Project shows that not only was a more comprehensive biological opinion possible, but that such opinions had already been completed.  *See* FWS_0172020 (2000 BiOp); FWS_023722 (2003 BiOp); FWS_028391 (2006 BiOp); FWS_002500 (2007 Suppl.); FWS_002988 (2017 Bull Trout BiOp); FWS_003253 (2017 Grizzly Bear Suppl.).  In the 2019 Supplement, the Fish and Wildlife Service does not adequately explain how it could ignore this vast reservoir of available biological information.

Second, *Conner* rejected the idea that future environmental review could "be substituted for comprehensive biological opinions" in the present. 848 F.2d at 1457–58.  Federal Defendants rely heavily on the fact that future environmental review and consultation will be required before mining operations could ever begin in this case.  But, as the court expanded on in *Wild Fish*, "[t]he duty to reinitiate consultation in the future . . . does not diminish the [Fish and Wildlife] Service's obligation to prepare a comprehensive biological opinion now" using "the best information available."  628 F.3d at 525.  Because the purpose of the evaluation adit is to "collect[] data to refine the final mine design," FS_118279, it is merely the first stage in the Rock Creek Mine Project.  The two decades of environmental information available to the agency could show that either the adit, or the mine operation it is designed to further, is "fundamentally incompatible with the continued existence of [certain] species" before agency action is taken.  *Conner*,

848 F.2d at 1454.  Thus, future safeguards, however onerous, do not obviate the agency's ESA obligations here.

*Conner* therefore weighs in favor of Plaintiffs.  But there is one important distinguishing fact: in *Conner*, the biological opinions at issue each stated that the "action" being considered "includes not just final lease issuance but all resulting subsequent activities."  *Id.* at 1453 (internal quotation marks omitted).  Thus, the agency itself recognized that the scope of the action extended beyond the lease sales.  In contrast, Federal Defendants are adamant that the action at issue here is limited to Phase I and that is reflected in the 2019 Supplement, *see* FWS_041199, and the 2018 ROD, FS_118281.  But a similar argument was considered, and rejected, in *Wild Fish*.

In *Wild Fish*, the Fish and Wildlife Service prepared a biological opinion addressing the anticipated impact the operation and maintenance of a fish hatchery would have on bull trout in Icicle Creek from 2006 to 2011.  628 F.3d at 517–19. The agency limited the scope of the action to a five-year period because two modifications were expected to take place by that time (one regarding a water intake system and the other restoring certain habitat).  *Id.* at 519.  The court held that the decision was arbitrary and capricious, explaining:

> What the Service's argument does not acknowledge is that the Hatchery has been operating for seventy years and is expected to continue operating into the future. The Hatchery simply made a decision, endorsed by the Service, to define the action as a five-year term of

operations, when it might as easily have chosen a thirty-year term or a one-year term.

The delineation of the scope of an action can have a determinative effect on the ability of a biological opinion fully to describe the impact of the action on the viability of the threatened species, here the bull trout. For example, limiting the analysis of the Hatchery's impact on the bull trout to a one-month term of operations would almost certainly be arbitrary and capricious. The time period under study would likely be too short to capture any effects on the bull trout, even though, as the 2008 BiOp under review recognizes, the Hatchery will have a negative impact over a five-year period.

The Hatchery must ensure that it does not "engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery" of the bull trout in the Columbia River interim recovery unit. 50 C.F.R. § 402.02. The artificial division of a continuing operation into short terms can undermine the consulting agency's ability to determine accurately the species' likelihood of survival and recovery, as the example just given illustrates.

*Id.* at 522. Thus, the court rejected the tautological argument being advanced here, i.e., that the scope of the project is properly limited because the agency limited it. *See also Greenpeace v. Nat'l Marine Fisheries Serv.*, 80 F. Supp. 2d 1137, 1146 (W.D. Wash. 2000) ("[A]n agency may not unilaterally relieve itself of its full legal obligation under the ESA by narrowly describing the agency action at issue in a biological opinion.").

Likely recognizing the challenge posed by *Wild Fish*, Federal Defendants and Defendant-Intervenor posit that this case and project are unique in that mine operations, or Phase II, may never come to pass, making this situation

fundamentally distinguishable from the continued operation of the hatchery. *See* 628 F.3d at 524 ("Particularly given the long life of this facility and the absence of any indication that the Hatchery might close down altogether in the foreseeable future, five years is not sufficient."). While this argument could have traction in cases where full-scale mining remains an abstract idea relegated to an unknown future, that is not the case here. Here, full-scale mining operations have been envisioned since the Project's inception and the Forest Service has previously approved such operations under at least two previous RODs for this very Project. Thus while the Forest Service has the authority to limit its current authorization as it sees fit, the Fish and Wildlife Service was required to explain adequately why a comprehensive biological opinion addressing Phase II would be unproductive in assessing the impacts of the Project. *See id.* at 525.

Considering the above, the Fish and Wildlife Service was required to prepare a comprehensive biological opinion considering all the information it had available to it, including information regarding the environmental impact of Phase II. The failure to do so was arbitrary and capricious in violation of the ESA.

### 2.    Effects

But even if "agency action" is limited to Phase I, Plaintiffs are correct that the Fish and Wildlife Service was still required to either consider the "effects" of Phase II or provide a reasoned explanation for why such analysis was not

necessary.  Pursuant to the ESA's implementing regulations, the "effects"

considered in a biological opinion are broadly defined to include:

> all consequences to listed species or critical habitat that are caused by
> the proposed action, including the consequences of other activities that
> are caused by the proposed action. A consequence is caused by the
> proposed action if it would not occur but for the proposed action and it
> is reasonably certain to occur. Effects of the action may occur later in
> time and may include consequences occurring outside the immediate
> area involved in the action.

50 C.F.R. § 402.02.  "A conclusion of reasonably certain to occur must be based

on clear and substantial information, using the best scientific and commercial data

available."  50 C.F.R. § 402.17.  The defendants argue that (1) any "consequences"

of the full-scale mining operation are not "caused" by the evaluation adit and

(2) mine operations are not "reasonably certain to occur."  Neither is persuasive.

### a.    Causation

The defendants first rely on the fact that numerous permits and approvals

will be required before Phase II can proceed.  In response, Plaintiffs argue that

causation is met because "but for" the evaluation adit, mining operations would not

proceed.  Pursuant to the ESA's implementing regulations,

> [c]onsiderations for determining that a consequence to the species or
> critical habitat is not caused by the proposed action include, but are not
> limited to:
>
> (1) The consequence is so remote in time from the action under
> consultation that it is not reasonably certain to occur; or
>
> (2) The consequence is so geographically remote from the immediate

area involved in the action that it is not reasonably certain to occur; or

(3) The consequence is only reached through a lengthy causal chain that involves so many steps as to make the consequence not reasonably certain to occur.

§ 402.17(b).  Here, full mine operations would begin immediately after the evaluation adit in the very same area.  As a result, the only real question is whether "a lengthy causal chain" separates the two.  It does not.  While the defendants hang their hats on future environmental review, that review will commence immediately following the adit, apparently based on information obtained during that adit.  The mere requirement that mine operations independently comply with the ESA and other environmental laws is not, by itself, a "lengthy causal chain" despite the amount of time that compliance review may take.  That is especially so given the fact that the Forest Service has previously approved full-scale mining operations for this very Project numerous times over the last two decades.  Causation therefore weighs in favor of Plaintiffs.

### b. Reasonably Certain

The defendants further insist that Phase II is not "reasonably certain" to occur.  While the defendants are correct that this Court's previous "reasonable probability" finding, (*see* Doc. 42 at 10), is not dispositive, the agencies' own record in this case is.  The Fish and Wildlife Service appears to have limited its justification for concluding that mining operations were not "reasonably certain to

occur" to the fact that they were not approved in the 2018 ROD.  *See*

FWS_041199.  This explanation is deficient in at least two ways.  First, defining

"reasonably certain to occur" as that which has been approved as "agency action"

would make the "effects" analysis required by the ESA superfluous.  The two

concepts are not coextensive.  Second, simply adopting the limited scope of the

approval does not show the agency actually considered the question of whether

mine operations were likely.  That absence is especially concerning in this case.

Pursuant to § 402.17(a), nonexclusive factors that bear on whether

something is "reasonably certain to occur" include:

> (1) Past experiences with activities that have resulted from actions that
> are similar in scope, nature, and magnitude to the proposed action;
>
> (2) Existing plans for the activity; and
>
> (3) Any remaining economic, administrative, and legal requirements
> necessary for the activity to go forward.

Given the procedural baggage here, at least two of these factors weigh in favor of a

finding that Phase II is "reasonably certain" to occur.  There are two decades of

agency analysis that considered full mine operations part and parcel of the same

project as the evaluation adit.  Indeed, there are thousands of pages of documents

outlining and approving full-scale mining operations in detail.  The agencies' own

documentation over the past twenty years therefore contains "clear and substantial

information" showing that mine operations are "reasonably certain" to occur.  That

distinguishes this case from other "mineral exploration projects." *See, e.g.*, *Chilkat Indian Vill. of Klukwan v. Bureau of Land Mgm't*, 825 F. App'x 425, 429 (9th Cir. 2020) (indicating that "Intervenors had not proposed or planned for the construction of a mine" following a proposed mineral exploration project in assessing "connected" actions under NEPA).

Accordingly, the Fish and Wildlife Service was required to consider the effects of the entire mining operation or provide a reasonable explanation why it did not so, addressing the administrative history of this case. Because it did not, the 2019 Supplement is infirm.

## B.     2018 ROD

Plaintiffs argue that if the Court sets aside the 2019 Supplement, it must also set aside the 2018 ROD because the Forest Service cannot meet its Section 7 obligations under the ESA "by relying on a Biological Opinion that is legally flawed." *Ctr. for Biological Diversity v. BLM*, 698 F.3d 1101, 1127–28 (9th Cir. 2012). But the defendants insist that the Forest Service may "reasonably" rely on the pared-back 2019 Supplement in light of the Court's 2010 decision upholding the Fish and Wildlife Service's no-jeopardy determination for the entire Project in *Rock Creek Alliance*, 703 F. Supp. 2d 1152. That argument is not persuasive. Not only is the analysis for 2010 over a decade old, but by Federal Defendants' own statement the 2019 Supplement "has the effect of withdrawing all prior analysis,

conclusions, and take statements that do not relate specifically to the Evaluation Project, or Phase I." (Doc. 114 at 8 n.1.)  Accordingly, if the 2019 Supplement is insufficient, there are no fallback documents for the Forest Service to rely on.  As a result, the 2018 ROD is also infirm.

## C.    Remedy

Defendant-Intervenor argues that even if remand is appropriate, vacatur is not because the errors can be fixed on remand and "mining would not occur during the remand period."  (Doc. 110 at 51; Doc. 120 at 27.)  They insist that enjoining the evaluation adit's implementation is inappropriate as Plaintiffs have not demonstrated irreparable harm in the absence of an injunction.  (Doc. 110 at 51 (citing *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 818 (9th Cir. 2018).)  That argument misses the mark.  As argued by Plaintiffs, the APA directs that the "reviewing court shall . . . set aside agency action, findings, and conclusions found to be" arbitrary, capricious, or contrary to law.  5 U.S.C. § 706(2)(A).  There is therefore a presumption of vacatur in most cases, *see All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018), that can only be overcome "[i]n rare circumstances," *Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010).  Such circumstances do not exist here.

While Defendant-Intervenor argues that mine operations cannot begin until after further environmental consultation, the evaluation adit is expected to have

24

environmental impacts in the short term.  It is because of those very impacts—
primarily the influx of workers to the area—that such environmental analysis was
required.  The 2019 Supplement and the 2018 ROD are inconsistent with the ESA
and are therefore set aside.

## II.    **Grizzly Bear Mortality**

Because the 2018 ROD and 2019 Supplement have been set aside based on
the segmentation issue, the Court does not reach the merits of Plaintiffs' grizzly
bear challenge.  Nevertheless, recognizing the limits of judicial review, *see Fed.
Commc'ns Comm'n v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021)
("A court simply ensures that the agency has acted within a zone of reasonableness
and, in particular, has reasonably considered the relevant issues and reasonably
explained that decision."), the Fish and Wildlife Service continues to bet the farm
on the effectiveness of the Project's proposed mitigation measures.  The agency
must therefore ensure that it "acknowledge[s] the gaps in the data," addresses any
countervailing evidence, and adequately explains any new, different, or amended
conclusion.  *Id.* at 1159–60.

### CONCLUSION

Based on the foregoing, IT IS ORDERED that Plaintiffs' motion for
summary judgment (Doc. 106) is GRANTED as to Counts II and III.  The 2019
Supplement and 2018 ROD are VACATED and REMANDED to the agencies for

consideration consistent with this opinion.  Count I is therefore not addressed.

IT IS FURTHER ORDERED that Federal Defendants' and Defendant-Intervenor's cross-motions for summary judgment (Docs. 109, 113) are DENIED.

IT IS FURTHER ORDERED that the Clerk is directed to enter judgment consistent with this decision and close the case file.

DATED this _14_ day of April, 2021.

Donald W. Molloy, District Judge
United States District Court